## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO:  15-00021** |
| **v.** | : | **DATE FILED: July 14, 2015** |
| **WILLIAM J. O'BRIEN III,** | | **VIOLATIONS:** |
| **MICHAEL THOMPSON,** | : | **21 U.S.C. § 846 (conspiracy to** |
| a/k/a "Mikey," | | **distribute controlled substances – 2** |
| a/k/a "Tomato Pie," | | **counts)** |
| **PETER MARRANDINO,** | : | **21 U.S.C. § 841(a)(1), (b)(1)(C)** |
| a/k/a "Petey Adams," | | **(distribution of controlled** |
| a/k/a "Nose," | | **substances – 114 counts)** |
| **JOSEPH MEHL,** | : | **21 U.S.C. § 841(a)(1), (b)(1)(E)** |
| a/k/a "Joseph Montanero," | | **(distribution of controlled** |
| **JOSEPH MITCHELL, SR.,** | | **substances – 7 counts)** |
| **PATRICK TREACY,** | : | **21 U.S.C. § 841(a)(1), (b)(1)(C)** |
| a/k/a "Redneck," | | **(distribution of controlled** |
| **CHARLES JOHNSON,** | | **substances resulting in death – 1** |
| **FRANK CORAZO, JR.,** | | **count)** |
| a/k/a "Stalker," | : | **18 U.S.C. § 1347 (health care fraud –** |
| **JENNIFER LYNN CHAMBERS,** | | **11 counts)** |
| a/k/a "Jennilynn," | : | **18 U.S.C. § 1956(h) (conspiracy to** |
| **ELIZABETH HIBBS,** | | **engage in money laundering – 1** |
| a/k/a "Elizabeth O'Brien" | | **count)** |
| | : | **18 U.S.C. § 371 (conspiracy to** |
| | | **commit bankruptcy fraud – 1 count)** |
| | : | **18 U.S.C. § 152(2) (false oath in** |
| | | **bankruptcy proceedings – 2 counts)** |
| | : | **18 U.S.C. § 2 (aiding and abetting)** |
| | | **Notice of forfeiture** |

## S E C O N D   S U P E R S E D I N G   I N D I C T M E N T

### COUNT ONE
**(Conspiracy to Distribute Controlled Substances)**

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

1.     Defendant WILLIAM J. O'BRIEN III was a doctor of osteopathic medicine licensed by the Commonwealth of Pennsylvania.   Defendant O'BRIEN held Pennsylvania

medical license number OS008318L, and DEA registration number BO3937781.   Defendant

O'BRIEN practiced family medicine.   Defendant O'BRIEN was not certified in pain

management medicine or its related subspecialties; neither had defendant O'BRIEN received

specialized training in pain management medicine or its related subspecialties.

        2.        Defendant WILLIAM J. O'BRIEN III was president and owner of WJO,

Inc. ("WJO"), a group of medical practices.   On or about November 15, 2010, defendant

O'BRIEN filed, in the United States Bankruptcy Court for the Eastern District of Pennsylvania, a

bankruptcy petition for WJO under Chapter 11 of the Bankruptcy Code.

        3.        On or about July 10, 2012, the Trustee appointed by the Bankruptcy Court

terminated the employment of defendant WILLIAM J. O'BRIEN III with WJO.   Thereafter,

defendant O'BRIEN opened a solo practice and began operating as Dr. Bill O'Brien, LLC.

        4.        Angela Rongione (charged elsewhere) was recruited by defendant

WILLIAM J. O'BRIEN III to work as the receptionist at his new practice.   At the time, Rongione

was employed by WJO.   On or about July 16, 2012, Rongione became an employee of Dr. Bill

O'Brien, LLC.

        5.        Defendant O'BRIEN operated his solo practice from various locations

including offices located at 2506 Broad Street, Philadelphia PA (a/k/a "South Philly"); 4432

Bristol Road, Suite 2, Trevose PA (a/k/a "Mega-Gym"); 9892 Bustleton Avenue, Suite 104,

Philadelphia PA (a/k/a "Bustleton"); and 49 Rolling Lane, Levittown PA (a/k/a "Levittown").

Rongione worked for defendant O'BRIEN at each of defendant O'BRIEN's office locations.

        6.        The Controlled Substances Act governs the manufacture, distribution, and

dispensing of controlled substances in the United States.   Under the Controlled Substances Act,

there are five schedules of controlled substances – Schedules I, II, III, IV, and V.   Controlled

substances are scheduled into these levels based upon their potential for abuse, among other

things.   For example, abuse of Schedule II controlled substances may lead to severe psychological

or physical dependence.   Abuse of Schedule III controlled substances may lead to moderate or

low physical dependence or high psychological dependence.   Abuse of Schedule IV controlled

substances may lead to more limited physical dependence or psychological dependence relative to

the drugs or other substances in Schedule III.

       7.     Oxycodone is an opioid medication that is similar to morphine and is

classified as a Schedule II controlled substance.   Oxycodone is used to treat moderate to severe

pain.   Oxycodone contains a narcotic and even if taken only in prescribed amounts, can cause

physical and psychological dependence.   At high doses, oxycodone can cause life threatening

conditions or death, especially if used in combination with other narcotics or alcohol.   Oxycodone

is often used in combination pain relief drugs.   For example, Percocet, which is a Schedule II

controlled substance, is used to treat moderate to moderately severe pain, and contains two drugs,

acetaminophen and 10 mg of oxycodone.   Percocet is manufactured by numerous pharmaceutical

companies under the following brand names:   Endocet, Roxicet, Roxilox and Tylox.

       8.     Methadone is a synthetic opioid that is similar to heroin and is classified as

a Schedule II controlled substance.   Methadone is a highly addictive drug which can cause

life-threatening conditions or death, especially if used in combination with other narcotics or

alcohol.   The primary use for methadone is for the prevention of withdrawal symptoms in patients

addicted to opiate drugs.   For this purpose, methadone must be administered in the context of a

comprehensive treatment program, where the drug has been shown to decrease the rate of relapse

to illicit opioids.   Methadone also can be used to relieve severe pain in patients in need of around

the clock pain medication, and who cannot be safely and effectively treated with other medications.

9.     Alprazolam, more commonly referred to by one of its brand names, Xanax, is the generic name for an addictive prescription sedative and anti-anxiety agent that is classified as a Schedule IV controlled substance.

10.    Title 21, United States Code, Section 841(a)(1), provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally ... manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."

11.    Title 21, United States Code, Section 802(10), provides that the term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for delivery.

12.    Title 21, United States Code, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations relating to the registration and control of the manufacture, distribution and dispensing of controlled substances."

13.    The Attorney General of the United States has exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of 21 Code of Federal Regulations § 1306.04, governing the issuance of prescriptions, which provides, among other things, that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.   Moreover, an order purporting to be a prescription issued not in the usual

4

course of professional treatment is not a prescription within the meaning and intent of section 309 of the Act [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the law relating to controlled substances.

        14.    The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed by the Commonwealth of Pennsylvania to prescribe or dispense controlled substances. Chapter 16.92 provides in pertinent part:

        (a)    A person licensed to practice medicine and surgery in this Commonwealth or otherwise licensed or regulated by the Board, when prescribing, administering or dispensing controlled substances, shall carry out, or cause to be carried out, the following minimum standards:

        (1)    Initial medical history and physical examination.... [B]efore commencing treatment that involves prescribing, administering or dispensing a controlled substance, an initial medical history shall be taken and an initial examination shall be conducted unless emergency circumstances justify otherwise. Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding thirty days. The physical examination shall include an evaluation of the heart, lungs, blood pressure and body functions that relate to the patient's specific complaint.

        (2)    Reevaluations. Among the factors to be considered in determining the number and the frequency of follow-up evaluations that should be recommended to the patient are the condition diagnosed, the controlled substance involved, expected results and possible side effects. For chronic conditions, periodic follow-up evaluations shall be recommended to monitor the effectiveness of the controlled substance in achieving the intended results.

        (3)    Patient counseling. Appropriate counseling shall be given to the patient regarding the condition diagnosed and the controlled substance prescribed, administered or dispensed. Unless the patient is in an inpatient care setting, the patient shall be specifically counseled about dosage levels, instructions for use, frequency and duration of use and possible side effects.

        (4)    Medical Records. [C]ertain information shall be recorded in the patient's medical record on each occasion when a controlled substance is prescribed, administered or dispensed. This information shall include the name of the controlled substance, its strength, the quantity and the date it was prescribed, administered or dispensed to a patient. The medical record shall also include a specification of the symptoms observed and reported, the diagnosis of the condition for which the controlled substance is being given and the directions given to the

5

patient for the use of the controlled substance.   If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall reflect changes in the symptoms observed and reported, in the diagnosis of the condition for which the controlled substance is being given and in the directions given to the patient.

15.     As a doctor of osteopathic medicine, defendant WILLIAM J. O'BRIEN III was authorized to dispense to patients Schedules II, III, IV and V controlled substances and to prescribe medicine to patients, including controlled substances, for legitimate medical purposes and in the usual course of professional practice.

16.     In actuality, defendant WILLIAM J. O'BRIEN III, with the assistance of Angela Rongione, ran a "pill mill" out of defendant O'BRIEN's offices, at which so-called "patients" could for a fee obtain prescriptions for controlled substances without there being any medical necessity for these controlled substances.

### THE CONSPIRACY

17.     From in or about July 2012 until in or about January 2015, in the Eastern District of Pennsylvania, and elsewhere, the defendant,

### WILLIAM J. O'BRIEN III,

conspired and agreed together with Angela Rongione (charged elsewhere) to commit the following offenses against the United States:

a.     to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C); and

b.     to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance

6

containing a detectable amount of alprazolam, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E).

## MANNER AND MEANS

It was part of the conspiracy that:

18.     Defendant WILLIAM J. O'BRIEN III sold prescriptions for Schedule II, Schedule III, Schedule IV, and Schedule V controlled substances from his offices to cash-paying "patients" outside the usual course of professional practice and not for a legitimate medical purpose.

19.     Defendant WILLIAM J. O'BRIEN III generally provided no physical examination or any other medical care or treatment before, or after, prescribing controlled substances in exchange for cash.

20.     Defendant WILLIAM J. O'BRIEN III typically charged "patients" approximately $250 cash for the first appointment to obtain prescriptions for controlled substances and approximately $200 cash for each subsequent appointment.   Defendant O'BRIEN and Angela Rongione referred to this as the "co-pay" to disguise the true nature of the payment.

21.     Angela Rongione assisted defendant WILLIAM J. O'BRIEN III in operating his "pill mill" operation.   Among other things, Rongione collected cash "co-pays," scheduled appointments for defendant O'BRIEN, and kept records of the prescriptions sold by defendant O'BRIEN.

22.     Angela Rongione screened new "patients" for defendant WILLIAM J. O'BREIN III to ensure that the "patient" had been "referred" by an existing "patient" or was otherwise known to defendant WILLIAM J. O'BRIEN III.   For example, Person #1, who was cooperating in the investigation, and whose identity is known to the grand jury, told Rongione that

7

"P.D.," who was a "patient" of defendant O'BRIEN at the time, had referred her to defendant O'BRIEN. Later, defendant O'BRIEN told Person #1 that he wanted to keep the practice "tight" to avoid raising "any flags." In exchange for cash, Person #1 obtained a prescription for narcotics from defendant O'BRIEN at the first appointment without there being a legitimate medical purpose.

23. After Person #1 had been a "patient" of defendant WILLIAM J. O'BRIEN for several months, Person #1 introduced Person #2 to Angela Rongione and to defendant O'BRIEN. Person #1 claimed that Person #2 was her niece. In actuality, Person #2 was a Special Agent of the FBI, acting in an undercover capacity. The same day that Person #1 made the introduction, Person #2 obtained an appointment with defendant O'BRIEN. In exchange for cash, defendant O'BRIEN prescribed narcotics for Person #2 at the first appointment without any legitimate medical purpose. In making his decision regarding how many oxycodone pills to prescribe to Person #2, defendant O'BRIEN asked Person #2, "if you had a big bowl of oxys, how many would you take in a day?"

24. Defendant WILLIAM J. O'BRIEN III generally falsified medical records for "patients" for whom he prescribed controlled substances. Defendant O'BRIEN documented medical charts to make it appear as if defendant O'BRIEN had conducted physical examinations and provided controlled substances for a legitimate medical purpose, when in fact he had not. For example, Person #1's chart reflects a diagnosis, made by defendant O'BRIEN, of post-traumatic cephalgia ("PTC"), a medical condition in which a patient suffers recurring headaches that are caused by a brain injury. Person #1 did not indicate to defendant O'BRIEN that she had experienced a brain injury. Rather, Person #1 told defendant O'BRIEN that she had headaches, but attributed her headaches to "stress" from living with her elderly mother and from her job as a

8

waitress.   Person #1 joked with defendant O'BRIEN that narcotics and alcohol, which are contraindicated, helped her to manage stress.

        25.    To avoid detection by law enforcement, "patients" of defendant WILLIAM J. O'BRIEN III were instructed to fill narcotics prescriptions purchased from defendant O'BRIEN at pharmacies located at a distance from defendant O'BRIEN's offices.   For example, Angela Rongione directed Person #1 to fill her prescriptions in the Roxborough area, where Person #1 claimed to reside, which was approximately 30 miles away from the Bustleton office where Person #1 had obtained prescriptions for controlled substances from defendant O'BRIEN.

## OVERT ACTS

        In furtherance of the conspiracy and to accomplish its objects, defendant WILLIAM J. O'BRIEN III and Angela Rongione, charged elsewhere, committed the following overt acts, among others, in the Eastern District of Pennsylvania:

        1.    On or about January 30, 2014, in Philadelphia, defendant WILLIAM J. O'BRIEN III knowingly and intentionally distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, by selling a prescription for Percocet to Person #1.

        2.    On or about January 30, 2014, in Philadelphia, Angela Rongione collected $200 cash from Person #1 before escorting Person #1 to a private room to obtain prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III.   Rongione instructed Person #1 to fill the prescriptions from defendant O'BRIEN at a pharmacy near where Person #1 resided, and not at a pharmacy located near the Bustleton office.

        3.    On or about the dates listed below, in Philadelphia, defendant WILLIAM J.

9

O'BRIEN III knowingly and intentionally distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, by selling prescriptions for oxycodone to Person #1 as follows:

| APPROXIMATE DATE OF PRESCRIPTION | QUANTITY (20 mg Tablets) | QUANTITY (30 mg Tablets) |
|---|---|---|
| April 3, 2014 | 60 | |
| April 24, 2014 | 60 | |
| May 15, 2014 | 90 | |
| June 2, 2014 | 90 | |
| June 19, 2014 | 90 | |
| July 10, 2014 | 120 | |
| August 7, 2014 | - | 90 |
| August 28, 2014 | - | 120 |
| September 18, 2014 | - | 120 |
| October 9, 2014 | - | 120 |
| October 30, 2014 | - | 120 |

4.      On or about April 3, 2014, April 24, 2014, and October 9, 2014, in Philadelphia, Angela Rongione collected $200 cash from Person #1 before directing Person #1 to a private room to obtain prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III.

5.      On or about the dates listed below, in Philadelphia, defendant WILLIAM J. O'BRIEN III knowingly and intentionally distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, by selling prescriptions for oxycodone to Person #2 as follows:

10

| APPROXIMATE DATE OF PRESCRIPTION | QUANTITY (30 mg Tablets) |
|---|---|
| August 7, 2014 | 120 |
| September 4, 2014 | 120 |
| October 2, 2014 | 180 |
| October 30, 2014 | 180 |
| November 24, 2014 | 180 |

6.     On or about August 7, 2014, in Philadelphia, Angela Rongione collected $250 cash from Person #2 who posed as a "walk-in" patient seeking controlled substances. Rongione advised Person #2 that each subsequent appointment with defendant WILLIAM J. O'BRIEN III would cost $200 cash.   After she collected the cash, Rongione escorted Person #2 to a private room to obtain prescriptions for controlled substances from defendant O'BRIEN.

7.     On or about the dates listed below, in Philadelphia, defendant WILLIAM J. O'BRIEN III knowingly and intentionally distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of alprazolam, a Schedule IV controlled substance, by selling prescriptions for Xanax to Person #1, as follows:

| APPROXIMATE DATE OF PRESCRIPTION | QUANTITY | REFILLS | TOTAL QUANTITY |
|---|---|---|---|
| May 15, 2014 | 40 | 1 | 80 |
| June 2, 2014 | 60 | 5 | 360 |
| June 19, 2014 | 90 | 5 | 540 |
| September 4, 2014 | 60 | - | 60 |
| October 2, 2014 | 60 | - | 60 |
| October 30, 2014 | 60 | - | 60 |
| November 20, 2014 | 60 | - | 60 |
| November 24, 2014 | 60 | - | 60 |

8.     On or about the dates listed below, in Philadelphia, defendant WILLIAM J. O'BRIEN III knowingly and intentionally distributed and dispensed, outside the usual course of

11

professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of alprazolam, a Schedule IV controlled substance, by selling prescriptions for Xanax to Person #2, as follows:

| APPROXIMATE DATE OF PRESCRIPTION | QUANTITY |
|---|---|
| September 4, 2014 | 60 |
| October 2, 2014 | 60 |
| October 30, 2014 | 60 |
| November 24, 2014 | 60 |

9.      As part of the continuing conspiracy, defendant WILLIAM J. O'BRIEN III also was willing to exchange sexual favors for prescriptions and for higher doses of narcotics. For example, on or about October 2, 2014 in a tape recorded meeting with Person #2, who was an undercover FBI agent, defendant O'BRIEN offered to trade a prescription for oral sex.

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO
### (Conspiracy to Distribute Controlled Substances)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.      Paragraphs 1 through 16 and 18 through 25 of Count One are incorporated here.

2.      Beginning in or around at least March 2012, the exact date unknown, defendant JOSEPH MEHL, who was employed as a tow truck driver, referred individuals involved in automobile accidents to defendant WILLIAM J. O'BRIEN III in exchange for prescriptions for controlled substances.   Defendant O'BRIEN prescribed controlled substances for defendant MEHL outside the usual course of professional practice and not for a legitimate medical purpose.

3.      Defendant JOSEPH MEHL introduced S.N. to defendant WILLIAM J. O'BRIEN III.   S.N., who is now deceased and whose identity is known to the grand jury, was a member of the Pagans, an outlaw motorcycle gang known for violence and drug dealing. Through his connection to the Pagans, S.N. had access to illegal drug distributors.   Defendant O'BRIEN and S.N. developed a scheme whereby so-called "patients," including S.N. and others who were recruited by S.N., or recruited by others at S.N.'s direction, would obtain medically unnecessary prescriptions for controlled substances from defendant O'BRIEN in exchange for cash.   With cash-paying "patients," defendant O'BRIEN could conceal money from, among others, creditors and the United States Bankruptcy Court.

4.      After filling the prescriptions, the "patients" would turn the pills over to S.N., or to others at S.N.'s direction.   S.N., or others at S.N.'s direction, would sell the pills to drug dealers.   Certain controlled substances, such as oxycodone (30 mg), were in high demand by

13

drug dealers.   One oxycodone (30 mg) pill could sell for at least approximately $25 on the street.

5.     S.N. recruited defendants MICHAEL THOMPSON and PETER MARRANDINO to assist him and defendant WILLIAM J. O'BRIEN III to further the scheme. Defendants THOMPSON and MARRANDINO obtained prescriptions from defendant O'BRIEN, for themselves and others whom they recruited, for large quantities of controlled substances for resale.

6.     To further expand the drug trafficking conspiracy, defendant MICHAEL THOMPSON permitted other individuals, referred to here as "recruiters," to procure their own "patients" who would work directly for the "recruiters."   These "patients" were allowed to obtain prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III in the same manner as defendant THOMPSON, so long as the "recruiters" paid defendant THOMPSON a share of their profits.

7.     Defendant CHARLES JOHNSON was a "recruiter" for defendant MICHAEL THOMPSON.   Defendant JOHNSON procured "patients" who obtained medically unnecessary prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III for resale.

8.     Defendant FRANK CORAZO, JR. was initially recruited as a "patient" by defendant MICHAEL THOMPSON.   Subsequently, defendant THOMPSON put defendant CORAZO in charge of defendant THOMPSON's "patient" group.

9.     Defendant PATRICK TREACY and defendant JOSEPH MITCHELL, SR., as Pagan members, had access to defendant WILLIAM J. O'BRIEN III and participated in the conspiracy.   Like S.N., defendants TREACY and MITCHELL had access to drug trafficking networks through their association with the Pagans.   Defendants TREACY and MITCHELL

14

obtained medically unnecessary prescriptions from defendant WILLIAM J. O'BRIEN III for large quantities of controlled substances for resale.

        10.     Defendant PATRICK TREACY recruited defendant JENNIFER LYNN CHAMBERS, his then-girlfriend, to obtain medically unnecessary prescriptions from defendant WILLIAM J. O'BRIEN III for large quantities of controlled substances for resale.

### THE CONSPIRACY

        11.     From in or about March 2012, the exact date being unknown, through in or about January 2015, in the Eastern District of Pennsylvania, and elsewhere, defendants

**WILLIAM J. O'BRIEN III,**
**MICHAEL THOMPSON,**
**a/k/a "Mikey,"**
**a/k/a "Tomato Pie,"**
**PETER MARRANDINO,**
**a/k/a "Petey Adams,"**
**a/k/a "Nose,"**
**JOSEPH MEHL,**
**a/k/a "Joseph Montanero,"**
**JOSEPH MITCHELL, SR.,**
**PATRICK TREACY,**
**a/k/a "Redneck,"**
**CHARLES JOHNSON,**
**FRANK CORAZO, JR.,**
**a/k/a "Stalker," and**
**JENNIFER LYNN CHAMBERS,**
**a/k/a "Jennilynn,"**

conspired and agreed together, and with Angela Rongione (charged elsewhere), and with others known and unknown to the grand jury, to commit the following offenses against the United States:

        a.     to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C);

b.      to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C); and

c.      to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of alprazolam, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E).

## MANNER AND MEANS

It was part of the conspiracy that:

12.      Defendant MICHAEL THOMPSON recruited "patients" in furtherance of the conspiracy.   Defendant THOMPSON provided a list to Angela Rongione, or another member of defendant WILLIAM J. O'BRIEN III's office staff, containing the names of recruited "patients" for whom defendant O'BRIEN would write prescriptions for controlled substances.   Angela Rongione, or another employee at her direction, retrieved medical charts for the "patients" on the list for defendant O'BRIEN.   Many of the individuals on defendant THOMPSON's list had either never been to the offices of defendant O'BRIEN, or were rarely present when the prescriptions were sold to defendant THOMPSON.   Consequently, the "patient" charts contained false information regarding medical treatment purportedly provided by defendant O'BRIEN that in fact was not provided.   Defendant THOMPSON obtained medically unnecessary prescriptions for controlled substances in his name and in the names of recruited "patients" from defendant O'BRIEN approximately every two weeks.   To maximize his profits, defendant THOMPSON, a Pennsylvania Medicaid beneficiary, used his Medicaid insurance benefit to pay for his medically

16

unnecessary prescriptions for controlled substances obtained from defendant O'BRIEN.

13.     Defendant MICHAEL THOMPSON permitted Persons #3 and #4, whose identities are known to the grand jury, to establish their own groups of recruited "patients." Person #3 and #4, among others, paid a portion of their profits to defendant THOMPSON.   For their "patients," Persons #3 and #4 paid the required $200 cash "co-pay" to defendant WILLIAM J. O'BRIEN III and also paid the pharmacy its charge to fill the prescriptions.   The "patients" routinely obtained prescriptions for controlled substances from defendant O'BRIEN without there being any medical necessity for these controlled substances.   After obtaining the prescriptions, the "patients" had the prescriptions filled at a pharmacy and then turned the pills over to their "recruiter" for a fee.   The controlled substances would be resold to a drug dealer at a profit. Persons #3 and #4, among others, obtained medically unnecessary prescriptions for controlled substances from defendant O'BRIEN approximately every two weeks.

14.     To reduce his visibility at the offices of defendant WILLIAM J. O'BRIEN III, defendant MICHAEL THOMPSON appointed defendant FRANK CORAZO, JR., who was a "patient" for defendant THOMPSON, to act as his surrogate.   Beginning in or around July 2013, defendant CORAZO would provide defendant THOMPSON's list of names of recruited "patients" to Angela Rongione, or another member of the office staff; defendant O'BRIEN then wrote prescriptions for controlled substances in the names of the "patients" on defendant THOMPSON's list, and provided the medically unnecessary prescriptions to defendant CORAZO.   Each time he obtained prescriptions, defendant CORAZO would pay defendant O'BRIEN $200 in cash for each name on his list.   Defendant CORAZO obtained medically unnecessary prescriptions for controlled substances from defendant O'BRIEN approximately every two weeks.   To maximize his profits, defendant CORAZO, a Pennsylvania Medicaid beneficiary, used his Medicaid

17

insurance benefit to pay for his medically unnecessary prescriptions for controlled substances obtained from defendant O'BRIEN.

15.     As part of his compensation, defendant FRANK CORAZO, JR. also would obtain medically unnecessary prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III, for himself and for his 82-year-old father, who was not even a patient of defendant O'BRIEN.   For example, on or about June 16, 2014, defendant CORAZO obtained from defendant O'BRIEN, identical prescriptions for himself and his father for 120 oxycodone (30 mg) pills; 120 Percocet (10 mg) pills; and 120 alprazolam (2 mg) pills with five refills.   On that same date, in addition to these large quantities of controlled substances, defendant O'BRIEN also prescribed 300 methadone (10 mg) pills for defendant CORAZO.

16.     Defendant FRANK CORAZO, JR. also bought pills from other "recruiters" who had been sponsored by defendant MICHAEL THOMPSON, and whose "patients" obtained prescriptions for them from defendant WILLIAM J. O'BRIEN III.   Defendant CORAZO typically paid the "recruiter" $800 in cash, which included a reimbursement for the fee paid to defendant O'BRIEN, for 120 oxycodone (30 mg) pills.

17.     Defendant CHARLES JOHNSON "recruited" Persons #5 and #6, whose identities are known to the grand jury, among others, both of whom obtained medically unnecessary prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III in exchange for cash.   After the prescriptions were filled, defendant JOHNSON sold the pills to drug dealers.   Person #5 was the mother of defendant JOHNSON's child.   Person #6 was defendant JOHNSON's girlfriend.

18.     Defendant MICHAEL THOMPSON had full access to the "patient" charts maintained at the offices of defendant WILLIAM J. O'BRIEN III.   Defendant THOMPSON used

18

the "patient" charts to audit the activity of others involved in the drug distribution scheme.   For

example, defendant THOMPSON collected a fee from the "recruiter" for, among others, those

"patients" whose chart indicated that "Mike" or "Mike Thompson" had made the referral.   By

reviewing "patient" charts, defendant THOMPSON determined whether the "recruiter" was

withholding money from him.

       19.   Defendant PETER MARRANDINO recruited "patients" in furtherance of

the conspiracy.   Defendant MARRANDINO provided a list to Angela Rongione, or another

member of the office staff, containing the names of recruited "patients," defendant WILLIAM J.

O'BRIEN III then wrote medically unnecessary prescriptions for controlled substances in the

names of the "patients" on defendant MARRANDINO's list.   Angela Rongione, or another

employee at her direction, retrieved medical charts for the "patients" on the list for defendant

O'BRIEN.   Many of the individuals on defendant MARRANDINO's list had either never been to

the offices of defendant O'BRIEN, or were rarely present when the prescriptions were sold to

defendant MARRANDINO.   Consequently, the "patient" charts contained false information

regarding medical treatment purportedly provided by defendant O'BRIEN that in fact was not

provided.   When defendant MARRANDINO obtained prescriptions for controlled substances

from defendant O'BRIEN, he paid defendant O'BRIEN approximately $200 in cash for each

recruited "patient."   Defendant MARRANDINO obtained medically unnecessary prescriptions

for controlled substances for himself and in the names of recruited "patients" from defendant

O'BRIEN approximately every two weeks.

       20.   Defendant PATRICK TREACY regularly obtained medically unnecessary

prescriptions for large quantities of controlled substances from defendant WILLIAM J. O'BRIEN

III for resale.   The Pagans members, like defendant TREACY, generally obtained their

prescriptions at the Levittown office.   Defendant O'BRIEN provided the Pagans members with a separate entrance.   Defendant O'BRIEN referred to defendant TREACY and his associates as his "VIP" patients.   Occasionally, defendant O'BRIEN brought prescriptions for controlled substances to defendant TREACY while defendant TREACY waited outside the office in his car.

21.   Defendant PATRICK TREACY, a 48-year-old man, mockingly reported on the medical history form for his initial visit with defendant WILLIAM J. O'BRIEN III that he had been pregnant "lots" of times; that he was menstruating; and that recently he had a "PAP" test, which screens for cervical cancer.   Notwithstanding the obvious lack of any credible medical information regarding defendant TREACY, defendant O'BRIEN sold defendant TREACY prescriptions for 240 oxycodone (30 mg) pills and 60 Xanax (2 mg) pills at his first visit.

22.   From in or around March 2012 through in or around January 2015, defendant PATRICK TREACY obtained medically unnecessary prescriptions for large quantities of controlled substances for resale from defendant WILLIAM O'BRIEN III for at least approximately 5,280 oxycodone (30 mg) pills; 2,880 oxycodone (15 mg) pills; approximately 1,700 Percocet (10 mg) pills; and 1,410 methadone (10 mg) pills.

23.   In furtherance of the conspiracy, defendant PATRICK TREACY permitted "business" associates to have access to defendant WILLIAM J. O'BRIEN III to obtain prescriptions for controlled substances.   Defendant TREACY received income or other benefits from these arrangements.   For example, defendant TREACY "hooked up John at 7th and Morris with the Doc."   Defendant TREACY claimed that this arrangement generated "$3,000 every two weeks."

24.   Defendant PATRICK TREACY recruited defendant JENNIFER LYNN CHAMBERS to obtain medically unnecessary prescriptions for large quantities of controlled

substances for resale from defendant WILLIAM J. O'BRIEN III.   From in or around February 2014 through in or around May 2014, defendant CHAMBERS obtained approximately 360 oxycodone (30 mg) pills and approximately 180 oxycodone (15 mg) pills.

25.   Defendant JOSEPH MITCHELL, SR., another Pagans member, regularly obtained medically unnecessary prescriptions for large quantities of controlled substances for resale from defendant WILLIAM J. O'BRIEN III.   From in or around September 2012 through in or around April 2014, defendant MITCHELL obtained prescriptions from defendant O'BRIEN for approximately 3,855 oxycodone (30 mg) pills; approximately 3,220 Percocet (10 mg) pills; and approximately 3,780 methadone (10 mg) pills.

26.   Defendant JOSEPH MITCHELL, SR. recruited his 18-year-old son to obtain medically unnecessary prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III.   From in or around January 2013 through in or around November 2013, defendant O'BRIEN provided prescriptions to defendant MITCHELL in the name of defendant MITCHELL's son for approximately 1,400 oxycodone (30 mg) pills; 120 Percocet (10 mg) pills; and 120 methadone (10 mg) pills for resale.

27.   Defendant JOSEPH MEHL recruited "patients," including so-called "accident patients," for defendant WILLIAM J. O'BRIEN III.   Defendant O'BRIEN submitted claims for medical treatment to the "accident patient's" automobile insurance provider for the personal injury protection ("PIP") coverage legally mandated by the state.   The PIP mandate in Pennsylvania was $5,000.   In exchange, defendant O'BRIEN wrote medically unnecessary prescriptions for controlled substances for defendant MEHL and his wife and brother-in law, identified respectively as Persons #7 and #8, whose identities are known to the grand jury.   The "accident patients" also were prescribed controlled substances by defendant O'BRIEN.   After the

21

PIP was exhausted, defendant O'BRIEN transferred the "accident" patients to his "pain management" practice.   To continue to obtain prescriptions for controlled substances, each "patient" was required to pay defendant O'BRIEN $200 in cash at each visit.

      28.    Defendant JOSEPH MEHL regularly obtained medically unnecessary prescriptions from defendant WILLIAM J. O'BRIEN III for large quantities of controlled substances for resale.   From in or around April 2012 through in or around January 2015, defendant MEHL, and Persons #7 and #8, obtained prescriptions from defendant O'BRIEN for approximately 11,980 oxycodone (30 mg) pills; 760 Percocet (10 mg) pills; and approximately 13,140 methadone (10 mg) pills.

      29.    Defendant JOSEPH MEHL recruited dancers from Philadelphia-area men's clubs, including Oasis Gentlemen's Club, which was frequented by Pagans members, to obtain medically unnecessary prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III.   Defendant MEHL would typically pay the pharmacy fee and take a portion of the "patient's" pills for himself.   Defendant O'BRIEN would offer prescriptions for controlled substances in exchange for sex.   For example, in order to obtain prescriptions for controlled substances, Persons #9 and #10, "patients" of defendant O'BRIEN whose identities are known to the grand jury, would perform oral sex on defendant O'BRIEN.

      30.    During the period from in or around March 2012 through in or around January 2015, in furtherance of the conspiracy, defendant WILLIAM J. O'BRIEN III unlawfully dispensed and distributed to defendants MICHAEL THOMPSON, PETER MARRANDINO, JOSEPH MEHL, JOSEPH MITCHELL, SR., PATRICK TREACY, CHARLES JOHNSON, FRANK CORAZO, JR., and JENNIFER LYNN CHAMBERS and their designees, at least approximately 238,895 oxycodone (30 mg) pills; approximately 11,649 oxycodone (15 mg) pills;

approximately 128,370 oxycodone (10 mg) pills (also known as Percocet); and approximately 160,492 methadone (10 mg) pills, all Schedule II controlled substances, all of which were prescribed by defendant O'BRIEN outside the course of professional practice and not for a legitimate medical purpose.

   31. From in or around March 2012 through in or around January 2015, the estimated street value of the controlled substances sold by the conspiracy was at least approximately $5,000,000. Defendant WILLIAM J. O'BRIEN III generated for himself at least approximately $2,000,000 in cash proceeds from the drug trafficking conspiracy.

## OVERT ACTS

   In furtherance of the conspiracy and to accomplish its objects, defendants WILLIAM J. O'BRIEN III, MICHAEL THOMPSON, PETER MARRANDINO, JOSEPH MEHL, JOSEPH MITCHELL, SR., PATRICK TREACY, CHARLES JOHNSON, FRANK CORAZO, JR., and JENNIFER LYNN CHAMBERS committed the following overt acts, among others, in the Eastern District of Pennsylvania, and elsewhere:

   1. On or about the dates listed below, each date constituting a separate overt act, defendant WILLIAM J. O'BRIEN III knowingly and intentionally distributed and dispensed, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, Schedule II controlled substance, by providing medically unnecessary prescriptions to Angela Rongione, as compensation for Rongione's services in furtherance of the conspiracy.

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| February 2, 2014 | oxycodone (30 mg) | 120 |
| February 17, 2014 | oxycodone (30 mg) | 120 |
| March 3, 2014 | oxycodone (30 mg) | 120 |
| March 17, 2014 | oxycodone (30 mg) | 120 |
| March 31, 2014 | oxycodone (30 mg) | 120 |
| April 14, 2014 | oxycodone (30 mg) | 120 |
| April 28, 2014 | oxycodone (30 mg) | 120 |
| May 12, 2014 | oxycodone (30 mg) | 120 |
| May 19, 2014 | oxycodone (30 mg) | 120 |
| June 23, 2014 | oxycodone (30 mg) | 120 |
| July 8, 2014 | oxycodone (30 mg) | 240 |
| August 4, 2014 | oxycodone (30 mg) | 240 |
| August 27, 2014 | oxycodone (30 mg) | 240 |
| September 30, 2014 | oxycodone (30 mg) | 180 |

2.     On or about the dates listed below, each date constituting a separate overt act, defendant MICHAEL THOMPSON knowingly and intentionally obtained prescriptions in his name from defendant WILLIAM J. O'BRIEN III, outside the usual course of professional practice and not for a legitimate medical purpose, containing a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, and a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, for the purpose of resale:

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| August 2, 2012 | Percocet | 120 |
| August 6, 2012 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| September 17, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| October 1, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| October 15, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| November 1, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| November 12, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| November 26, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| December 10, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| December 19, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| December 26, 2012 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| January 16, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| January 23, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| February 11, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| February 26, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| March 11, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| March 25, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| April 5, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| April 12, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| April 18, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| May 2, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| May 13, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 360<br>360<br>360 |
| July 8, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| July 22, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| August 5, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |

3.     On or about the dates listed below, each date constituting a separate overt act, defendant FRANK CORAZO, JR. knowingly and intentionally obtained prescriptions in his name from defendant WILLIAM J. O'BRIEN III, outside the usual course of professional practice and not for a legitimate medical purpose, containing a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, and a mixture and substance

26

containing a detectable amount of methadone, a Schedule II controlled substance, for the purpose of resale:

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| September 17, 2012 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
| October 1, 2012 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
| October 15, 2012 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| November 1, 2012 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| November 12, 2012 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| November 26, 2012 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| December 10, 2012 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| December 19, 2012 | methadone (10 mg) | 450 |
|  | oxycodone (30 mg) | 240 |
|  | Percocet | 120 |
| December 26, 2012 | Percocet | 120 |
| January 9, 2013 | Percocet | 120 |
| January 16, 2013 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
| January 23, 2013 | Percocet | 120 |
| January 30, 2013 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
| February 05, 2013 | Percocet | 120 |
| February 13, 2013 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
| February 19, 2013 | Percocet | 120 |
| February 26, 2013 | methadone (10 mg) | 225 |
|  | oxycodone (30 mg) | 120 |
| March 4, 2013 | Percocet | 120 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| March 11, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 225<br>120 |
| March 18, 2013 | Percocet | 120 |
| March 25, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 225<br>120 |
| April 2, 2013 | Percocet | 120 |
| April 5, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 225<br>120 |
| April 12, 2013 | Percocet | 120 |
| April 18, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 225<br>120 |
| April 24, 2013 | Percocet | 120 |
| May 2, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>180 |
| May 13, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 450<br>240<br>240 |
| May 30, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 450<br>240<br>240 |
| July 8, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 225<br>120<br>120 |
| July 22, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 225<br>120<br>120 |
| August 5, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 225<br>120 |
| August 8, 2013 | Percocet | 120 |
| August 15, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 225<br>120<br>120 |
| August 26, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 225<br>120<br>120 |
| September 5, 2013 | methadone (10 mg) | 225 |
| September 16, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 225<br>120<br>120 |

28

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| September 27, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 225<br>120<br>120 |
| October 11, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 225<br>120<br>120 |
| October 30, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 450<br>240<br>240 |
| November 26, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 450<br>240<br>240 |
| January 6, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 600<br>240 |
| January 29, 2014 | Percocet | 80 |
| February 10, 2014 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 300<br>120<br>80 |
| March 6, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 300<br>120 |
| March 24, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 300<br>120 |
| April 14, 2014 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 300<br>120<br>120 |
| April 28, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 300<br>120 |
| May 19, 2014 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 450<br>180<br>120 |
| June 16, 2014 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 300<br>120<br>120 |
| July 7, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 300<br>120 |
| July 14, 2014 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 300<br>120<br>120 |
| August 4, 2014 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 300<br>120<br>120 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| August 25, 2014 | methadone (10 mg) oxycodone (30 mg) Percocet | 600 240 240 |
| October 6, 2014 | methadone (10 mg) oxycodone (30 mg) Percocet | 300 120 120 |
| October 27, 2014 | methadone (10 mg) oxycodone (30 mg) Percocet | 300 120 120 |
| November 17, 2014 | methadone (10 mg) oxycodone (30 mg) Percocet | 300 120 120 |
| December 8, 2014 | methadone (10 mg) oxycodone (30 mg) Percocet | 300 120 120 |
| December 18, 2014 | methadone (10 mg) oxycodone (30 mg) Percocet | 300 120 120 |
| December 22, 2014 | methadone (10 mg) oxycodone (30 mg) Percocet | 300 120 120 |
| January 19, 2015 | methadone (10 mg) oxycodone (30 mg) Percocet | 300 120 120 |

4.      On or about the dates listed below, each date constituting a separate overt act, defendant PETER MARRANDINO knowingly and intentionally obtained prescriptions in his name from defendant WILLIAM J. O'BRIEN III, outside the usual course of professional practice and not for a legitimate medical purpose, containing a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, and a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, for the purpose of resale:

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| August 14, 2012 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| September 5, 2012 | Percocet | 120 |
| October 9, 2012 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| October 24, 2012 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| November 6, 2012 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| December 10, 2012 | Percocet | 120 |
| December 12, 2012 | oxycodone (30 mg) | 120 |
| December 26, 2012 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| January 15, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| January 28, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| February 6, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| February 25, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| March 11, 2013 | oxycodone (30 mg) | 120 |
| March 25, 2013 | methadone (10 mg) | 120 |
| April 10, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| April 22, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| May 6, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| May 20, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| May 31, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| June 13, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| July 8, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| July 22, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| August 5, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| August 19, 2013 | oxycodone (30 mg) Percocet | 120 120 |
| September 3, 2013 | oxycodone (30 mg) Percocet | 120 120 |
| September 16, 2013 | oxycodone (30 mg) Percocet | 120 120 |
| September 30, 2013 | oxycodone (30 mg) Percocet | 120 120 |
| October 14, 2013 | oxycodone (30 mg) Percocet | 120 120 |
| October 28, 2013 | oxycodone (30 mg) Percocet | 120 120 |
| November 13, 2013 | oxycodone (30 mg) Percocet | 120 120 |
| November 27, 2013 | oxycodone (30 mg) Percocet | 120 90 |
| December 19, 2013 | methadone (10 mg) oxycodone (30 mg) | 120 120 |
| January 26, 2014 | methadone (10 mg) oxycodone (30 mg) | 120 120 |
| February 15, 2014 | methadone (10 mg) oxycodone (30 mg) | 120 120 |

5.      On or about the dates listed below, each date constituting a separate overt act, defendant PATRICK TREACY knowingly and intentionally obtained prescriptions from defendant WILLIAM J. O'BRIEN III, outside the usual course of professional practice and not for a legitimate medical purpose, containing a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, and a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, for the purpose of resale:

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| March 1, 2012 | oxycodone (30 mg) | 240 |
| March 22, 2012 | oxycodone (30 mg) | 240 |

32

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| September 19, 2012 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| September 27, 2012 | oxycodone (15 mg) | 60 |
| October 3, 2012 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| October 11, 2012 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| November 1, 2012 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| November 6, 2012 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| November 12, 2012 | methadone (10 mg) | 90 |
| November 20, 2012 | methadone (10 mg) | 90 |
| | oxycodone (30 mg) | 120 |
| December 4, 2012 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| December 11, 2012 | oxycodone (30 mg) | 240 |
| | Percocet | 240 |
| January 15, 2013 | oxycodone (30 mg) | 240 |
| | Percocet | 240 |
| January 29, 2013 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| February 11, 2013 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| February 25, 2013 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| March 11, 2013 | methadone (10 mg) | 150 |
| | oxycodone (30 mg) | 90 |
| March 25, 2013 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| April 22, 2013 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| May 6, 2013 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| May 21, 2013 | oxycodone (30 mg) | 120 |
| | oxycodone (15 mg) | 120 |
| June 4, 2013 | oxycodone (30 mg) | 120 |
| | oxycodone (15 mg) | 120 |
| July 16, 2013 | oxycodone (30 mg) | 120 |
| | oxycodone (15 mg) | 120 |

33

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| July 29, 2013 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>90 |
| August 13, 2013 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| August 21, 2013 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| September 3, 2013 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| September 18, 2013 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| September 25, 2013 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| December 3, 2013 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| December 24, 2013 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| January 7, 2014 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| February 11, 2014 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| March 11, 2014 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| April 1, 2014 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| April 16, 2014 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120 |
| May 6, 2014 | oxycodone (30 mg)<br>oxycodone (15 mg) | 240<br>240 |
| November 11, 2014 | methadone (10 mg)<br>oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120<br>120 |
| December 16, 2014 | methadone (10 mg)<br>oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120<br>120 |
| January 7, 2015 | methadone (10 mg)<br>oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120<br>120 |
| January 28, 2015 | methadone (10 mg)<br>oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>120<br>120 |

6.     On or about the dates listed below, each date constituting a separate overt act, defendant JOSEPH MITCHELL, SR. knowingly and intentionally obtained prescriptions in his name from defendant WILLIAM J. O'BRIEN III, outside the usual course of professional practice and not for a legitimate medical purpose, containing a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, and a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, for the purpose of resale:

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| August 20, 2012 | methadone (10 mg) | 90 |
|  | oxycodone (30 mg) | 90 |
| September 13, 2012 | methadone (10 mg) | 90 |
|  | oxycodone (30 mg) | 90 |
| October 1, 2012 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| October 15, 2012 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| November 1, 2012 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| November 12, 2012 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| November 26, 2012 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| December 11, 2012 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |
| December 26, 2012 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 120 |
|  | Percocet | 120 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| January 8, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| January 23, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| February 5, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| February 19, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| March 11, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| March 29, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| April 12, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| April 24, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| May 8, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| May 22, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| June 25, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| July 9, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>120 |
| July 24, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 120<br>120<br>90 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| August 13, 2013 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| | Percocet | 90 |
| August 28, 2013 | oxycodone (30 mg) | 120 |
| | Percocet | 120 |
| October 1, 2013 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| | Percocet | 90 |
| October 14, 2013 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| | Percocet | 90 |
| October 29, 2013 | methadone (10 mg) | 120 |
| | Percocet | 120 |
| November 12, 2013 | methadone (10 mg) | 120 |
| | Percocet | 90 |
| February 25, 2014 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| | Percocet | 80 |
| April 9, 2014 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| | Percocet | 80 |
| April 30, 2014 | methadone (10 mg) | 120 |
| | oxycodone (30 mg) | 120 |
| | Percocet | 80 |

7.    In or around May 2014, defendant WILLIAM J. O'BRIEN III, at the direction of defendant MICHAEL THOMPSON, "discharged" defendant JOSEPH MITCHELL, SR. from his practice.   The abrupt "discharge" left defendant MITCHELL without a source of controlled substances for resale.   Defendant MITCHELL complained to defendant PATRICK TREACY that he had been "cut off from the doc" at the direction of defendant THOMPSON.   As a result of losing income from his role in the conspiracy, defendant MITCHELL was "forced" to seek legitimate employment.   Defendant MITCHELL complained to defendant TREACY that "workin' every day . . .is for the birds . . . ain't for Pagans."

37

8.     On or about the dates listed below, each date constituting a separate overt act, defendant CHARLES JOHNSON knowingly and intentionally obtained prescriptions in his name from defendant WILLIAM J. O'BRIEN III, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, and a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, for the purpose of resale:

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| October 28, 2013 | oxycodone (30 mg)<br>Percocet | 120<br>120 |
| November 12, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 90<br>90<br>90 |
| November 26, 2013 | methadone (10 mg)<br>oxycodone (30 mg)<br>Percocet | 90<br>90<br>90 |
| December 17, 2013 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| January 7, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| January 28, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| February 18, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| March 11, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| April 1, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| April 22, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| May 13, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| June 3, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| June 25, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| July 15, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| August 5, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| August 26, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| September 17, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| October 8, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| October 28, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| November 18, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| December 9, 2014 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| January 6, 2015 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |
| January 28, 2015 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |

9.     On or about the dates listed below, each date constituting a separate overt act, defendant JOSEPH MEHL knowingly and intentionally obtained prescriptions from defendant WILLIAM J. O'BRIEN III, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, and a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, for the purpose of resale:

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| July 12, 2012 | methadone (10 mg) | 120 |
| July 16, 2012 | methadone (10 mg) | 180 |
| July 19, 2012 | methadone (10 mg)<br>oxycodone (30 mg) | 120<br>120 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| July 26, 2012 | methadone (10 mg) | 135 |
| August 6, 2012 | methadone (10 mg) | 120 |
| August 9, 2012 | oxycodone (30 mg) | 120 |
| August 20, 2012 | methadone (10 mg) oxycodone (30 mg) Percocet | 120 180 100 |
| September 10, 2012 | methadone (10 mg) oxycodone (30 mg) | 240 120 |
| September 17, 2012 | methadone (10 mg) oxycodone (30 mg) | 120 120 |
| September 19, 2012 | oxycodone (30 mg) Percocet | 120 120 |
| September 26, 2012 | methadone (10 mg) oxycodone (30 mg) | 180 180 |
| October 1, 2012 | methadone (10 mg) oxycodone (30 mg) Percocet | 75 120 75 |
| October 15, 2012 | methadone (10 mg) oxycodone (30 mg) Percocet | 120 120 75 |
| October 25, 2012 | methadone (10 mg) oxycodone (30 mg) Percocet | 120 120 120 |
| November 5, 2012 | methadone (10 mg) oxycodone (30 mg) | 120 120 |
| November 19, 2012 | methadone (10 mg) oxycodone (30 mg) | 90 120 |
| January 9, 2013 | methadone (10 mg) oxycodone (30 mg) | 90 90 |
| January 22, 2013 | methadone (10 mg) oxycodone (30 mg) | 120 90 |
| March 18, 2013 | oxycodone (30 mg) | 90 |
| April 3, 2013 | oxycodone (30 mg) Percocet | 90 |
| April 23, 2013 | methadone (10 mg) oxycodone (30 mg) | 90 90 |
| May 7, 2013 | methadone (10 mg) oxycodone (30 mg) | 120 90 |
| May 21, 2013 | methadone (10 mg) oxycodone (30 mg) | 120 90 |

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| June 4, 2013 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 90 |
| June 18, 2013 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 90 |
| July 22, 2013 | methadone (10 mg) | 120 |
|  | oxycodone (30 mg) | 90 |

10.     On or about July 26, 2012, in furtherance of the conspiracy, defendant JOSEPH MEHL recruited Person #7 to obtain prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III outside the usual course of professional practice and not for a legitimate medical purpose.   From on or about July 26, 2012 through on or about January 21, 2015, Person #7 obtained prescriptions for approximately 7,110 oxycodone (30 mg) pills; and approximately 9,780 methadone (10 mg) pills, both Schedule II controlled substances for the purpose of resale.

11.     On or about May 14, 2014, in furtherance of the conspiracy, defendant JOSEPH MEHL recruited Person #8 to obtain prescriptions for controlled substances from defendant WILLIAM J. O'BRIEN III outside the usual course of professional practice and not for a legitimate medical purpose.   From on or about May 14, 2014 through on or about January 21, 2015, Person #8 obtained prescriptions for approximately 4,440 oxycodone (30 mg) pills; and approximately 1,200 methadone (10 mg) pills, both Schedule II controlled substances for the purpose of resale.

12.     On or about the dates listed below, each date constituting a separate overt act, defendant JENNIFER LYNN CHAMBERS knowingly and intentionally obtained prescriptions from defendant WILLIAM J. O'BRIEN III, outside the usual course of professional

41

practice and not for a legitimate medical purpose, for a mixture and substance containing a

detectable amount of oxycodone, a Schedule II controlled substance for the purpose of resale:

| APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|
| February 11, 2014 | oxycodone (30 mg) | 60 |
| February 25, 2014 | oxycodone (30 mg) | 60 |
| March 11, 2014 | oxycodone (15 mg) | 60 |
| March 25, 2014 | oxycodone (30 mg) | 120 |
| April 9, 2014 | oxycodone (15 mg) | 60 |
| May 7, 2014 | oxycodone (30 mg)<br>oxycodone (15 mg) | 120<br>60 |

13.     On or about May 14, 2014, defendant JENNIFER LYNN CHAMBERS,

with the assistance of defendant JOSEPH MEHL, attempted to obtain prescriptions for controlled

substances from defendant WILLIAM J. O'BRIEN III.   Defendant CHAMBERS told defendant

PATRICK TREACY that she would sell the prescriptions to raise money for him.

14.     On or about May 8, 2014, defendant PATRICK TREACY was incarcerated

in Philadelphia.   While defendant TREACY was in prison, defendant JENNIFER LYNN

CHAMBERS was ostracized by the Pagans.   As a result, on or about May 21, 2014, at the

direction of defendant MICHAEL THOMPSON, defendant WILLIAM J. O'BRIEN III

"discharged" defendant CHAMBERS from his practice.   Defendant TREACY told defendant

CHAMBERS that she had been ostracized because defendant CHAMBERS was using heroin.

Defendant TREACY explained, "I'm part of an organized crime family . . . they won't let me be

with you if you are using!"

All in violation of Title 21, United States Code, Section 846.

## COUNTS THREE THROUGH ONE HUNDRED SIXTEEN
### (Distribution of Schedule II Controlled Substances)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 16 and 18 through 25 of Count One, and Paragraphs 2 through 10 and 12 through 31 of Count Two are incorporated here.

2.      On or about each of the dates listed below in the Eastern District of Pennsylvania, defendant

### WILLIAM J. O'BRIEN III

knowingly and intentionally distributed and dispensed, outside the usual course of professional practice and for no legitimate medical purpose, a mixture and substance containing a detectable amount of the Schedule II controlled substance listed (each distribution constituting a separate count of this indictment):

| COUNT | PERSON | APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|---|---|
| 3 | Person #1 | April 3, 2014 | oxycodone (20 mg) | 60 |
| 4 | Person #1 | April 24, 2014 | oxycodone (20 mg) | 60 |
| 5 | Person #1 | May 15, 2014 | oxycodone (20 mg) | 90 |
| 6 | Person #1 | June 2, 2014 | oxycodone (20 mg) | 90 |
| 7 | Person #1 | June 19, 2014 | oxycodone (20 mg) | 90 |
| 8 | Person #1 | July 10, 2014 | oxycodone (20 mg) | 120 |
| 9 | Person #1 | August 7, 2014 | oxycodone (30 mg) | 90 |
| 10 | Person #1 | August 28, 2014 | oxycodone (30 mg) | 120 |
| 11 | Person #1 | September 18, 2014 | oxycodone (30 mg) | 120 |
| 12 | Person #1 | October 9, 2014 | oxycodone (30 mg) | 120 |
| 13 | Person #1 | October 30, 2014 | oxycodone (30 mg) | 120 |
| 14 | Person #1 | November 20, 2014 | oxycodone (30 mg) | 120 |

| COUNT | PERSON | APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|---|---|
| 15 | Person #1 | December 15, 2014 | oxycodone (30 mg) | 120 |
| 16 | Person #2 | August 7, 2014 | oxycodone (30 mg) | 120 |
| 17 | Person #2 | September 4, 2014 | oxycodone (30 mg) | 120 |
| 18 | Person #2 | October 2, 2014 | oxycodone (30 mg) | 180 |
| 19 | Person #2 | October 30, 2014 | oxycodone (30 mg) | 180 |
| 20 | Person #2 | November 24, 2014 | oxycodone (30 mg) | 180 |
| 21 | Person #3 | September 10, 2012 | oxycodone (30 mg) | 120 |
| 22 | Person #3 | September 24, 2012 | oxycodone (30 mg) | 120 |
| 23 | Person #3 | January 5, 2013 | oxycodone (30 mg) | 120 |
| 24 | Person #3 | April 9, 2013 | oxycodone (30 mg) | 240 |
| 25 | Person #4 | October 17, 2012 | oxycodone (30mg) | 240 |
| 26 | Person #4 | March 19, 2013 | oxycodone (30 mg) | 120 |
| 27 | Person #4 | July 15, 2013 | oxycodone (30 mg) | 240 |
| 28 | Person #5 | April 22, 2014 | oxycodone (30 mg) | 120 |
| 29 | Person #6 | January 13, 2015 | oxycodone (30 mg) | 120 |
| 30 | Person #7 | November 5, 2014 | oxycodone (30 mg) | 120 |
| 31 | Person #7 | November 19, 2014 | oxycodone (30 mg) | 120 |
| 32 | Person #7 | December 3, 2014 | oxycodone (30 mg) | 120 |
| 33 | Person #8 | December 3, 2014 | oxycodone (30 mg) | 120 |
| 34 | Person #8 | December 17, 2014 | oxycodone (30 mg) | 240 |
| 35 | Person #8 | January 7, 2015 | oxycodone (30 mg) | 120 |
| 36 | Person #8 | January 21, 2015 | oxycodone (30 mg) | 120 |
| 37 | Person #9 | September 4, 2014 | oxycodone (30 mg) | 120 |
| 38 | Person #9 | September 4, 2014 | amphetamine (30 mg) | 90 |
| 39 | Person #9 | September 4, 2014 | methadone (10 mg) | 150 |

| COUNT | PERSON | APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|---|---|
| 40 | Person #9 | September 4, 2014 | methadone (10 mg) | 30 |
| 41 | C. Johnson | February 18, 2014 | oxycodone (30 mg) | 120 |
| 42 | C. Johnson | March 11, 2014 | oxycodone (30 mg) | 120 |
| 43 | C. Johnson | July 15, 2014 | methadone (10 mg) | 120 |
| 44 | C. Johnson | July 15, 2014 | oxycodone (30 mg) | 120 |
| 45 | Person #10 | March 17, 2014 | oxycodone (30 mg) | 240 |
| 46 | Person #10 | April 14, 2014 | oxycodone (30 mg) | 240 |
| 47 | Person #10 | May 15, 2014 | methadone (10 mg) | 180 |
| 48 | Person #10 | August 28, 2014 | oxycodone (30 mg) | 240 |
| 49 | Person #10 | December 18, 2014 | oxycodone (30 mg) | 240 |
| 50 | Person #10 | January 12, 2015 | methadone (10 mg) | 180 |
| 51 | Person #10 | January 12, 2015 | oxycodone (30 mg) | 240 |
| 52 | Person #11 | May 8, 2013 | oxycodone (30 mg) | 120 |
| 53 | Person #11 | May 8, 2013 | amphetamine (20 mg) | 90 |
| 54 | Person #12 | August 27, 2014 | oxycodone (30 mg) | 120 |
| 55 | Person #12 | September 23, 2014 | oxycodone (30 mg) | 120 |
| 56 | A. Rongione | February 4, 2014 | oxycodone (30 mg) | 120 |
| 57 | A. Rongione | July 8, 2014 | oxycodone (30 mg) | 240 |
| 58 | A. Rongione | August 27, 2014 | oxycodone (30 mg) | 240 |
| 59 | A. Rongione | November 24, 2014 | oxycodone (30 mg) | 240 |
| 60 | J. Mehl | September 26, 2012 | oxycodone (30 mg) | 180 |
| 61 | J. Mehl | October 1, 2012 | oxycodone (30 mg) | 120 |
| 62 | J. Mehl | October 15, 2012 | oxycodone (30 mg) | 120 |
| 63 | F. Corazo Jr. | January 30, 2013 | oxycodone (30 mg) | 120 |
| 64 | F. Corazo Jr. | May 13, 2013 | oxycodone (30 mg) | 240 |
| 65 | F. Corazo Jr. | August 4, 2014 | methadone (10 mg) | 600 |
| 66 | F. Corazo Jr. | August 25, 2014 | methadone (10 mg) | 600 |

| COUNT | PERSON | APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|---|---|
| 67 | M. Thompson | December 26, 2012 | oxycodone (30 mg) | 120 |
| 68 | M. Thompson | May 13, 2013 | oxycodone (30 mg) | 360 |
| 69 | P. Treacy | September 19, 2012 | oxycodone (30 mg) | 120 |
| 70 | P. Treacy | October 3, 2012 | oxycodone (30 mg) | 120 |
| 71 | P. Treacy | December 11, 2012 | oxycodone (30 mg) | 240 |
| 72 | P. Treacy | August 13, 2013 | oxycodone (30 mg) | 120 |
| 73 | P. Treacy | May 6, 2014 | oxycodone (30 mg) | 120 |
| 74 | P. Treacy | May 6, 2014 | oxycodone (15 mg) | 120 |
| 75 | P. Treacy | November 11, 2014 | oxycodone (30 mg) | 120 |
| 76 | P. Treacy | November 11, 2014 | oxycodone (15 mg) | 120 |
| 77 | P. Treacy | December 16, 2014 | oxycodone (30 mg) | 120 |
| 78 | P. Treacy | December 16, 2014 | oxycodone (15 mg) | 120 |
| 79 | P. Treacy | January 7, 2015 | oxycodone (30 mg) | 120 |
| 80 | J. Chambers | March 25, 2014 | oxycodone (30 mg) | 120 |
| 81 | J. Chambers | May 7, 2014 | oxycodone (30 mg) | 120 |
| 82 | J. Mitchell Sr. | April 12, 2013 | oxycodone (30 mg) | 120 |
| 83 | J. Mitchell Sr. | April 24, 2013 | oxycodone (30 mg) | 120 |
| 84 | J. Mitchell Sr. | October 1, 2013 | oxycodone (30 mg) | 120 |
| 85 | J. Mitchell Sr. | October 14, 2013 | oxycodone (30 mg) | 120 |
| 86 | J. Mitchell Sr. | February 25, 2014 | oxycodone (30 mg) | 120 |
| 87 | J. Mitchell Sr. | April 9, 2014 | oxycodone (30 mg) | 120 |
| 88 | J. Mitchell Sr. | April 30, 2014 | oxycodone (30 mg) | 120 |
| 89 | Person #13 | October 14, 2013 | oxycodone (30 mg) | 120 |
| 90 | Person #13 | October 1, 2013 | oxycodone (30 mg) | 120 |
| 91 | S.N. | July 29, 2012 | oxycodone (30 mg) | 120 |
| 92 | S.N. | August 6, 2012 | oxycodone (30 mg) | 120 |

| COUNT | PERSON | APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|---|---|---|---|---|
| 93 | S.N. | September 5, 2013 | oxycodone (30 mg) | 120 |
| 94 | Person #14 | September 24, 2012 | oxycodone (30 mg) | 120 |
| 95 | Person #14 | November 5, 2012 | oxycodone (30 mg) | 120 |
| 96 | Person #14 | January 15, 2013 | oxycodone (30 mg) | 240 |
| 97 | Person #15 | September 5, 2013 | oxycodone (30 mg) | 240 |
| 98 | Person #15 | October 2, 2013 | oxycodone (30 mg) | 240 |
| 99 | Person #15 | August 4, 2014 | oxycodone (30 mg) | 120 |
| 100 | P. Marrandino | August 14, 2012 | oxycodone (30 mg) | 120 |
| 101 | P. Marrandino | November 13, 2013 | oxycodone (30 mg) | 120 |
| 102 | P. Marrandino | December 19, 2013 | oxycodone (30 mg) | 120 |
| 103 | P. Marrandino | January 26, 2014 | oxycodone (30 mg) | 120 |
| 104 | Person #16 | August 1, 2013 | oxycodone (30 mg) | 120 |
| 105 | Person #16 | August 26, 2013 | oxycodone (30 mg) | 120 |
| 106 | Person #17 | December 23, 2013 | oxycodone (30 mg) | 120 |
| 107 | Person #17 | December 11, 2014 | oxycodone (30 mg) | 240 |
| 108 | Person #18 | October 1, 2014 | oxycodone (30 mg) | 120 |
| 109 | Person #18 | October 22, 2014 | oxycodone (30 mg) | 120 |
| 110 | Person #19 | November 13, 2013 | oxycodone (30 mg) | 120 |
| 111 | Person #19 | December 19, 2013 | oxycodone (30 mg) | 120 |
| 112 | Person #20 | October 21, 2014 | oxycodone (30 mg) | 120 |
| 113 | Person #20 | November 4, 2014 | oxycodone (30 mg) | 120 |
| 114 | Person #20 | December 16, 2014 | oxycodone (30 mg) | 240 |
| 115 | Person #21 | December 17, 2013 | oxycodone (30 mg) | 120 |
| 116 | Person #21 | December 17, 2013 | methadone (10 mg) | 60 |

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C).

## COUNTS ONE HUNDRED SEVENTEEN
## THROUGH ONE HUNDRED TWENTY-THREE
### (Distribution of Schedule IV Controlled Substances)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 16 and 18 through 25 of Count One are incorporated here.

2.     On or about each of the dates listed below, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### WILLIAM J. O'BRIEN III

knowingly and intentionally distributed and dispensed, outside the usual course of professional practice and for no legitimate medical purpose, a mixture and substance containing a detectable amount of alprazolam, a Schedule IV controlled substance (each distribution constituting a separate count of this indictment):

| COUNT | PERSON | APPROXIMATE DATE OF PRESCRIPTION | DRUG | QUANTITY |
|-------|--------|----------------------------------|------|----------|
| 117 | Person #1 | May 15, 2014 | Xanax (1 mg) | 40 |
| 118 | Person #1 | June 2, 2014 | Xanax (1 mg) | 60 |
| 119 | Person #1 | November 20, 2014 | Xanax (1 mg) | 60 |
| 120 | Person #2 | September 4, 2014 | Xanax (.5 mg) | 60 |
| 121 | Person #2 | October 2, 2014 | Xanax (.5 mg) | 60 |
| 122 | Person #2 | October 30, 2014 | Xanax (.5 mg) | 60 |
| 123 | Person #2 | November 24, 2014 | Xanax (1 mg) | 60 |

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E).

## COUNT ONE HUNDRED TWENTY-FOUR
### (Distribution of Controlled Substances Resulting in Death)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 16 and 18 through 25 of Count One, and Paragraphs 2 through 10 and 12 through 31 of Count Two are incorporated here.

2.      In addition to medically unnecessary controlled substances, defendant WILLIAM J. O'BRIEN III prescribed other drugs for "patients" to create the appearance that he was operating a legitimate medical practice.   Among other drugs, defendant O'BRIEN prescribed cyclobenzaprine, a muscle relaxant also known as Flexeril®.

3.      On or about December 17, 2013, in Levittown, in the Eastern District of Pennsylvania, defendant

### WILLIAM J. O'BRIEN III

knowingly and intentionally distributed and dispensed, and aided and abetted the distribution and dispensing of, outside the usual course of professional practice and not for a legitimate medical purpose, approximately 120 pills each containing 30 milligrams of oxycodone, each pill of which is a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance; and approximately 60 pills each containing 10 milligrams of methadone, each pill of which is a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance to Person #21, a person known to the grand jury, and the death of Person #21 resulted from the combined use of these substances, with cyclobenzaprine.   Defendant O'BRIEN prescribed for Person #21, 540 pills of cyclobenzaprine each containing 10 milligrams.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), and Title 18, United States Code, Section 2.

49

## COUNT ONE HUNDRED TWENTY-FIVE
## THROUGH ONE HUNDRED THIRTY
### (Health Care Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.       Paragraphs 1 through 16 and 18 through 25 of Count One, and Paragraphs 2 through 10 and 12 through 31 of Count Two are incorporated here.

2.       Keystone First was a "health care benefit program," within the meaning of Title 18, United States Code, Section 24(b).   Keystone First provided health insurance coverage for Pennsylvanians who were eligible to received medical assistance, commonly known as Medicaid.

3.       Defendant MICHAEL THOMPSON was a Medicaid beneficiary.   As a Medicaid beneficiary defendant THOMPSON received prescription drug benefits through Keystone First.

4.       Keystone First would pay for prescription drugs for defendant MICHAEL THOMPSON prescribed by a licensed physician within the usual course of professional practice and for a legitimate medical purpose.   Upon his enrollment with Keystone First, defendant THOMPSON agreed to abide by Keystone First's rules and regulations.

### THE SCHEME TO DEFRAUD

5.       Defendant MICHAEL THOMPSON used Keystone First benefits to pay for medically unnecessary prescriptions for oxycodone (30 mg) pills that defendant THOMPSON obtained from William J. O'Brien III for the purpose of resale.   Defendant THOMPSON falsely represented to Keystone First that the prescriptions were medically necessary.

50

6.     Defendant MICHAEL THOMPSON obtained oxycodone (30 mg) pills at little or no cost to him using his Keystone First benefits.   Defendant THOMPSON then sold the pills to drug dealers.

7.     From in or around August 2012 through in or around August 2013, in the Eastern District of Pennsylvania, and elsewhere, defendant

**MICHAEL THOMPSON,**
**a/k/a "Mikey,"**
**a/k/a "Tomato Pie,"**

knowingly and willfully executed, and aided and abetted, a scheme and artifice to defraud a health care benefit program, that is Keystone First, in connection with the delivery of or payment for health care benefits, items, or services, by means of false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Keystone First, by causing fraudulent health care insurance claims for medically unnecessary prescription drugs to be submitted in the amounts listed below (each claim constituting a separate count of this indictment):

| COUNT | DRUG | APPROXIMATE DATE OF CLAIM | APPROXIMATE AMOUNT OF CLAIM |
|-------|------|---------------------------|-----------------------------|
| 125 | oxycodone (30 mg) | August 13, 2012 | $ 175.58 |
| 126 | oxycodone (30 mg) | September 4, 2012 | $ 175.58 |
| 127 | oxycodone (30 mg) | January 30, 2013 | $ 177.28 |
| 128 | oxycodone (30 mg) | February 26, 2013 | $ 175.58 |
| 129 | oxycodone (30 mg) | July 10, 2013 | $ 199.99 |
| 130 | oxycodone (30 mg) | August 2, 2013 | $ 199.99 |

In violation of Title 18, United States Code, Section 1347.

## COUNT ONE HUNDRED THIRTY-ONE
## THROUGH ONE HUNDRED THIRTY-FIVE
### (Health Care Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.      Paragraphs 1 through 16 and 18 through 25 of Count One, and Paragraphs 2 through 10 and 12 through 31 of Count Two are incorporated here.

2.      Keystone First was a "health care benefit program," within the meaning of Title 18, United States Code, Section 24(b).   Keystone First provided health insurance coverage for Pennsylvanians who were eligible to received medical assistance, commonly known as Medicaid.

3.      Defendant FRANK CORAZO, JR. was a Medicaid beneficiary.   As a Medicaid beneficiary defendant CORAZO received prescription drug benefits through Keystone First.

4.      Keystone First would pay for prescription drugs for defendant FRANK CORAZO, JR. prescribed by a licensed physician within the usual course of professional practice and for a legitimate medical purpose.   Upon his enrollment with Keystone First, defendant CORAZO agreed to abide by Keystone First's rules and regulations.

### THE SCHEME TO DEFRAUD

5.      Defendant FRANK CORAZO, JR. used Keystone First benefits to pay for medically unnecessary prescriptions for oxycodone (30 mg) pills that defendant CORAZO obtained from William J. O'Brien III for the purpose of resale.   Defendant CORAZO falsely represented to Keystone First that the prescriptions were medically necessary.

6.      Defendant FRANK CORAZO, JR. obtained oxycodone (30 mg) pills at little or no cost to him using his Keystone First benefits.   Defendant CORAZO then sold the pills to drug dealers.

7.      From in or around August 2012 through in or around June 2013, in the Eastern District of Pennsylvania, and elsewhere, defendant

**FRANK CORAZO, JR.,**
**a/k/a "Stalker,"**

knowingly and willfully executed, and aided and abetted, a scheme and artifice to defraud a health care benefit program, that is Keystone First, in connection with the delivery of or payment for health care benefits, items, or services, by means of false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Keystone First, by causing fraudulent health care insurance claims for medically unnecessary prescription drugs to be submitted in the amounts listed below (each claim constituting a separate count of this indictment):

| COUNT | DRUG | APPROXIMATE DATE OF CLAIM | APPROXIMATE AMOUNT OF CLAIM |
|---|---|---|---|
| 131 | oxycodone (30 mg) | August 6, 2012 | $ 175.58 |
| 132 | oxycodone (30 mg) | September 17, 2012 | $ 177.28 |
| 133 | oxycodone (30 mg) | October 15, 2012 | $ 177.28 |
| 134 | oxycodone (30 mg) | March 11, 2013 | $ 177.28 |
| 135 | oxycodone (30 mg) | June 28, 2013 | $ 177.28 |

In violation of Title 18, United States Code, Section 1347.

## COUNT ONE HUNDRED THIRTY-SIX
### (Money Laundering Conspiracy)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.      Paragraphs 1 through 16 and 18 through 25 of Count One, and Paragraphs 2 through 10 and 12 through 31 of Count Two are incorporated here.

2.      Defendant WILLIAM J. O'BRIEN III and defendant ELIZABETH HIBBS were married in or around January 2010.   At that time defendant O'BRIEN owned WJO, Inc. ("WJO"), a group of medical practices.   At various times, defendant HIBBS worked as the Chief Executive Officer of WJO and the Chief Operating Officer of WJO.

3.      While working for WJO, defendant ELIZABETH HIBBS became aware that defendant WILLIAM J. O'BRIEN III had begun to prescribe excessive amounts of controlled substances, especially for members or associates of the Pagans, who caused disruptions at certain WJO offices.   Because Pagan members and associates continued to cause disruption at certain WJO offices, members of the office staff expressed strong concerns about their personal safety to Physician #1, who was employed by WJO and whose identity is known to the grand jury.

4.      In or around April 2012, Physician #1 confronted defendant WILLIAM J. O'BRIEN III about these concerns with defendant ELIZABETH HIBBS present.   Defendant HIBBS continued to work for defendant O'BRIEN's medical practices after becoming aware of defendant O'BRIEN's criminal activities.

5.      In or around July 2012, defendants WILLIAM J. O'BRIEN III and ELIZABETH HIBBS were terminated from WJO.   Thereafter, defendant O'BRIEN operated a solo practice as "Dr. Bill O'Brien, LLC."   Defendant HIBBS worked for his practice.   In addition

to periodically assisting defendant O'BRIEN with patients, and acting as the office manager, defendant HIBBS's companies – Rapidly Recover DME and Dragonflies Health Care – were the primary suppliers of durable medical equipment and certain prescription drugs for defendant O'BRIEN's patients.   Defendant O'BRIEN prescribed this durable medical equipment and these prescriptions drugs for virtually every "accident patient" in his practice, and then submitted claims to the patient's automobile insurance provider for Rapidly Recover DME and Dragonflies Health Care.

6.     Defendant ELIZABETH HIBBS, through Rapidly Recover DME and Dragonflies Health Care, received payments by check from the patients' insurance companies. Defendant HIBBS deposited these checks into bank accounts titled to Rapidly Recover DME and Dragonflies Health Care, for which she was the signatory.   From in or around July 2012 through in or around January 2015, defendant HIBBS did not operate cash businesses.

7.     In or around October 2012, defendant ELIZABETH HIBBS trained Angela Rongione, and former staff members Employees #1 and #2, whose identities are known to the grand jury, when defendant WILLIAM J. O'BRIEN III opened the Mega-Gym and Levittown offices.   Defendant HIBBS would periodically work at the reception desk at Levittown and Bustleton.   While working in these offices, defendant HIBBS, among other things, retrieved medical charts and escorted patients to examination rooms.

8.     On or about October 15, 2012 defendant WILLIAM J. O'BRIEN IIII and defendant ELIZABETH HIBBS were officially divorced.   The decree and order of divorce filed in the Court of Common Pleas for Philadelphia County cited "irretrievable breakdown" as the cause for the dissolution of the marriage.   Notwithstanding an "irretrievable breakdown" in their relationship, defendants O'BRIEN and HIBBS resided together, worked together, and by all

outward appearances, appeared to continue to act as husband and wife.

9.     In or around November 2014, defendant WILLIAM J. O'BRIEN III, at the

urging of defendant ELIZABETH HIBBS, terminated Angela Rongione's employment.

Following Rongione's departure, defendant HIBBS worked at Levittown and Bustleton on a

regular basis.   Defendant HIBBS was in a position to observe the "patients" for whom defendant

O'BRIEN was prescribing controlled substances, and the large quantities of controlled substances

that defendant O'BRIEN routinely prescribed for those "patients."   Defendant HIBBS was

licensed as a Physician Assistant in Pennsylvania.   As a trained and experienced Physician

Assistant, defendant HIBBS was knowledgeable about the customary safeguards and regulations

attendant to prescribing controlled substances, and the circumstances indicating that most, if not

all, of the controlled substance prescriptions that defendant O'BRIEN was writing were not for a

legitimate medical purpose.

## THE CONSPIRACY

10.     From in or about July 2012 through in or about January 2015, in the

Eastern District of Pennsylvania, the District of New Jersey, and elsewhere, defendants

### WLLIAM J. O'BRIEN III and
### ELIZABETH HIBBS,
### a/k/a "Elizabeth O'Brien,"

conspired and agreed together to knowingly conduct and attempt to conduct financial transactions

affecting interstate commerce, which involved the proceeds of a specified unlawful activity, that

is, conspiracy to distribute controlled substances, in violation of Title 21, United States Code,

Section 846, and distribution of controlled substances, in violation of Title 21, United States Code,

Section 841(a)(1), and the defendants acted with knowledge that the transaction was designed in

whole or part to conceal and disguise the nature, source, ownership, and control of the proceeds of

56

specified unlawful activity.

## MANNER AND MEANS

It was part of the conspiracy that:

11.     Defendant WILLIAM J. O'BRIEN III sold prescriptions for dangerous and addictive controlled substances without a legitimate medical purpose in exchange for cash. Defendant O'BRIEN required that "patients" pay him a cash fee of $200 before he would see them.   Angela Rongione, charged elsewhere, and others at her direction, placed the daily cash collections in an envelope for defendant O'BRIEN.   Angela Rongione, and others at her direction, placed a receipt, known as a "cash slip," in the medical chart to show defendant O'BRIEN that the "patient" had paid the $200 cash as required.   Before providing the "patient" with prescriptions for controlled substances, defendant O'BRIEN checked the chart for the "cash slip."   At the end of each business day, defendant O'BRIEN reconciled the "cash slips" to the total amount of cash inside the envelope.

12.     Defendant WILLIAM J. O'BRIEN III generated at least approximately $20,000 per week in illegal cash proceeds.   Defendant O'BRIEN did not record the cash receipts in the business accounts titled to "Dr. Bill O'Brien LLC," including those accounts held at TD Bank ending in #7274; #0050; and #5378.

13.     Defendant WILLIAM J. O'BRIEN III directed Employee #2 to shred the "cash slips" at the end of each business day.   After he completed his reconciliation of cash receipts, defendant O'BRIEN would place a note on the pile of "cash slips" indicating that the documents were ready for shredding.

14.     Defendant WILLIAM J. O'BRIEN III took all of the cash collected in the office.   Defendant O'BRIEN carried the cash outside from the office in his briefcase.   Defendant

O'BRIEN transported thousands of dollars in cash from his office to the residence that he shared with defendant ELIZABETH HIBBS.

15.     Defendant ELIZABETH HIBBS deposited the illicit cash proceeds into various bank accounts, at different banks, and into safety deposit boxes titled in her name or held jointly with one of her daughters.   This elaborate mechanism concealed the fact that the source of the cash was defendant WILLIAM J. O'BRIEN III's illegal drug distribution operation.

16.     Defendant ELIZABETH HIBBS concealed the illicit proceeds generated by defendant WILLIAM J. O'BRIEN III in five accounts, held at three separate banks, including TD Bank account ending in #2312; Wells Fargo Bank account ending in #1846; Wells Fargo Bank account ending in #2086; Wells Fargo Bank account ending in #5603; and National Penn Bank account ending in #8960.

17.     From in or around July 9, 2013 through in or around December 9, 2014, defendant ELIZABETH HIBBS routinely made cash deposits into TD Bank account ending in #2312 for a total of approximately $56,710 over this month period.   Defendant HIBBS typically deposited cash in this account, which was titled to her, on a bi-weekly basis.

18.     From in or around July 2012 through in or around December 1, 2014, defendant ELIZABETH HIBBS deposited approximately $94,100 in cash into Wells Fargo Bank account ending in #1846, a checking account titled to defendant HIBBS.

19.     From in or around February 2013 through in or around December 1, 2014, defendant ELIZABETH HIBBS deposited approximately $43,000 in cash into Wells Fargo Bank account ending in #2086, a checking account titled to defendant HIBBS and her daughter Julianne.

20.     From in or around June 2013 through in or around December 23, 2014 defendant ELIZABETH HIBBS deposited approximately $21,000 in cash into Wells Fargo Bank

account ending in #5603, a checking account titled to defendant HIBBS.

21.     From in or around August 13, 2013 through in or around September 14, 2014, defendant ELIZABETH HIBBS deposited approximately $17,000 in cash into National Penn Bank account ending in #8960, a checking account titled to defendant HIBBS and her daughter Patricia.

22.     From in or around August 1, 2014 through in or around November 12, 2014 defendant ELIZABETH HIBBS deposited approximately $6,600 in cash into National Penn Bank account ending in #6054, a checking account titled to defendant HIBBS.

23.     In furtherance of the conspiracy, defendants ELIZABETH HIBBS and WILLIAM J. O'BRIEN III concealed proceeds from defendant O'BRIEN's drug dealing operation in bank safety deposit boxes.

24.     On or about January 28, 2013, defendant ELIZABETH HIBBS opened safety deposit box #422 at a TD Bank branch in Newtown, PA to conceal criminally derived proceeds.   Safety deposit box #422 was titled to defendant HIBBS and her daughter Patricia, but only defendant HIBBS accessed the box.

25.     On or about November 11, 2014, defendant ELIZABETH HIBBS opened safety deposit box # 1677 at a TD Bank branch located in Philadelphia, PA.   Safety deposit box #1677 was titled to defendant HIBBS.   After she opened safety deposit box #1677, defendant HIBBS did not access it again until its contents, including approximately $58,800 in cash, were seized by federal agents on or about January 29, 2015.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendants WILLIAM J. O'BRIEN III and ELIZABETH HIBBS committed the following overt acts, among

59

others, in the Eastern District of Pennsylvania, the District of New Jersey, and elsewhere:

1.      On or about January 28, 2015, defendant WILLIAM J. O'BRIEN III stored approximately $10,290 in cash, representing proceeds of drug dealing activities, in the residence he shared with defendant ELIZABETH HIBBS in Philadelphia PA.

2.      On or about the dates listed below, each date constituting a separate overt act, defendant ELIZABETH HIBBS deposited cash, obtained from defendant WILLIAM J. O'BRIEN III, into bank accounts titled to her, in order to conceal the illegal source of the proceeds:

| APPROXIMATE DATE | FINANCIAL INSTITUTION | ACCOUNT ENDING in # | AMOUNT of CASH DEPOSITED |
|---|---|---|---|
| July 18, 2012 | Wells Fargo | 1846 | $  800.00 |
| July 24, 2012 | Wells Fargo | 1846 | $4,000.00 |
| August 8, 2012 | Wells Fargo | 1846 | $2,500.00 |
| August 15, 2012 | Wells Fargo | 1846 | $6,000.00 |
| August 24, 2012 | Wells Fargo | 1846 | $3,000.00 |
| September 13, 2012 | Wells Fargo | 1846 | $1,800.00 |
| September 17, 2012 | Wells Fargo | 1846 | $  500.00 |
| September 24, 2012 | Wells Fargo | 1846 | $ 3,800.00 |
| October 4, 2012 | Wells Fargo | 1846 | $1,000.00 |
| October 10, 2012 | Wells Fargo | 1846 | $ 900.00 |
| October 22, 2012 | Wells Fargo | 1846 | $3,300.00 |
| November 1, 2012 | Wells Fargo | 1846 | $2,000.00 |

| APPROXIMATE DATE | FINANCIAL INSTITUTION | ACCOUNT ENDING in # | AMOUNT of CASH DEPOSITED |
|---|---|---|---|
| November 8, 2012 | Wells Fargo | 1846 | $2,000.00 |
| November 14, 2012 | Wells Fargo | 1846 | $1,000.00 |
| November 20, 2012 | Wells Fargo | 1846 | $2,500.00 |
| December 26, 2012 | Wells Fargo | 1846 | $1,900.00 |
| January 28, 2013 | Wells Fargo | 1846 | $2,000.00 |
| February 6, 2013 | Wells Fargo | 2086 | $1,600.00 |
| February 19, 2013 | Wells Fargo | 1846 | $1,000.00 |
| February 19, 2013 | Wells Fargo | 2086 | $3,000.00 |
| February 21, 2013 | Wells Fargo | 1846 | $6,000.00 |
| March 11, 2013 | Wells Fargo | 1846 | $1,100.00 |
| March 15, 2013 | Wells Fargo | 1846 | $3,000.00 |
| March 27, 2013 | Wells Fargo | 1846 | $2,000.00 |
| April 11, 2013 | Wells Fargo | 2086 | $1,000.00 |
| May 2, 2013 | Wells Fargo | 2086 | $2,500.00 |
| May 8, 2013 | Wells Fargo | 1846 | $2,000.00 |
| June 13, 2013 | Wells Fargo | 1846 | $1,500.00 |
| June 13, 2013 | Wells Fargo | 5603 | $   470.00 |
| July 29, 2013 | TD Bank | 2312 | $1,980.00 |
| August 6, 2013 | TD Bank | 2312 | $1,200.00 |
| August 14, 2013 | TD Bank | 2312 | $2,000.00 |
| August 19, 2013 | National Penn | 8960 | $4,500.00 |
| September 4, 2013 | TD Bank | 2312 | $1,000.00 |
| September 5, 2013 | Wells Fargo | 2086 | $2,000.00 |
| September 20, 2013 | TD Bank | 2312 | $   940.00 |
| October 2, 2013 | Wells Fargo | 2086 | $2,000.00 |
| October 7, 2013 | TD Bank | 2312 | $2,000.00 |
| October 9, 2013 | TD Bank | 2312 | $3,000.00 |

| APPROXIMATE DATE | FINANCIAL INSTITUTION | ACCOUNT ENDING in # | AMOUNT of CASH DEPOSITED |
|---|---|---|---|
| October 15, 2013 | Wells Fargo | 1846 | $2,000.00 |
| October 18, 2013 | Wells Fargo | 1846 | $1,000.00 |
| October 22, 2013 | TD Bank | 2312 | $3,000.00 |
| October 23, 2013 | Wells Fargo | 1846 | $3,000.00 |
| October 30, 2013 | Wells Fargo | 1846 | $1,500.00 |
| October 30, 2013 | Wells Fargo | 2086 | $2,000.00 |
| October 30, 2013 | TD Bank | 2312 | $1,500.00 |
| November 6, 2013 | Wells Fargo | 1846 | $1,000.00 |
| November 6, 2013 | Wells Fargo | 5603 | $3,000.00 |
| November 6, 2013 | TD Bank | 2312 | $1,900.00 |
| November 12, 2013 | National Penn | 8960 | $3,250.00 |
| November 12, 2013 | TD Bank | 2312 | $1,750.00 |
| November 18, 2013 | TD Bank | 2312 | $  700.00 |
| November 22, 2013 | Wells Fargo | 1846 | $1,500.00 |
| November 27, 2013 | Wells Fargo | 1846 | $2,200.00 |
| November 27, 2013 | TD Bank | 2312 | $2,700.00 |
| December 4, 2013 | Wells Fargo | 2086 | $2,000.00 |
| December 17, 2013 | TD Bank | 2312 | $3,000.00 |
| December 23, 2013 | Wells Fargo | 1846 | $1,000.00 |
| December 26, 2013 | Wells Fargo | 1846 | $1,000.00 |
| December 26, 2013 | Wells Fargo | 2086 | $2,000.00 |
| December 26, 2013 | TD Bank | 2312 | $2,500.00 |
| January 13, 2014 | Wells Fargo | 1846 | $1,400.00 |
| January 13, 2014 | National Penn | 8960 | $2,000.00 |
| January 13, 2014 | TD Bank | 2312 | $3,500.00 |
| January 15, 2014 | Wells Fargo | 1846 | $1,000.00 |
| January 21, 2014 | TD Bank | 2312 | $ 300.00 |

| APPROXIMATE DATE | FINANCIAL INSTITUTION | ACCOUNT ENDING in # | AMOUNT of CASH DEPOSITED |
|---|---|---|---|
| January 23, 2014 | TD Bank | 2312 | $1,980.00 |
| January 31, 2014 | Wells Fargo | 1846 | $2,000.00 |
| January 31, 2014 | Wells Fargo | 2086 | $2,500.00 |
| February 6, 2014 | Wells Fargo | 5603 | $2,000.00 |
| February 7, 2014 | Wells Fargo | 1846 | $1,000.00 |
| February 21, 2014 | Wells Fargo | 1846 | $2,000.00 |
| February 27, 2014 | TD Bank | 2312 | $1,000.00 |
| March 4, 2014 | Wells Fargo | 5603 | $ 500.00 |
| March 10, 2014 | Wells Fargo | 2086 | $2,500.00 |
| March 19, 2014 | Wells Fargo | 1846 | $ 500.00 |
| March 27, 2014 | Wells Fargo | 2086 | $1,500.00 |
| March 28, 2014 | Wells Fargo | 2086 | $6,000.00 |
| April 7, 2014 | Wells Fargo | 2086 | $2,500.00 |
| April 7, 2014 | Wells Fargo | 5603 | $ 200.00 |
| April 10, 2014 | TD Bank | 2312 | $1,000.00 |
| April 16, 2014 | Wells Fargo | 5603 | $1,000.00 |
| April 24, 2014 | Wells Fargo | 1846 | $1,500.00 |
| May 12, 2014 | Wells Fargo | 2086 | $2,500.00 |
| May 12, 2014 | TD Bank | 2312 | $4,000.00 |
| May 15, 2014 | Wells Fargo | 1846 | $2,000.00 |
| May 15, 2014 | TD Bank | 2312 | $2,000.00 |
| June 3, 2014 | TD Bank | 2312 | $1,500.00 |
| June 3, 2014 | Wells Fargo | 1846 | $ 500.00 |
| June 3, 2014 | Wells Fargo | 2086 | $2,500.00 |
| June 3, 2014 | Wells Fargo | 5603 | $9,000.00 |
| June 3, 2014 | National Penn | 8960 | $3,500.00 |
| July 9, 2014 | Wells Fargo | 2086 | $1,100.00 |

| APPROXIMATE DATE | FINANCIAL INSTITUTION | ACCOUNT ENDING in # | AMOUNT of CASH DEPOSITED |
|---|---|---|---|
| July 17, 2014 | Wells Fargo | 1846 | $3,000.00 |
| July 21, 2014 | TD Bank | 2312 | $  700.00 |
| July 28, 2014 | TD Bank | 2312 | $3,000.00 |
| July 29, 2014 | Wells Fargo | 1846 | $  180.00 |
| August 6, 2014 | TD Bank | 2312 | $1,180.00 |
| August 6, 2014 | Wells Fargo | 2086 | $1,100.00 |
| August 6, 2014 | National Penn | 6054 | $3,000.00 |
| August 8, 2014 | Wells Fargo | 1846 | $  120.00 |
| August 21, 2014 | Wells Fargo | 1846 | $  800.00 |
| August 21, 2014 | Wells Fargo | 2086 | $1,100.00 |
| August 21, 2014 | TD Bank | 2312 | $  600.00 |
| August 28, 2014 | Wells Fargo | 1846 | $  900.00 |
| August 28, 2014 | TD Bank | 2312 | $1,080.00 |
| September 3, 2014 | TD Bank | 2312 | $  500.00 |
| September 10, 2014 | National Penn | 8960 | $4,000.00 |
| September 10, 2014 | National Penn | 6054 | $2,000.00 |
| September 25, 2014 | Wells Fargo | 1846 | $  730.00 |
| October 6, 2014 | Wells Fargo | 2086 | $1,000.00 |
| October 8, 2014 | Wells Fargo | 1846 | $  750.00 |
| October 10, 2014 | TD Bank | 2312 | $  300.00 |
| October 15, 2014 | TD Bank | 2312 | $3,000.00 |
| October 21, 2014 | Wells Fargo | 1846 | $1,000.00 |
| October 21, 2014 | TD Bank | 2312 | $  400.00 |
| October 28, 2014 | TD Bank | 2312 | $  400.00 |
| October 29, 2014 | Wells Fargo | 1846 | $  300.00 |
| November 4, 2014 | TD Bank | 2312 | $1,100.00 |
| November 12, 2014 | National Penn | 6054 | $1,600.00 |

| APPROXIMATE DATE | FINANCIAL INSTITUTION | ACCOUNT ENDING in # | AMOUNT of CASH DEPOSITED |
|---|---|---|---|
| November 19, 2014 | Wells Fargo | 1846 | $3,780.00 |
| December 1, 2014 | Wells Fargo | 1846 | $   700.00 |
| December 1, 2014 | Wells Fargo | 2086 | $1,100.00 |
| December 15, 2014 | Wells Fargo | 1846 | $   200.00 |
| December 23, 2014 | Wells Fargo | 5603 | $5,000.00 |

3.     On or about November 11, 2014, defendant ELIZABETH HIBBS concealed approximately $58,800 in cash, which represented proceeds from defendant WILLIAM J. O'BRIEN III's drug dealing operation, in TD Bank safety deposit box #1677 located in Philadelphia PA.

4.     From on or about January 28, 2013 to on or about October 21, 2014, defendant ELIZABETH HIBBS concealed approximately $58,050 in cash, which represented proceeds from defendant WILLIAM J. O'BRIEN III's drug dealing operation, in TD Bank safety deposit box #422 located in Newtown, PA.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT ONE HUNDRED THIRTY-SEVEN
### (Conspiracy to Commit Bankruptcy Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 16 and 18 through 25 of Count One, and Paragraphs 2 through 10 and 12 through 31 of Count Two, are incorporated here.

<u>Bankruptcy Background</u>

At all times material to this indictment:

2.      A voluntary bankruptcy was initiated by the filing of a bankruptcy petition (the "petition") in the Bankruptcy Court.   The person or corporation filing the petition was a "debtor" under federal bankruptcy law.   The bankruptcy process was governed by the United States Bankruptcy Code (the "Bankruptcy Code").

3.      Upon the filing of a bankruptcy petition, full financial disclosure was required.   The financial disclosure requirements were the same for individual debtors and corporate debtors.   The debtor was required to fully disclose all financial circumstances, including, among other things, assets, liabilities, income from prior years, and any anticipated income.   Assets included real, personal, tangible and intangible property, whether or not the asset was held in the debtor's name or held in the name of another person or entity on behalf of the debtor.

4.      A bankruptcy "estate" was created upon the filing of a bankruptcy petition, which was a collective reference to all legal or equitable interests of the debtor in property at the time of the bankruptcy filing.   The estate included all property in which the debtor had an interest, even if it were owned or held by another person.

66

5.      Chapter 11 of the Bankruptcy Code allowed a debtor to preserve, protect, and reorganize a financially ailing business.   Reorganization under Chapter 11 allowed the debtor to attempt to restructure pre-filing debts, allows the entity to continue in operation, and offered the debtor an opportunity to repay some debts and discharge the remainder.

6.      Reorganization under Chapter 11 afforded a debtor the chance to remain in possession of its property and control the business operation.   The debtor was therefore known as the "Debtor In Possession" (the "DIP").

7.      The DIP was required to fulfill certain statutory duties of a trustee as specified in Title 11, United States Code, Section 704.   These duties included, among others, collecting and preserving the estate for the benefit of its creditors.   All property that the debtor obtained both before and after the filing of the petition, but before discharge by the bankruptcy court, was property of the estate.   The DIP was required to segregate property of the estate by closing all pre-petition bank accounts, and conducting business transaction through new accounts titled as DIP.   All of the debtor's receipts were required to be deposited into the DIP accounts and all expenditures made from those same accounts.

8.      The DIP was required to provide detailed accounting statements of its operations which were filed with the Bankruptcy Court.   The accounting statements, known as monthly operating reports ("MOR"), were required to include all of the receipts and expenditures of the DIP.   The MOR was used to gauge the ability of the debtor to fund the Chapter 11 reorganization plan to provide payment to the creditors, with the ultimate goal of discharging the bankruptcy petition.

9.      In certain circumstances, such as where fraud, dishonesty, incompetence, or gross mismanagement was suspected, a Chapter 11 Trustee would be appointed.   Rule 2004

of the Federal Rules of Bankruptcy Procedure required that the debtor, and other witnesses, be placed under oath when questioned by the Trustee, or the Trustee's representative, about the DIP's financial affairs.

10.     Defendant WILLIAM J. O'BRIEN III was president and owner of WJO. From in or around November 2010 to in or around July 2012, defendant O'BRIEN and his then-wife, defendant ELIZABETH HIBBS, were employees of WJO.   Defendant HIBBS was WJO's chief operating officer, and during that same period defendants O'BRIEN and HIBBS, at various times, held the position of chief executive officer of WJO.   Defendant O'BRIEN was the sole shareholder of WJO.

11.     On or about November 15, 2010, defendant WILLIAM J. O'BRIEN III voluntarily filed, or caused to be filed, in the United States Bankruptcy Court for the Eastern District of Pennsylvania, a bankruptcy petition for WJO under Chapter 11 of the Bankruptcy Code.   The matter was captioned In re WJO, Inc. and was assigned case number 10-19894. The case remained open at all times relevant to this indictment.

12.     Prior to November 1, 2010, defendant WILLIAM J. O'BRIEN III had consolidated other businesses which he owned, including HyperOx I LP, HyperOx III LP and East Coast TMR Inc., into WJO.

13.     After filing the petition for WJO, as a DIP, defendant WILLIAM J. O'BRIEN III opened new bank accounts for WJO - WJO DIP; and WJO DIP (Payroll).   As a DIP, defendant O'BRIEN was required to use these accounts exclusively for WJO's receipts and disbursements.   These requirements were reviewed with defendant O'BRIEN at the initial debtor interview on December 6, 2010.

68

14.     As of November 15, 2010, the date on which the petition was filed, all of the assets of WJO, including its outstanding receivables, became part of the bankruptcy estate. Specifically, any and all outstanding receivables, although related to services rendered prior to filing for bankruptcy on November 15, 2010, became the legal property of the estate.   On and after November 15, 2010, unless and until the petition was discharged, all billings, receipts, and payments for services rendered by WJO were the property of the estate.

15.     As of November 15, 2010, WJO's accounts receivable were primarily comprised of payments due from medical insurance providers, and from attorneys based on indemnification agreements.   An attorney representing a patient without medical insurance would indemnify defendant WILLIAM J. O'BRIEN III for the cost of the patient's medical treatment.   The patient would not be charged at the time of service.   Instead, defendant O'BRIEN would be paid by the patient's attorney later, with proceeds from the settlement of the patient's personal injury case.

16.     In addition to its core medical practice, WJO provided contract billing and collection services to Philadelphia Family Medical Associates, Inc. ("PFMA").   PFMA was a separate and independent medical practice of Physician #2, whose identity is known to the grand jury.   Physician #2 worked part-time for WJO, but also maintained a solo practice.   Several years before the petition was filed, Physician #2 had contracted with WJO, on behalf of PFMA, for WJO to perform billing and collection services for PFMA.   Employee #3, a WJO employee whose identity is known to the grand jury, would submit insurance claims for PFMA and collect its outstanding receivables.   PFMA typically paid WJO approximately 50% of the total amount collected by Employee #3.   PFMA typically paid WJO by check on a weekly basis.   The checks from PFMA were made payable to defendant WILLIAM J. O'BRIEN III.

69

17.     On or about July 3, 2012, an order was entered by the Bankruptcy Court directing the appointment of Alfred T. Guiliano, Esq. as the Chapter 11 Trustee for WJO.   On or about July 10, 2012, acting in his capacity as the court-appointed Trustee, Mr. Guiliano terminated the employment of defendants WILLIAM J. O'BRIEN, III and ELIZABETH HIBBS with WJO.

18.     Mr. Guiliano initiated an adversary proceeding (Adversary No. 13-372) against defendant WILLIAM J. O'BRIEN III seeking to recover monies that were allegedly taken from the estate by defendant O'BRIEN and converted to defendant O'BRIEN's personal use.   Specifically, Person #22, whose identity is known to the grand jury, sought treatment from defendant O'BRIEN from approximately in or around October 20, 2008 through in or around April 28, 2010 for work-related injuries.   Defendant O'BRIEN claimed that the cost of the medical services that he provided to Person #22 was approximately $135,000.   Liberty Mutual Insurance Company ("Liberty Mutual") provided workmans' compensation coverage for Person #22's employer.   On November 15, 2010, when the petition was filed, the account receivable for services rendered to Person# 22, which defendant O'BRIEN claimed was $135,000, became the property of the bankruptcy estate.

19.     Leslie J. Jandoli, Esq. represented Person #22 in connection with workmans' compensation claims.   In or around August 2012, after defendant WILLIAM J. O'BRIEN III was fired from WJO, Attorney Jandoli settled Person #22's claim with Liberty Mutual.   As part of the settlement, Liberty Mutual offered to pay $40,000 for medical services provided by defendant O'BRIEN to Person #22.   Unaware that defendant O'BRIEN had been fired from WJO, Attorney Jandoli conveyed the offer to defendant O'BRIEN, who accepted it.

70

Defendant O'BRIEN instructed Attorney Jandoli that the settlement check should be made payable to him personally.

20.     On or about September 12, 2012, defendant O'BRIEN deposited the $40,000 check from Liberty Mutual into TD bank account ending in #7274 titled to "Dr. Bill O'Brien LLC" for which he was the authorized signer.

21.     On or about November 29, 2012, Mr. Guiliano, in his capacity as the court-appointed Trustee for WJO, referred In re WJO, Inc., case 10-19894, to the United States Attorney for the Eastern District of Pennsylvania for investigation into allegations of bankruptcy fraud.

22.     On or about April 28, 2014, the Bankruptcy Court entered an order in the adversary proceeding (Adversary No. 13-372) granting summary judgment in favor of the Trustee and against defendant WILLIAM J. O'BRIEN III.   The Court determined that the $40,000 payment from Liberty Mutual was the property of the bankruptcy estate.   Accordingly, the Court entered a judgment against defendant O'BRIEN in the amount of $40,000.   When the Trustee attempted to collect the $40,000 from defendant O'BRIEN, defendant O'BRIEN falsely claimed he did not have any money with which to pay the judgment.

## THE CONSPIRACY

23.     From at least in or about January 2011 to in or about January 2015, in the Eastern District of Pennsylvania, the District of New Jersey, and elsewhere, defendants

**WILLIAM J. O'BRIEN, III and**
**ELIZABETH HIBBS,**
**a/k/a "Elizabeth O'Brien,"**

conspired and agreed together to knowingly and fraudulently conceal, and caused to be concealed, from creditors and the United States Trustee, in connection with WJO bankruptcy

71

case number 10-19894, which is a case under Title 11 of the United States Code, property

belonging to the bankruptcy estate, that is by diverting payments received after November 15,

2010, which were the property of the bankruptcy estate, into personal bank accounts and other

non-DIP accounts, in violation of Title 18, United States Code, Section 152(1).

## MANNER AND MEANS

It was part of the conspiracy that:

24.     Defendant WILLIAM J. O'BRIEN III filed, and caused to be filed, false

and fraudulent MOR statements, which he signed or caused to be signed as true and correct,

under penalty of perjury, in which the defendants intentionally omitted monies received by WJO,

and concealed other material facts, and provided false and misleading information.

25.     WJO employees were instructed to separate any checks for payment on

WJO's accounts receivable which listed defendant WILLIAM J. O'BRIEN III, not WJO, as the

payee.   Defendant O'BRIEN concealed these monies from the Trustee by omitting the

payments from the MOR and then depositing the funds into non-WJO DIP accounts.

26.     In or around January 2011, PFMA was notified that, going forward,

remittance checks for WJO's billing and collection services should be made payable to

"Elizabeth O'Brien" instead of "William J. O'Brien III" as had been the historical practice.

However, the billing and collection services continued to be performed as before by Employee

#3, who was a paid employee of WJO.   Defendant HIBBS did not perform any of the billing or

collection work, yet she collected checks from PFMA and deposited the monies into non-WJO

DIP accounts.   The business relationship between PFMA and WJO was concealed from the

Trustee.

27.     Defendants WILLIAM J. O'BRIEN III and ELIZABETH HIBBS frustrated efforts by the Bankruptcy Court and the Trustee to identify and collect estate property by testifying falsely at hearings and depositions.   For example, on or about June 13, 2012, defendant HIBBS testified falsely that she was performing the billing and collections for PFMA during her free time on weekends to justify the payments to her from PFMA instead of to WJO. On or about October 6, 2014, defendant O'BRIEN testified falsely at a deposition by the Trustee's representative that "he gets nothing" from his business when, at that time, he was generating significant cash proceeds from his drug trafficking operation.   Also on or about October 6, 2014, defendant O'BRIEN further testified that he was living at his Levittown office, or sometimes with an unidentified cousin, because he was broke and homeless.   At that time, defendant O'BRIEN had rented at a luxury condominium in Philadelphia, and resided in Beach Haven, New Jersey and other locations with defendant HIBBS.   Contrary to his testimony, defendant O'BRIEN lived a lavish lifestyle that included Caribbean vacations, designer clothing, and fine dining.

28.     Defendants WILLIAM J. O'BRIEN IIII and ELIZABETH HIBBS were married on or about January 30, 2010.   Defendant O'BRIEN and defendant HIBBS were officially divorced on or about October 15, 2012.   The decree and order of divorce filed in the Court of Common Pleas for Philadelphia County cited "irretrievable breakdown" as the cause for the dissolution of the marriage.   Notwithstanding an alleged "irretrievable breakdown" in their relationship, defendants O'BRIEN and HIBBS resided together, worked together, and by all outward appearances, appeared to continue to act as husband and wife.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendants

WILLIAM J. O'BRIEN III and ELIZABETH HIBBS committed the following overt acts, among

others, in the Eastern District of Pennsylvania, the District of New Jersey, and elsewhere:

        1.      On or about the dates listed below, each date constituting a separate overt

act, defendant ELIZABETH HIBBS knowingly and fraudulently concealed and caused to be

concealed from creditors and from the United States Bankruptcy Trustee the following payments

from PFMA, which were property of the estate, by diverting the payments to Wachovia/Wells

Fargo Bank account ending in #1846, which was titled to her:

| DATE OF DEPOSIT | CHECK NO. | AMOUNT |
|---|---|---|
| February 11, 2011 | 9190 | $4,465.69 |
| February 18, 2011 | 9194 | $6,688.63 |
| February 18, 2011 | 9173 | $8,015.67 |
| February 23, 2011 | 9209 | $2,697.41 |
| March 8, 2011 | 9221 | $4,149.84 |
| March 24, 2011 | 9236 | $2,547.14 |
| March 24, 2011 | 9261 | $4,273.14 |
| April 19, 2011 | 9289 | $5,077.09 |
| April 19, 2011 | 9282 | $4,014.23 |
| May 13, 2011 | 9346 | $5,000.00 |
| May 13, 2011 | 9345 | $6,208.06 |
| May 26, 2011 | 9356 | $6,822.41 |
| May 26, 2011 | 9367 | $2,819.72 |
| June 14, 2011 | 9378 | $3,313.55 |
| June 14, 2011 | 9398 | $3,739.94 |
| July 6, 2011 | 9437 | $2,592.73 |
| July 11, 2011 | 9447 | $5,068.39 |
| July 26, 2011 | 9473 | $2,866.58 |
| August 5, 2011 | 9507 | $2,519.36 |
| October 31, 2011 | 9664 | $1,696.96 |

        2.      On or about the dates listed below, each date constituting a separate overt

act, defendant ELIZABETH HIBBS knowingly and fraudulently concealed, and caused to be

concealed, from creditors and from the United States Bankruptcy Trustee the following

payments from PFMA, which were property of the estate, by diverting these payments to

National Penn Bank account ending in #8960, which was titled to her:

| DATE OF DEPOSIT | CHECK NO. | AMOUNT |
|---|---|---|
| April 18, 2011 | 9268 | $7,607.86 |
| June 22, 2011 | 9414 | $3,210.28 |
| September 8, 2011 | 9527 | $5,920.02 |
| September 8, 2011 | 9556 | $5,789.11 |
| September 8, 2011 | 9557 | $4,754.94 |
| September 8, 2011 | 9518 | $2,997.06 |
| September 8, 2011 | 9585 | $4,631.88 |

      3.      On or about the dates listed below, each date constituting a separate overt

act, defendant ELIZABETH HIBBS knowingly and fraudulently concealed, and caused to be

concealed, from creditors and from the United States Bankruptcy Trustee the following

payments from PFMA, which were property of the bankruptcy estate, by diverting these

payments to a business account at Wachovia/Wells Fargo Bank, titled to "Rapidly Recover,

LLC" account ending in # 1264.   Defendant HIBBS was the only authorized signatory on the

account.

| DATE OF DEPOSIT | CHECK NO. | AMOUNT |
|---|---|---|
| November 9, 2011 | 9677 | $4,727.09 |
| November 9, 2011 | 9640 | $7,237.10 |
| November 9, 2011 | 9654 | $4,692.34 |
| November 9, 2011 | 9693 | $2,991.37 |
| November 17, 2011 | 9706 | $3,014.41 |
| November 28, 2011 | 9724 | $3,686.91 |
| December 12, 2011 | 9749 | $2,243.20 |
| December 12, 2011 | 9739 | $1,746.40 |
| December 23, 2011 | 9773 | $4,430.86 |
| December 28, 2011 | 9788 | $1,596.60 |
| December 28, 2011 | 9797 | $5,326.80 |

| DATE OF DEPOSIT | CHECK NO. | AMOUNT |
|---|---|---|
| January 13, 2012 | 9822 | $4,830.38 |
| January 13, 2012 | 9801 | $2,916.35 |
| February 3, 2012 | 9850 | $4,942.20 |
| February 3, 2012 | 9851 | $1,419.92 |
| February 3, 2012 | 9836 | $614.59 |
| February 8, 2012 | 9866 | $2,269.17 |
| February 16, 2012 | 9873 | $1,018.26 |
| February 27, 2012 | 9888 | $2,250.81 |
| March 1, 2012 | 9897 | $1,562.71 |
| March 9, 2012 | 9918 | $385.01 |
| March 21, 2012 | 9921 | $1,053.89 |
| April 9, 2012 | 9954 | $1,629.68 |
| April 9, 2012 | 9938 | $4,308.81 |
| April 11, 2012 | 9975 | $453.07 |
| April 19, 2012 | 9983 | $4,555.65 |
| April 23, 2012 | 9968 | $3,429.76 |
| May 2, 2012 | 9992 | $4,060.33 |
| May 10, 2012 | 10015 | $3,093.08 |
| May 10, 2012 | 10022 | $5,571.57 |
| May 18, 2012 | 10035 | $1,103.88 |
| May 23, 2012 | 10043 | $2,735.05 |
| June 18, 2012 | 10073 | $1,689.17 |
| June 25, 2012 | 10092 | $1,528.95 |
| June 25, 2012 | 10059 | $2,239.99 |
| July 10, 2012 | 10085 | $2,315.53 |

4.      On or about the dates listed below, each date constituting a separate overt act, defendant ELIZABETH HIBBS knowingly and fraudulently concealed and caused to be concealed from creditors and from the United States Bankruptcy Trustee, the following payments from PFMA, which were property of the bankruptcy estate and which she deposited or caused to be deposited into a personal account at Bank of America, account ending in #0968, titled as "Elizabeth Hibbs."

| DATE OF DEPOSIT | CHECK NO. | AMOUNT |
|---|---|---|
| July 29, 2011 | 9490 | $5,283.52 |
| October 17, 2011 | 9586 | $3,065.99 |

| DATE OF DEPOSIT | CHECK NO. | AMOUNT |
|---|---|---|
| October 17, 2011 | 9614 | $2,596.85 |
| October 17, 2011 | 9602 | $2,934.21 |
| October 17, 2011 | 9624 | $4,165.77 |

5.      On or about the dates listed below, each date constituting a separate overt act, defendant WILLIAM J. O'BRIEN III knowingly and fraudulently concealed, and caused to be concealed, from creditors and from the United States Bankruptcy Trustee the following payments, which were property of the estate, by diverting these payments into Citizens Bank account ending in #2128 which was titled to him:

| DATE OF DEPOSIT | PAYER | CHECK NO. | AMOUNT |
|---|---|---|---|
| July 13, 2011 | Ohio Casualty | 1008141653 | $4,000 |
| July 13, 2011 | Gaber Law Offices | 5102 | $1,500 |
| July 27, 2011 | Gaber Law Offices | 5123 | $2,300 |
| August 3, 2011 | Gaber Law Offices | 5168 | $2,000 |
| August 15, 2011 | Treasurer of PA | 8224180 | $4,000 |
| August 15, 2011 | Treasurer of PA | 8225110 | $4,000 |
| August 24, 2011 | Gaber Law Offices | 5225 | $3,500 |
| August 24, 2011 | Risk Enterprise | 70255047 | $5,000 |
| August 29, 2011 | Gallagher Basset | 67580399 | $4,000 |
| October 12, 2011 | Broadspire | 6510835835 | $4,000 |
| October 12, 2011 | IMX Medical | 4387 | $4,000 |
| December 12, 2011 | Pilgrim's Pride | 32285527 | $4,000 |
| February 13, 2012 | Gaber Law Office | 5754 | $3,200 |
| February 24, 2012 | Gaber Law Office | 5783 | $500 |
| March 2, 2012 | Gaber Law Office | 5849 | $1,400 |
| April 2, 2012 | Gaber Law Office | 5927 | $600 |
| April 2, 2012 | Gaber Law Office | 5908 | $400 |
| May 29, 2012 | CompServices | 1276652 | $2,000 |
| May 31, 2012 | Gaber Law Office | 6142 | $3,500 |

6.      On or about the dates listed below, each date constituting a separate overt act, defendant WILLIAM J. O'BRIEN III knowingly and fraudulently concealed, and cause to be concealed, from creditors and from the United States Bankruptcy Trustee the following

payments, which were property of the bankruptcy estate, by diverting these payments to a

business account at TD Bank, titled as "Dr. Bill O'Brien, LLC," account # 7274.   Defendant

O'BRIEN was the only authorized signatory on the account.

| DATE OF DEPOSIT | PAYER | CHECK NO. | AMOUNT |
|---|---|---|---|
| August 3, 2012 | Gaber Law Office | 6298 | $3,000 |
| August 7, 2012 | Gaber Law Office | 6444 | $3,000 |
| August 31, 2012 | Gaber Law Office | 6492 | $400 |
| September 14, 2012 | Leslie J. Jandoli, Esq. | 1092 | $40,000 |
| October 3, 2012 | Gaber Law Office | 6592 | $1,000 |

All in violation of Title 18, United States Code, Section 371.

## COUNT ONE HUNDRED THIRTY-EIGHT
### (False Oath in Bankruptcy Proceedings)

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.      On or about June 13, 2012, in the Eastern District of Pennsylvania,

defendant

### ELIZABETH HIBBS
### a/k/a "Elizabeth O'Brien"

knowingly and fraudulently made a false material statement under oath in, and in relation to <u>In re</u>

<u>WJO, Inc.</u>, bankruptcy case number 10-19894, by falsely testifying at a hearing before a United

States Bankruptcy Judge that she personally performed the billing and collection services for

Philadelphia Family Medical Associates, Inc., when in truth and in fact, and as the defendant

well knew, the billing and collection services for Philadelphia Family Medical Associates, Inc.

were performed by an employee of WJO, Inc.

        In violation of Title 18, United States Code, Section 152(2).

## COUNT ONE HUNDRED THIRTY-NINE
### (False Oath in Bankruptcy Proceedings)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     On or about October 6, 2014, in the Eastern District of Pennsylvania,

defendant

### WILLIAM J. O'BRIEN III

knowingly and fraudulently made a false material statement under oath in and in relation to In re

WJO, Inc., bankruptcy case number 10-19894, by falsely testifying at a deposition in connection

with an adversary case that he personally received no income and took no money from his

business, Dr. Bill O'Brien, LLC, that he "had nothing" and that he was living in a room in the

office that he was renting in Levittown, when in truth and in fact, as defendant then well knew,

the defendant received numerous cash payments for the sale of prescriptions for controlled

substances which were not deposited into his business bank account.

      In violation of Title 18, United States Code Section 152 (2).

## NOTICE OF FORFEITURE # 1

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     As a result of the violations of Title 21, United States Code, Sections 846 and 841(a)(1) set forth in this indictment, defendants

**WILLIAM J. O'BRIEN III,**
**MICHAEL THOMPSON,**
**a/k/a "Mikey,"**
**a/k/a "Tomato Pie,"**
**PETER MARRANDINO,**
**a/k/a "Petey Adams,"**
**a/k/a "Nose,"**
**JOSEPH MEHL,**
**a/k/a "Joseph Montanero,"**
**JOSEPH MITCHELL, SR.,**
**PATRICK TREACY,**
**a/k/a "Redneck,"**
**FRANK CORAZO, JR.,**
**a/k/a "Stalker,"**
**CHARLES JOHNSON, and**
**JENNIFER LYNN CHAMBERS,**
**a/k/a "Jennilynn,"**

shall forfeit to the United States of America:

(a)     any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offenses;

(b)     any property constituting, or derived from, proceeds obtained directly or indirectly from the commission of such offenses, including but not limited to:

i.     A sum of money equal to at least $5,000,000 in United States currency, representing the amount of proceeds obtained as a result of the conspiracy to violate the Controlled Substances Act, for which the defendants are jointly and severally liable;

ii.     $10,290 in cash seized on or about January 29, 2015 from 1600 Arch Street, Unit xxx3, Philadelphia PA;

81

iii.    $3,000 in cash seized on or about January 29, 2015 from a 2008 KIA Sedona, Pennsylvania License Plate HBE5352, VIN #KNDMB23348624048; and

iv.    $1,256 in cash seized on or about January 29, 2015 from the person of William J. O'Brien III.

2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 21, United States Code, Section 853.

<u>**NOTICE OF FORFEITURE #2**</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.    As a result of the violations of Title 18, United States Code, Section 1956 set forth in this indictment, defendants

**WILLIAM J. O'BRIEN III and**
**ELIZABETH HIBBS,**
**a/k/a "Elizabeth O'Brien"**

shall forfeit to the United States of America any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to:

      i.    A sum of money equal to at least $366,530 in United States currency, representing the amount of proceeds obtained as a result of the conspiracy, for which the defendants are jointly and severally liable;

      ii.    Approximately $58,800 in cash seized on or about January 29, 2015 from TD Bank safety deposit box #1677 located in Philadelphia PA;

      iii.    Jewelry seized on or about January 29, 2015 from TD Bank safety deposit box #1677 located in Philadelphia PA;

      iv.    Approximately $58,050 in cash seized on or about January 29, 2015 from TD Bank safety deposit box #422 located in Newtown PA;.

      v.    Jewelry seized on or about January 29, 2015 from TD Bank safety deposit box # 422 located in Newtown, PA, including but not limited to, a loose diamond within a De Simone jewelry box;

      2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

      a.    cannot be located upon the exercise of due diligence;

83

        b.        has been transferred or sold to, or deposited with, a third party;

        c.        has been placed beyond the jurisdiction of the Court; or

        d.        has been substantially diminished in value,

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property subject to forfeiture.

        All pursuant to Title 18, United States Code, Section 982(a)(1).

84

## <u>NOTICE OF FORFEITURE #3</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.      As a result of the violation of Title 18, United States Code, Section 371 set

forth in this indictment, for conspiracy to commit bankruptcy fraud, and violation of Title 18,

United States Code, Section 152, defendants

**WILLIAM J. O'BRIEN III and**
**ELIZABETH HIBBS,**
**a/k/a "Elizabeth O'Brien"**

shall forfeit to the United States of America any property, real or personal, involved in such

offense, or any property traceable to such property, including but not limited to:

        A sum of money equal to at least $342,504 in United States currency,

representing the amount of proceeds obtained as a result of the bankruptcy fraud conspiracy, for

which the defendants are jointly and severally liable.

        2.      If any of the property subject to forfeiture, as a result of any act or omission

of the defendants:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the Court; or

        d.      has been substantially diminished in value,

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461,

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461.

**A TRUE BILL:**

_____

**GRAND JURY FOREPERSON**

**ZANE DAVID MEMEGER**
**UNITED STATES ATTORNEY**