# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

        v.          :          **CRIMINAL NO. 15-0021**

WILLIAM J. O'BRIEN III          :

## GOVERNMENT'S SENTENCING MEMORANDUM

On June 28, 2016, a jury convicted defendant William J. O'Brien III ("O'Brien") of 123 violations of federal law, including conspiracy; distribution of controlled substance; distribution of controlled substances resulting death; money laundering; bankruptcy fraud; and lying under oath.[1] The depth and breadth of his criminality was astounding.

As proven at trial, the defendant was a drug trafficker with a propensity for violence. He conspired with dangerous outlaws, abused vulnerable victims, and caused the death of at least one person. There was no explanation for his conduct other than unbridled, and amoral, greed. For these reasons, as well as for the reasons provided below, the government recommends a sentence within the advisory guideline range of life imprisonment. All of the appropriate considerations of sentencing show that the defendant deserves nothing less.

---

[1] The defendant was found guilty of two counts of conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(a), (b)(1)(C); 110 counts of unlawfully distributing a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1),(b)(1)(C); seven counts of unlawfully distributing a Schedule IV controlled substance, in violation of 21 U.S.C. § 841(a)(1),(b)(1)(E); one count of conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h); one count of conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C. § 371; one count of making a false oath in a bankruptcy proceeding, in violation of 18 U.C. § 152(2); and one count of unlawfully distributing a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1),(b)(1)(C).

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006). In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc). The failure to properly calculate the advisory guideline range will rarely be harmless error. *United States v. Langford*, 516 F.3d 205, 214-18 (3d Cir. 2008).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United*

2

*States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any properly presented sentencing argument which has colorable legal merit and a factual basis renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors, which support a within-guideline sentence.

## I.   BACKGROUND

On January 20, 2015, O'Brien and his receptionist Angela Rongione ("Rongione") were charged by indictment (Cr. No. 15-0021) with one count of conspiracy to distribute controlled substances outside the scope of professional practice, in violation of 21 U.S.C. § 846.   The indictment furthered charged O'Brien with 26 counts of distributing oxycodone and alprazolam (Xanax), Schedule II and Schedule IV controlled substances respectively, in violation of 21 U.S.C. § 841(a).   The distribution counts were based on prescriptions for these controlled substances that O'Brien sold to a government cooperator and to an FBI undercover agent, which sales were recorded on audio and video tape.

On January 29, 2015, federal agents arrested O'Brien and Rongione, and executed search warrants at multiple locations, including O'Brien's offices and residences in Philadelphia and New Jersey.   Medical charts seized from O'Brien's offices revealed that he was prescribing large quantities of controlled substances to hundreds of patients on a regular basis.   The charts were

devoid of documentation showing that the prescriptions were for a legitimate medical purpose.   In addition, agents recovered cash hidden in the defendant's residence, vehicle, and in two safe deposit boxes titled to his paramour Elizabeth Hibbs ("Hibbs"), and evidence that he routinely destroyed records of his illegal drug proceeds.

On February 24, 2015, O'Brien and Rongione were charged by superseding indictment with one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846.   O'Brien was charged separately with 49 counts of illegal distribution of controlled substances in violation of 21 U.S.C. § 841(a).

The ongoing investigation revealed that O'Brien was working with members of the Pagans Motorcycle Club ("Pagans"), an outlaw gang known for violence and drug dealing.   The Pagans and their associates recruited "pseudo-patients" to buy prescriptions for oxycodone (30 mg), and other drugs, from O'Brien.   Oxycodone (30 mg) was in high demand by drug dealers who could sell each pill on the street for $25 to $30.   O'Brien sold prescriptions for oxycodone (30 mg), and other controlled substances, to hundreds of these "pseudo- patients".   After filling the prescriptions, the Pagans and their underworld associates resold the pills on the street.

On July 14, 2015, O'Brien and nine codefendants, who were Pagans and Pagans associates, were charged in a 139-count Second Superseding Indictment ('the indictment") with conspiracy to distribute controlled substances.   O'Brien was also charged with 121 separate counts of distribution of controlled substances, and distribution resulting in death.   O'Brien and Hibbs were charged with conspiracy to engage in money laundering, conspiracy to commit bankruptcy fraud, and making false statements under oath in bankruptcy proceedings.

On October 8, 2015, O'Brien informed the Court of his desire to proceed *pro se*.   On

November 3, 2015, after conducting an inquiry as required by *United States v Peppers*, 302 F.3d 120 (3d Cir. 2002), the Court granted O'Brien's request.

On May 20, 2016, O'Brien proceeded to trial on the charges in the indictment.  All other defendants pleaded guilty.  Over almost six weeks of trial, the government presented overwhelming evidence proving the defendant's guilt, including: videotapes of the defendant prescribing medically unnecessary controlled substances, in exchange for cash, to an undercover informant and an undercover FBI agent; videotapes and photographs of the defendant meeting with his co-conspirators; patient files that proved, on their face, that the prescriptions written by the defendant were illegitimate; search warrant evidence evincing the vast wealth accumulated by the defendant in his drug-dealing scheme; financial transaction evidence showing the defendant's attempts to disguise the ownership of his drug proceeds by funneling it into Hibbs' accounts; bankruptcy records showing that the defendant claimed he had "nothing," while he lavishly spent his ill-gotten gains; the testimony of coconspirators who recruited "pseudo-patients" who obtained illegal prescriptions for dangerous narcotics from the defendant for resale; the testimony of office workers who observed the defendant's illegal actions and his attempts to conceal those actions; the testimony of "pseudo-patients" for whom the defendant illegally prescribed drugs they never took, which drugs were then sold on the street; testimony of female patients who were drug addicts, from whom the defendant extorted sex acts in exchange for narcotics prescriptions; the defendant's own videotaped post-arrest admissions that he had sex with patients and was a "heavy prescriber;" the testimony of a highly qualified expert witness that all of the defendant's prescriptions charged in the indictment were written outside the course of professional practice and for no legitimate medical purpose; and the testimony of an experienced medical examiner, in conjunction with that of the medical expert, that

the illegitimate prescriptions written by the defendant for oxycodone and methadone resulted in the death of a patient.

Throughout trial, the defendant abused the leeway he was granted by the Court as a *pro se* defendant to badger witnesses, waste the Court's and jury's time, and attempt to derail the proceedings.   Nevertheless, on June 28, 2016, he was found guilty on all but four distribution counts.

## II.   SENTENCING CALCULATION

### A.   Statutory Minimum and Maximum Sentences

a)   The statutory maximum sentence for conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, is 20 years' imprisonment per count (two counts); 3 years to lifetime supervised release; a fine of $1,000,000; and a special assessment of $100.

b)   The statutory maximum for distribution of a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a), (b)(1)(C), is 20 years' imprisonment per count (110 counts); 3 years to lifetime supervised release; a fine of $1,000,000, and a special assessment of $100.

c)   The statutory maximum sentence for distribution of a Schedule IV controlled substance, in violation of 21 U.S.C. § 841(a), (b)(1)(E), is 5 years' imprisonment per count (7 counts); 1 year to lifetime supervised release; a $250,000 fine; and a $100 special assessment.

d)   The statutory minimum sentence for distribution of a Schedule II controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c), is 20 years' imprisonment.   The statutory maximum sentence is life imprisonment; lifetime supervised release; a fine of $1,000,000; and a special assessment of $100.

e)      The statutory maximum sentence for conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956 (h), is 20 years' imprisonment; 3 years of supervised release; a fine of $500,000; and a special assessment of $100.

f)      The statutory maximum sentence for conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C. §§ 371 and 152(1), is 5 years' imprisonment; 3 years of supervised release; a fine of $500,000; and a special assessment of $100.

g)      The statutory maximum sentence for making a false oath in connection with a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2), is 5 years' imprisonment, 3 years of supervised release; a fine of $500,000; and a special assessment of $100.

In all, O'Brien faces a statutory mandatory minimum of 20 years' imprisonment, and a maximum sentence of life in prison[2], fines of $116,250,000; lifetime supervised release; and a special assessment of $12,300.

**B.      Sentencing Guidelines Calculation**

Probation has prepared a PSR that calculated accurately the advisory sentencing guidelines that apply to the defendant, and the government agrees that the defendant's final offense level is 50, calculated as follows:

(i)      **Base Offense Level = 38.**   Pursuant to USSG §2D1.l(a)(2), an offense involving the distribution of a Schedule II controlled substance resulting in death has a base offense level of 38.

---

2      The statutory maximum for distribution of Schedule II controlled substance resulting in death is life in prison.   The total statutory maximum for all other charges is 2,300 years' imprisonment.

(ii)      **Possession of a Dangerous Weapon - +2 levels.**   Pursuant to USSG §2D1.1 (b)(l), two levels are added because coconspirators, at the defendant's direction, used dangerous weapons, that is brass knuckles and a pipe, to threaten a patient in furtherance of the conspiracy.

(iii)      **Made Credible Threats or Used Violence - +2 levels.**   Pursuant to USSG §2D1.l(b)(2), two levels are added because the defendant threatened violence and directed the use of violence during the course of the Count Two conspiracy.

(iv)      **Distribution of Controlled Substance to Pregnant Person -+2 levels.** Pursuant to USSG §2D1.l(b)(15)(B)(iii), two levels are added because the defendant was the leader of the organization, and illegally prescribed a Schedule II controlled substance to a "pseudo-patient" who was 6 months pregnant.

(v)      **Abuse of Trust or Use of Special Skill - +2 levels.**   Pursuant to USSG §3B1.3, two levels are added because the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated or concealment of offense.   The defendant used his medical practice as a front for drug dealing.   As a licensed physician, he was relied on by the public to safely distribute prescriptions for controlled substances in accordance with relevant regulations, and in his position was able to engage in criminal conduct without supervision in a manner that was difficult to detect.   Further, the defendant abused a position of private trust with those patients who came to him for treatment believing that he was acting as a real doctor.   These patients trusted the defendant because he was a physician, and they took the pills he prescribed.   The defendant turned patients into addicts so that he could extort them for cash, and in some cases, for sex.

(vi)      **Role in the Offense - +4 levels.**   Pursuant to USSG §3B1. 1(a), four levels are added because the defendant was an organizer or leader of a criminal activity that involved five or

more participants or was otherwise extensive.

Based on the above, the total offense conduct score is 50.   The base offense level of 38 correlates to the defendant's conviction on Count 124 for causing the death of a patient.   Pursuant to the grouping rules under USSG § 3D1.1, there was no additional penalty for the defendant's conviction for two counts of conspiracy involving the distribution of more than 700,000 pills containing Schedule II controlled substances.   Likewise, there is no additional penalty reflected in the guidelines calculation for his conviction of drug distribution (117 counts); money laundering; bankruptcy fraud; or for making false oath related to bankruptcy proceedings.   According to USSG § 3D1.4 (c), the fact that these offenses do not increase the defendant's guidelines supports a sentence at the higher end of the sentencing range.

Pursuant to USSG Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, as it is here, the offense level will be treated as a Level 43. Therefore, the defendant's sentencing guidelines are calculated using Level 43, the highest offense score contemplated by the guidelines.   The defendant made objections to the PSR's calculation of his sentencing guidelines.   The defendant's objections are baseless.   The government's response to each objection is discussed in more detail in Section IV of this memorandum.

O'Brien has zero criminal history points resulting in a Criminal History Category of I.   For Offense Level 43, and Criminal History Category I, the advisory guidelines recommend life imprisonment.

### III.    ANALYSIS OF FACTORS PURSUANT TO 18 U.S.C. § 3553

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a)

suggests that the most appropriate sentence for this defendant is one within the advisory guideline

range.

The Supreme Court has declared:   "As a matter of administration and to secure nationwide

consistency, the Guidelines should be the starting point and the initial benchmark."   *Gall v. United*

*States*, 552 U.S. 38, 49 (2007).   "These requirements mean that '[i]n the usual sentencing, . . . the

judge will use the Guidelines range as the starting point in the analysis and impose a sentence within

the range."   *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United*

*States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original).   "Common sense

indicates that in general, this system will steer district courts to more within-Guidelines sentences."

*Peugh*, 133 S. Ct. at 2084.   "The federal system adopts procedural measures intended to make the

Guidelines the lodestone of sentencing."   *Id.*

In addition, this Court must also consider all of the sentencing considerations set forth in

Section 3553(a).   Those factors include: (1) the nature and circumstances of the offense and the

history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public

from further crimes of the defendant; (4) the need to provide the defendant with educational or

vocational training, medical care, or other correctional treatment in the most effective manner; (5)

the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found guilty

of similar conduct; and (7) the need to provide restitution to any victims of the offense.   18 U.S.C. §
3553(a).[3]

    1.  <u>The Nature and Circumstances of the Offense and the Defendant's History and
       Characteristics.</u>

The defendant's criminal conduct spanned over many years progressing from bankruptcy

fraud to drug dealing and money laundering.   His crimes were deliberate.   He made a callous,

calculated decision to forsake his duty as a physician to satisfy his greed.   Clearly, he had sufficient

education and skills to earn an honest, respectable living.   But this was not enough.   The defendant

wanted a lavish lifestyle far beyond the means of a doctor with his credentials, without working for

it.   To line his pockets with millions in untraceable cash, the defendant sold thousands of

prescriptions for dangerous and addictive drugs to his drug dealing coconspirators, who resold the

pills.   He was the kingpin of the conspiracy, and he relished the power it gave him.   The defendant

boasted that he had the power of pen.   In the defendant's view, he controlled the prescriptions, so he

also controlled those who wanted them.

The defendant should not be underestimated because of his innocuous appearance and

advanced level of education.   He is a dangerous criminal with a propensity for violence.   To

advance his mercenary agenda, the defendant conspired with the Pagans whose members had access

---

    [3]  Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose
a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in
paragraph (2) of this subsection."   The Third Circuit has held that "district judges are not required
by the parsimony provision to routinely state that the sentence imposed is the minimum sentence
necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not
greater than necessary" language requires as a general matter that a judge, having explained why a
sentence has been chosen, also explain why some lighter sentence is inadequate.'"   *United States v.
Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (*quoting United States v. Navedo Concepcion*, 450 F.3d
54, 58 (1st Cir. 2006)).

to drug distribution networks and scores of "pseudo patients" to buy O'Brien's prescriptions. From July 2012 through January 2015, O'Brien and his coconspirators distributed more than 700,000 illegal pills, containing oxycodone and other dangerous Schedule II and Schedule IV controlled substances, in Philadelphia and surrounding communities.

These gang members committed acts of violence at the defendant's behest, which included collecting money from "patients" who owed O'Brien money. At trial, the Court heard testimony, and recorded evidence, that revealed the defendant's violent nature. During a recorded exchange between O'Brien and his patient Anthony Rongione, now deceased, O'Brien threatened to "fuckin hunt you [Rongione] down like a dog and hurt you" because Rongione owed him money. When Rongione failed to pay, O'Brien sent coconspirators Patrick Treacy ("Treacy"), a Pagans enforcer, and Joseph Mehl ("Mehl") to settle the score. Codefendant Michael Thompson ("Thompson") testified at trial that he was present when O'Brien gave the order, along with Rongione's address, to Mehl. Armed with a pipe, and brass knuckles, Mehl and Treacy threatened Mr. Rongione outside of his residence. Treacy and Mehl fled the scene when a neighbor called the police. The entire incident was captured on a neighbor's security camera and memorialized in police reports. During a post-arrest interview with the FBI, Mehl admitted that he and Treacy went to Rongione's house with these weapons to collect money for O'Brien.

O'Brien employed Pagans to settle personal vendettas as well. Thompson testified that O'Brien wanted his ex-wife ("Kathleen") "beat up, killed." According to Thompson's testimony at trial, O'Brien told him that "she has to go, Mikey." [Trial Transcript June 9, 2016, Page 51]. Thompson said that he refused to harm the mother of O'Brien's three children. Treacy, however, was up for the task. Fortunately, Treacy was arrested before he could complete the job. O'Brien

12

also retaliated against the CFO of his former company, whom O'Brien believed had reported his wrongdoing to the bankruptcy trustee.   Thompson testified that "Beeks," an unindicated coconspirator known to law enforcement as a Pagans member, "gave him [the CFO] a beating" for O'Brien.   [Trial Transcript June 9, 2016, Page 50].

*Vulnerable Victims*

The defendant extorted sex from female "pseudo-patients" who had become desperately addicted to the drugs he prescribed them.   He used his power — the power of the pen — to physically and psychologically debase these vulnerable victims.   Two of these "pseudo-patients" bravely testified at trial.

Kathleen Reeves told the jury that if she wanted prescriptions from the defendant for oxycodone and other drugs, she was required to perform oral sex on him while scores of people were outside in the waiting room.   Ms. Reeves testified "I knew I had no choice."   [Trial Transcript June 14, 2016, Page 54].   Even more shocking was the defendant's conduct with Deanna Lane, who was six months pregnant when he extorted her for sex.   Ms. Lane testified that at the same time she was obtaining medically unnecessary opioids from O'Brien, she was injecting approximately 50 bags of heroin a day.   The defendant saw the extensive needle tracks on her arms; he knew that she was selling her prescriptions for heroin; and he knew that she was pregnant.   Nevertheless, the defendant gave Ms. Lane prescriptions for large quantities of opioids because he wanted sex from her.   During cross-examination, the defendant heartlessly took every opportunity to cause these women more humiliation and shame.

Ms. Reeves and Ms. Lane were not the defendant's only victims.   A young woman identified in the indictment as Person #9, to whom O'Brien was convicted of illegally distributing

13

controlled substances (Counts 37-40), testified before a federal grand jury. Like Ms. Reeves, Person #9 recounted becoming addicted to the oxycodone pills that O'Brien gave her. After she was hooked, O'Brien threatened to cut off her supply of pills unless she provided oral sex, which she reluctantly agreed to do. Sadly, federal agents learned that Person #9 has become addicted to heroin; an all too common path following prescription opioid abuse. Similarly, Person #11 told federal agents that the defendant demanded oral sex from her in exchange for prescriptions for opioid pills. Person #11 continues to undergo treatment for the psychological and physical damage caused by the defendant. The number of known victims, and the ease with which O'Brien propositioned SA Heather Whelan for oral sex in exchange for prescriptions, would indicate that there may be other victims who are unwilling, or unable, to come forward.

The defendant also took advantage of vulnerable patients like Joseph Ennis, who naively believed that O'Brien was acting as a real doctor. Instead of treating these patients, the defendant turned them into addicts.

### *Contempt for the Law*

The defendant's contempt for the law and lack of respect for the authority of the Court was on full display throughout the six-week trial. He hurled insults at prosecutors and federal agents; mocked and mimicked government witnesses; and concocted baseless and incendiary accusations of government misconduct. He disrespected witnesses calling them names such as "psychopath;" "insurance whore;" "moron;" "idiot;" and other choice words. During one tirade, O'Brien crowed "when I'm found innocent, it's going to be justice reform and I can talk ...... I'm white, not Black, not Latino. I don't have to put up with this crap." [Trial Transcript June 27, 2016, Page 196]. In another shocking display of impropriety during cross-examination, O'Brien insinuated that SA

Whelan was impregnated by a drug dealer.

The defendant used his *pro se* status to make oblique threats against cooperating witnesses during cross-examination.   Knowing that Thompson had grave concerns for his family's safety, the defendant persisted in questioning him regarding his family's current whereabouts.   Further, the defendant repeatedly called Thompson a "rat" in open court, and reminded him that other prisoners knew that Thompson was cooperating with the government.   In another thinly disguised threat, O'Brien asked Thompson if he knew that coconspirator and Pagans member Joseph Mitchell, who shared a cell block with O'Brien, was "asking how you (Thompson) are doing."   [Trial Transcript June 9, 2016, Pages 150-151].   After he testified, Thompson received an unsigned letter containing a specific threat to harm him and his family.   To ensure his safety, Federal Detention Center ("FDC") officials segregated Thompson from the general population.

O'Brien continued his menacing conduct during cross-examination of Peter Marrandino. During the following exchange in open court, O'Brien admitted his efforts to retaliate against Marrandino:

> WJO: …..they put you, me and Michael Thompson in the same holding cell last week? Were we alone?
> PM: No
> WJO: How many other people were in the cell with us?
> PM: 30 maybe?
> WJO: Could it have been dangerous for you or me if the other people got excited or there was a fight?
> PM: Probably could have been dangerous for me.
> WJO: Because of what I was saying?
> PM: Yes
> WJO: Because you are cooperating with the government?

[Trial Transcript June 13, 2016, Pages 72-74].

The defendant is a practiced liar who cannot, and should not, be believed.   In connection

with his company's bankruptcy proceedings, O'Brien testified that he "had nothing," lived in the

back of his rented Levittown doctor's office, and was eating cheese sandwiches to survive.   In

reality, O'Brien was residing in a luxury condominium and living a lavish lifestyle.   While swearing

that he was destitute, to avoid his financial obligations to the creditors and the bankruptcy trustee,

O'Brien enjoyed extravagant vacations, fine dining, and nonstop profligate spending.   As proven at

trial, O'Brien consistently lied and submitted false documents in connection with court proceedings,

even while under oath.

      The defendant continued to perpetrate falsehoods before this Court.   For example, he

claimed repeatedly that the lead AUSA blocked his access to a laptop computer.   Even after this

was the subject of a hearing, in which the FDC attorney conclusively established that the AUSA did

no such thing, he continued to repeat his falsehood to the Court.   During trial, O'Brien falsely

alleged that federal agents "went after" his step-daughter, Patricia Hibbs, purportedly as leverage

against him.   That claim was another total fabrication.   O'Brien knew that Patricia Hibbs was

never indicted, and had never been arrested, in this case, yet he attempted to question a witness with

a document purporting to be a docket sheet showing Patricia Hibbs as a defendant.

      While the defendant enjoyed the presumption of innocence, the Court went to great lengths

to protect his right to a fair trial.   The Court tolerated the defendant's impertinence with remarkable

restraint and patience.   Now that the defendant stands before the Court as a convicted criminal, his

boisterous and contemptuous conduct need no longer be abided.

      2.     The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law,
          and Provide Just Punishment for the Offense.

      The defendant engaged in serious offenses which caused the tragic death of at least

one patient.   Joseph Ennis naively sought medical treatment from the defendant following

16

an automobile accident.   Instead of treating Mr. Ennis, the defendant drugged him.   Mr. Ennis was only 38 years old when, on December 22, 2013, he died from a lethal combination of methadone, oxycodone and cyclobenzaprine all prescribed by the defendant without a legitimate medical purpose.   Mr. Ennis' large, close-knit family, with nine brothers and sisters, continues to be devastated by the senseless loss of their beloved son and brother.

Another patient, Daniel Weimar, was only 42 when he died from the adverse effects of drugs prescribed by the defendant.   Like Joseph Ennis, Mr. Weimar sought treatment from the defendant following an accident.   O'Brien prescribed large quantities of Schedule II controlled substances, as well as other drugs like muscle relaxers, to which Mr. Weimar became severely addicted.   On June 12, 2013, Mr. Weimar was admitted to Eagleville Hospital for in-patient drug treatment.   Three days later, on June 15, 2013, he left against the advice of a real doctor who was treating him at Eagleville.   The next day, on June 16, 2013, O'Brien gave Mr. Weimar more prescriptions for oxycodone (30 mg) 240 pills; and oxycontin (80 mg) 120 pills.   Mr. Weimar filled the prescriptions on July 1, 2013; he died three days later on July 4, 2013.   At the scene, police recovered at least six pill bottles, all of which had been prescribed by the defendant.   The bottle of oxycodone (30 mg), filled on July 1, 2013 for 240 pills, was empty.   [See Coroner's Report and Incident Reports attached as **EXHIBIT 1**].

Mr. Weimar's death was ruled an accidental overdose and adverse effect of drugs. An autopsy was not performed.   Due to the absence of an autopsy, the government declined to charge O'Brien with distribution resulting in the death of Daniel Weimar.   Nevertheless, it is clear that the defendant's actions contributed significantly to, and most likely caused,

17

Mr. Weimar's death.

The defendant caused many lives to be ruined by addiction. The damage done by him to Mr. Ennis and Mr. Weimar, and their families, is irreversible. The defendant's punishment must reflect the grave consequences of his actions.

    3.    <u>The Need to Deter Criminal Conduct and Protect the Public from Future Harms.</u>

This is a case for which both specific deterrence and general deterrence are exceptionally important. Based on the depth and breadth of the defendant's criminal conduct, and his propensity for violence, his permanent incarceration is the best way to protect the public. O'Brien is a violent, dangerous criminal, who has not accepted responsibility for his conduct. He has not expressed any remorse, and he continues to blame others for his situation. He has also shown complete disregard for the law. In fact, the defendant knew that he was under federal investigation for healthcare fraud when he began concealing assets from the bankruptcy court and engaging in drug trafficking.

The need for general deterrence is also critical. Our nation is facing an opioid epidemic. Since 2000 the rate of deaths from overdoses has increased 137%, including a 200% increase in the rate of overdose deaths involving opioids (opioid pain relievers and heroin).[4] In 2014, more Americans died from drug overdose than any year on record, and 61% of those deaths involved an opioid.[5] Oxycodone and hydrocodone continue to be involved in more overdose deaths than any other opioid type.[6] Further, the increase in abuse of prescription pain medicines is interrelated with the recent surge in deaths from heroin.[7] People who misuse opioid pain medicines are 19 times

---

[4] CDC, MMWR, January 1, 2016.
[5] CDC, MMW, 2015; 64; 1-5.
[6] CDC, MMWR, January 1, 2016.
[7] CDC, MMWR, January 1, 2016.

more likely than others to start using heroin.[8]   In fact, four in five new heroin users started out misusing prescription pain medicine.[9]   Street dealers often mix heroin with toxic adulterants making it even more dangerous, and deadly, than prescription opioids.

Communities affected by drugs tend to experience more violent crime, including robbery, assault, and gun violence.   The involvement of gangs in drug trafficking and distribution, increases the likelihood of violence.[10]   Outlaw gangs, like the Pagans, are capitalizing on the increased prescription drug abuse problem in the United States by trafficking oxycodone.[11]   The Philadelphia-area has experienced an increase in gang activity involving the distribution of prescription drugs.   In 2013, the Philadelphia Police Department Criminal Intelligence Unit identified a 76% increase in the number of gangs operating within the city and the immediate suburbs controlling prescription drug distribution.[12]   The rampant abuse of prescription drugs, fueled by drug dealing doctors, has created financial opportunity for the gangsters who are proliferating in our community.

Part of the reason that prescription drug abuse is so rampant is that these drugs come with the imprimatur of legitimacy.   According to a CNN poll, 40 percent of respondents said that prescription pills are "much safer" than illegal drugs; 31 percent say there is "nothing wrong" with prescription drug use; and 29 percent thought prescription painkillers are non-addictive.[13]

---

[8] Muhri PK, Gfroerer JC, M. Davies MC.   Associations of Nonmedical Pain Reliever Use and Initiation of Heroin Use in the United States. August 2013.
[9] American Society of Addiction Medicine, Opioid Addiction 2016 Facts & Figures.
[10] See National Drug Threat Assessment 2015, page 8.
[11] Id. page 11.
[12] Id. page 9.
[13] Good Medicine Meets Bad Behavior, CNN, May 16, 2006.

Obviously, physicians play a critical role in combating the opioid epidemic.   As gatekeepers, physicians can warn patients about the addictive nature of these substances, and prescribe these drugs in limited quantities and only when medically necessary.

Instead of helping battle this scourge, as his physician's oath required, O'Brien intentionally perpetuated the crisis.   It is imperative to send a strong, unequivocal message to him, and to other would be physician drug dealers, that such conduct will not be tolerated by this Court.   The imposition of a life sentence in this case, in accordance with the advisory guidelines, will convey that message clearly and undoubtedly deter others who may be considering embarking on a similar course.

> 4. The Need for Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ."   § 3553(a)(2)(D).

> 5. The Guidelines and Policy Statements Issued by the Sentencing Commission.

The Guidelines remain of significant importance in advising judges regarding appropriate sentences.   Uniformity in sentencing should be a paramount goal; in order to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible.   The best vehicle for achieving such a goal is through application of the Sentencing Guidelines.

> 6. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who Have Been Found Guilty of Similar Crimes.

Imposing a sentence in accordance with the guideline recommendation promotes fairness

20

and prevents disparities among similarly situated defendants.    Other physicians like the defendant have been sentenced to life imprisonment for distributing controlled substances resulting in death. For example, in the Southern District of Ohio, Paul H. Volkman, M.D. was sentenced to four consecutive life terms for distribution of controlled substances resulting in the deaths of four patients. (Crim. No. 12-3212).    Likewise, in the Northern District of Florida, David W. Webb, M.D. was sentenced to three concurrent life sentences for distribution of controlled substances resulting in the deaths of three patients. (Crim. No. 10-10574).    A similar case in this district was *United States v. Norman Werther* (Cr. No. 11-434).    Norman Werther, M.D., 73, was convicted by a jury of one count of distribution of controlled substances resulting in death; five counts of conspiracy to distribute controlled substances; one count of maintaining a drug involved premise; 117 counts of money laundering; and 180 counts of distribution of controlled substances.    On September 24, 2013, the Honorable Berle M. Schiller sentenced Werther to 300 months' imprisonment, below the advisory guidelines of 360 months to life.[14]

There are several factors that distinguish O'Brien and Werther.    First, the advisory guidelines calculated for O'Brien are higher and consequently recommend that he be sentenced to a longer period of imprisonment.    The USSG recommends life imprisonment for O'Brien, compared to 360 months' imprisonment, at the low end of the range, for Werther.    O'Brien's guidelines reflect the fact that he used threats and violence in furtherance of the conspiracy, and his distribution of controlled substances to a "pseudo-patient" who was six months pregnant.[15]    Further, O'Brien was convicted of the additional offenses of bankruptcy fraud and for lying under oath.    Moreover,

---

[14] In light of his advanced age, Werther, in reality, was sentenced to a life term.
[15] A total of six points were added for special offense characteristics pursuant to USSG §§ 2D1.1(b)(1); 2D1.1(b)(2); and 2D1.1(b)(15)(B).

O'Brien's affiliation with a dangerous outlaw motorcycle gang. i.e. the Pagans, unquestionably makes him more dangerous than others convicted of distributing controlled substances outside the scope of professional practice.

Adherence to the recommended guideline range is the only course for assuring that the defendant's sentence is consistent with those imposed nationwide on similarly situated offenders, and thus complying with Section 3553(a)(6) and avoiding undue disparity.   Thus, the imposition of a within-guideline sentence in this case would be consistent with the punishment imposed for similarly situated defendants.

7.   The Need to Provide Restitution to Any Victims of the Offense.

"As its name suggests, the Mandatory Victims Restitution Act, which was enacted by Congress in 1996, mandates that defendants who are convicted of or plead guilty to certain crimes pay restitution to their victims." *United States v. Quillen*, 335 F.3d 219, 222 (3d Cir. 2003) (quoting *United States v. Simmonds*, 235 F.3d 826, 830 (3d Cir. 2000)).   O'Brien is facing life imprisonment, and therefore it is highly unlikely that he will pay his debt.   However, some payments can be made during the period of incarceration through the Inmates Responsibility Program.[16]

In summary, the defendant is a dangerous criminal who has demonstrated a deep-seated contempt for the law.   He continues to blame others, and has expressed no remorse for the consequences of his actions.   There are simply no bases to justify the imposition of a sentence below the advisory guideline range for this defendant.

---

[16]   Thus far, Kathleen O'Brien and Allstate Insurance Company, both victims of the bankruptcy fraud have submitted victim impact statements.   These, and any other impact statements received, will be provided to the Court prior to sentencing.

## IV.    Defendant's Objections to the PSR

The defendant raised five objections to the Presentence Investigation Report ("PSR"), claiming that there was insufficient evidence to support certain enhancements.   A preponderance of evidence is required to support sentencing enhancements.   *United States v. Fisher,* 502 F.3d 293, 307 (3d. Cir. 2007).   The enhancements challenged by the defendant are supported by ample evidence, most of which was introduced at trial.   The defendant's objections, listed below, are baseless and should be overruled.

1.    The defendant objects to the number of pills distributed in furtherance of the conspiracy, noted in Paragraph 94 of the PSR.   At trial, the evidence established that coconspirators, and their associates, distributed the pills illegally prescribed by the defendant.   Accordingly, he is responsible for all pills that he prescribed outside the course of professional practice in furtherance of the conspiracy.   "Where there is no drug seizure . . . the court shall approximate the quantity of the controlled substance.   In making this determination, the [district] court may consider, for example, . . . financial or other records . . . ." *U.S.S.G. § 2D1.1, comment. (n.5).*

Using the defendant's charts, which were admitted into evidence at trial, the government has summarized the number of Schedule II controlled substances prescribed by O'Brien, outside the course of professional practice.[17]   According to the government's calculations, the defendant was responsible for distributing at least approximately 386,264 pills (oxycodone 30 mg); 31,175 pills

---

[17]   In *United States v. Najam-Azmat,* the appellate court affirmed the lower court's decision to hold the defendant accountable for all of the hydrocodone, oxycodone, and Xanax that he prescribed during the course of the conspiracy to distribute controlled substances noting "[t]he district court admitted Dr. Azmat's patient files into evidence, and Investigator Sikes prepared a summary spreadsheet of the amount of medication prescribed to each patient. Therefore, even though there was no drug seizure, the district court had Dr. Azmat's prescription records and was able to make an accurate assessment." *Najam-Azmat,* 805 F.3d 1018, 1047 (11th Cir. 2015).

23

(oxycodone 15 mg); 165,630 pills (oxycodone 10 mg); and 206,582 pills (methadone 10 mg), or approximately 789,651 pills containing Schedule II controlled substances.   A summary spreadsheet, and supporting documentation, will be provided to the Court prior to sentencing.   The government will ask the Court to file this information under seal since it necessarily contains the names of uncharged persons.

2.        The defendant claims that there is no evidence that a dangerous weapon was used as required to support a two level enhancement pursuant to USSG §2D1.1(b)(1), set out at Paragraph 139 of the PSR.   That is incorrect. As the defendant well knows, at trial, Thompson testified that O'Brien sent Treacy and Mehl to collect money from O'Brien's patient Anthony Rongione.   Treacy and Mehl went to Mr. Rongione's residence armed with a pipe and brass knuckles.   The incident was captured on a neighbor's security camera and memorialized in police reports included here as [See incident interview reports attached as **EXHIBIT 2**].   Further, during a recorded post-arrest interview with the FBI, Mehl admitted that he went with Treacy to collect money for O'Brien using a pipe and brass knuckles.   O'Brien played Mehl's recorded interview for the jury.   [See excerpt of Mehl's interview transcript attached as **EXHIBIT 3**].   Thus, there is ample evidence to support the application of this enhancement.

3.        The defendant argues that there is no evidence to support a two level enhancement pursuant to USSG §2D1.1(b)(2), set out at Paragraph 140 of the PSR.   Under USSG §2D1.1(b)(2), two levels are added 'if the defendant used violence, made a credible threat to use violence, or directed the use of violence."   In addition to the information in paragraph 2 above, the defendant introduced a recording at trial, made by his former patient Anthony Rongione. who owed O'Brien money. [See Trial Exhibit #701].   The recording captured O'Brien threatening to "fuckin hunt you

24

[Rongione] down like a dog and hurt you" in order to get his money from Rongione.   [See transcript of recording attached as **EXHIBIT 4**].   In addition, Thompson testified at trial that O'Brien sent Mehl and Treacy to threaten Rongione.   Thus, there is ample evidence to support the application of this enhancement.

4.      The defendant claims that there is insufficient evidence to support a four level enhancement for his leadership role in the offense, noted in Paragraph 144 of the PSR.   Under USSG §3B1.1(a), four levels are added if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."   As proven at trial, the defendant was the kingpin of an extensive drug trafficking conspiracy that including Thompson, Marrandino, Mehl, Treacy, Joseph Mitchell, Sr., Charles Johnson, and Jennilynn Chambers.   The scheme would not have been possible without O'Brien.   O'Brien made it clear to his coconspirators that he had the power of the pen.   Unless O'Brien wrote prescriptions, there were no drugs to sell. The four level enhancement is fully supported by the trial record.

5.      The defendant objects to an enhancement for abuse of a position of trust, or a specific skill, set out in Paragraph 143 of the PSR.   Pursuant to USSG §3B1.3, two levels are added "if the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."   The two-level enhancement for abuse of public or private trust is clearly applicable in this case.

The defendant used his medical practice as a front for drug dealing.   As a licensed physician, he was relied on by the public to safely distribute prescriptions for controlled substances in accordance with relevant regulations, and in his position was able to engage in criminal conduct without supervision in a manner that was difficult to detect.   Further, the defendant abused a

position of private trust with those patients who came to him for treatment believing that he was

acting as a real doctor.    These patients trusted him as a physician, and took the pills that he

prescribed for them.    As a result, the defendant turned patients into addicts so that he could extort

them for cash, and in some cases, for sex.

## V.    **CONCLUSION**

As noted, the Sentencing Guidelines present "the lodestone of sentencing," *Peugh*, 133 S. Ct.

at 2084, and that guide is once again persuasive in this case.    In sum, for all of the reasons set forth

in this memorandum, the government respectfully requests that this Court impose a within-guideline

sentence of life imprisonment.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


/s/ M. Beth Leahy
M. BETH LEAHY
DAVID E. TROYER
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this Sentencing Memorandum has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

> George Newman, Esquire (Standby Counsel)
> 834 Chestnut Street
> Suite 206
> Philadelphia, PA 19107]

I hereby certify that a copy of this Sentencing Memorandum has been served by first-class

mail, postage prepaid, upon:

> William J. O'Brien III (*pro se*)
> FDC Philadelphia
> P.O. Box 562
> Philadelphia, PA 19106

> /s M. Beth Leahy
> M. BETH LEAHY
> Assistant United States Attorney

DATED:   September 26, 2016

27

EXHIBIT 1



# County of Bucks

## OFFICE OF THE CORONER
### Bucks County, Pennsylvania
850 Eagle Blvd, Warminster, PA  18974
Phone: (267) 880-5040          Fax (267) 880-5656
### Dr. Joseph P. Campbell, Coroner

Mr. Emanuel Weimar
███ Longview Road
Warrington, PA 18976

August 6, 2013

Dear Mr. Weimar,

Please allow this correspondence to serve as a follow up to the Coroner's investigation into the death of your brother, Daniel. First, I would like to offer my sincerest condolences to you and your family.

The investigator handling the case for the Coroner's Office was Harvey Giebel, Deputy Coroner. According to Deputy Giebel's report, Daniel was last seen alive on July 4, 2013 at approximately 6:30 AM. At approximately 4:00 PM, Daniel was found unresponsive on the floor of his residence. 911 was called and police and paramedics responded. Unfortunately, the paramedics were unable to resuscitate Daniel. Past medical history for Daniel included back pain and depression.

Toxicology was drawn and submitted to National Medical Services, Inc., a medical and forensic toxicology company located in Willow Grove, PA. Upon completion of the report, the following substances were found in Daniel's bodily systems including,

1. Diazepam (Valium) a benzodiazepine used for the treatment of anxiety was found at a level of 75 nanograms/mL. Nordiazepam, the active metabolite of Valium was found at a level of 220 nanograms/mL. Therapeutic levels range from 100 to 400 nanograms/mL for Valium and 130 to 550 nanograms/mL for its metabolite.
2. Oxycodone (OxyContin) a potent narcotic analgesic was found at a level of 780 nanograms/mL. Oxymorphone, the active metabolite of OxyContin was found at a level of 13 nanograms/mL. Therapeutic levels range from 30 to 100 nanograms/mL for OxyContin and 1.9 to 4.4 nanograms/mL for its metabolite.
3. Cocaine was found at a level of 29 nanograms/mL. Benzoylecgonine, a metabolite of Cocaine was found at a level of 3200 nanograms/mL.

A Final Death Certificate was issued on August 6, 2013 listing the cause of death as adverse effects of drugs and the manner of death was listed as accidental. The certificate was sent to Shelly Funeral Home for processing.

Again, I would like to offer my sincerest condolences to you and your family. If you have any questions or concerns regarding this case, please feel free to contact me at the above telephone number.

Sincerely,

Richard Kuntz, RN BSN First Deputy Coroner

cc:   Sgt Fallon, Warrington Twp Police Department
      Harvey Giebel, Deputy Coroner
      File



# County of Bucks
### OFFICE OF THE CORONER
Bucks County, Pennsylvania
850 Eagle Blvd., Warminster, PA 18974
Phone: 267-880-5040          Fax: 267-880-5656

### Dr. Joseph P. Campbell, Coroner

## Coroner's Report

**BCC#:**   **2013-0267**

**Personal Information**

| | | | |
|---|---|---|---|
| Decedent's Name | Daniel J Weimar | Age | 42 |
| Decedent's Address | ▮ Longview Road | DOB | ▮ |
| | Warrington, PA 18976 | Race | White |
| | | Sex | Male |

Social Security No        ▮

**Next of Kin**

NOK          Emanuel R. Ukimar       Relationship   Brother       Phone #
Address      ▮ Longview Road, Warrington, Pa. 18976
Notified Date   7/4/2013              Notified Time   4:00 PM
Notified At     2127 Longview Road, Warington, Pa. 18976
Name of Person  (Brother) Robert Weimar

**Death Information**

Date of Death    7/4/2013                    Time of Death    6:20 PM
Pronounced By   Harvey H. Giebel
Transported By   Harvey H. Giebel            Transported To   Bucks County Fo

**Incident Information**

Incident Location   ▮ Longview Road, Warrington       Work Related   No
Death City          Warrington, PA 18976
Death Municipality  Warrington Township
Event/Incident/Injury Date   7/4/2013      Time   4:00 PM   Incident Type   Home

**Coroner View**

View Date         7/4/2013                   View Time   6:20 PM
View Location     Scene
Police Officer/Agency   Sgt. Fallon
                  Warrington Twp. Police Dept.

BCC#:   2013-0267

**Medical Information** _____

Past Medical History

  Back pain.

Medication/Drug/Alcohol Usage    See attached medication list.

**Cause/Manner** _____

Cause of Death    Adverse Effects of Drugs

Manner of Death    Accidental

Due To

Contributing Factors

**Physical and Valuables** _____

Physical Exam

Valuables    No    Receipt No.    Claimed By

Funeral Director

Funeral Home    Shelly Funeral Home, 1460 Easton Road, Warrington, PA 18976

**Autopsy/Toxicology/Photos** _____

Autopsy    No    By    At    Date

Toxicology    Yes    By  National Medical Services, Inc.

Photos    Yes    By  Bucks County Deputy Coroner Harvey Giebel

Safety Devices    None: N    Lap Belt: N    Shoulder Belt: N    Lap & Shoulder: N  Air Bag: N

History

  42 year old white male found unresponsive on the floor at home by his family. Ambulance and police
notified. Scene examination revealed the deceased lying face-up on the living room floor wearing
socks, underwear, and a t-shirt. Was cold to touch, rigor mortis full in all extremities, livor
mortis dark purplish and fixed to posterior body surfaces. No obvious signs of trauma or fractures
present. Last seen alive at 6:30 a.m. today and found at approx. 4:00 p.m. Past medical history of
back pain and depression. On multiple prescription medications with many missing according to
dates prescribed (See attached medication list). Attending Dr. William O'Brien III (215-633-1750).
No obvious signs of foul play or abuse. Scene examined, investigated, and photographed. Body moved
to the Bucks County Forensic Facility for further examination and investigation of death.

Additional Medication    N

_Harvey H Giebel_    Date    8/6/2013



7/15/2013      Warrington Township Police Department

# Incident Supplement Report

## Incident 2013-07-0111

## Supplements

1)    Suir

*Prepared By:*   Robert Bell (75-20)          *Report Date:*   07/04/2013

I responded with Officer Kozuch to 2127 Longview Road for a report of a possible expiration. I arrived after Officer Kozuch at the residence along with members of the Warrington Ambulance. I entered from east side of the residence which lead me to a family type room. Officer Kozuch was talking to family members were i observed the obviously deceased laying on his back on the floor. It appeared rigor mortis had started to set in and lividity was observed on his lower parts of his body. There didnt appear to be any signs of trauma. While I took photos of the deceased he was identified to be the homeowners son a Mr. Daniel Weiman. I asked for a brief history about the deceased and according to his brother and his father Daniel had been addicted to prescription medicines for a long time. I was advised he took numerous pills for a past injury to his back and he had been under a great deal of pain. The prescription pills were provided to me and I conducted a inventory of them. All pills were prescribed to him by a Dr. William J. O'brien III 215-945-4762.

1. OxyContin 80mg 1pill 4x a day filled on 7/1/13 120 pills only 100 were found in the bottle.
2. OxyContin 30 mg 1 to 2 pills every 6 hrs filled on 7/1/13 240 pills the bottle was empty.
3.Gabapentin 2 bottles 300 mg 2 pills 4 x a day filled on 6/17/2013 240 pills per bottle 1 bottle was empty the other had 30 left.
4. Cyclobenzaprine 10mg filled on 6/17/2013 240 pills per bottle with 95 still left.
5. Diazepam 10mg 1 pill every 3 hrs filled on 6/17/2013 90 per bottle and was found empty.

I took photos of the pills and when the Coroner Harvey Geibel arrived the pills were pointed out to him. He elected to take the pills for further investigation. The pills were turned over to him and I assisted the Coroner in packaging up the body and loading and lifting. NFA

# Incident Summary

| | *Incident Number:* |
|---|---|
| | 2013-07-011 |

*Supplemental Notes:*

Dispatched to the above location for the report of a subject, later identified as Daniel J. Weimar deceased on the living room floor. Warrington Ambulance was also enroute.

I arrived on scene as was met outside by Robert Weimar. He reports his brother Daniel to be deceased on the floor. I entered the residence from the back porch door into a family/ living room. I observed a white male laying face up on the floor. I could not locate a pulse Daniels body was cold and stiff he was wearing a black t shirt and blue boxer shorts. Medic # 129 arrived and detected no signs of life from Daniel.

I removed the family from the room and spoke with them, they were all identified. Father Emanuel and step-mother Barbara where the only ones present when they believe Daniel passed away. I spoke with them both who reports that Daniel was heavily medicated over the past year due to a recent back injury. They report that Daniel has lived with them for almost a year and for most of the year again has been heavily medicated, sleeping most hours of the day. Today it was reported that Daniel was sleeping on the couch most of the morning, he was moaning and not making sense. This was normal how he acted. His brother Robert went to work at approximately 1200. Prior to Robert leaving the residence Daniel was sleeping on the floor, where he was still located. Robert reported seeing Daniel breathing and moaning, like normal when he left. Emanuel and Barbara reported that at approximately 1530 hrs the noticed that Daniel was not breathing and cold. They reported no sign of life.

Emanuel then called Daniels sister Stephanie and Robert back to the house ASAP. They arrived and then Robert called the Police/Medics.

Daniel stayed in his room all day yesterday and only came out to eat something. Daniel was moaning yesterday as he usually does. Daniel has been depressed for countless years and it has been worse since his construction accident where he injured his back. Daniel was on Probation in Bucks County and Supervised by Kathleen Snyder. Daniel was in Eagleville Rehabilitation Center for substance abuse June 12 to 15, 2013. Doctor William J. O'Brien III 215-633-1750 prescribed Daniels medication and was his Doctor. There was an active Warrant from Bucks County for Parole violation (NIC W707697396).

Daniel was involved in an unknown incident in Plumstead with Officer Mooney at an unknown date. The family reported that all Daniels medications were seized for an unknown reason by Officer Mooney, they also reported that Daniel mentioned that Cocaine and possibly Marajuana was also seized but could not get the truth out of Daniel. They reported Daniel still took his prescribed medications that he had at the house.

The family assured Police that no one had moved anything from Daniel.

Sgt. Fallon contacted Lt. Friel. He also called the Corner and spoke with Corner Harvey Giebel. Sgt. Fallon stated that he was enroute and provided over an hour ETA.

The remains were kept as they were on the floor until the Corner arrived at 1822 hrs. Giebel was advised that if an autopsy occurs to contact WPD prior to. He reported he needed to speak with the Doctor to determine what they are going to do. He also estimated the time of death to be approx 8 to 12 hours. Giebel was assisted in removing the remains of Daniel.

Emanuel reports that he spoke with Daniel at approximately 1130 hrs today date, he was not 100% sure of the time though.

| *Signature:* | *Badge No:* | *Reviewed By:* | | *Date Reviewed:* |
|---|---|---|---|---|
| | 141 | | | |
| David Kozuch | | | | |

# Incident Summary

The back porch was neat and orderly, there was no sign of a struggle. A scan over Daniels body appeared to have some type of Cirrhosis on his legs, some old scaring and marking. Officer Bell took photographs of the room and remains. He also inventoried the medication that was on scene and checked Daniels bed room.

Sgt. Fallon reported he will have Daniel removed from NCIC on his active warrant. See their SUIRS.

| Signature: | Badge No: | Reviewed By: | | Date Reviewed: |
|---|---|---|---|---|
| | 141 | | | |
| David Kozuch | | | | |

07/15/2013

*Informant PS*



**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, DABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**  07/11/2013 08:00

| | |
|---|---|
| **Patient Name** | WEIMAR, DANIEL J. |
| **Patient ID** | BCC13-0267 |
| **Chain** | 11440342 |
| **Age** | 42 Y |
| **Gender** | Male |
| **Workorder** | 13166638 |

Page 1 of 6

To:  10009
Bucks County Coroner
Attn: Dr. Joseph Campbell
850 Eagle Blvd
Warminster, PA  18974

RECEIVED CORONER'S OFFICE
13 JUL 11 AM 8:21

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Diazepam | 76 | ng/mL | Peripheral Blood |
| Nordiazepam | 220 | ng/mL | Peripheral Blood |
| Cocaine | 29 | ng/mL | Peripheral Blood |
| Benzoylecgonine | 3200 | ng/mL | Peripheral Blood |
| Oxycodone - Free | 780 | ng/mL | Peripheral Blood |
| Oxymorphone - Free | 13 | ng/mL | Peripheral Blood |
| Opiates | Presump Pos | ng/mL | Urine |
| Cocaine / Metabolites | Presump Pos | ng/mL | Urine |
| Benzodiazepines | Presump Pos | ng/mL | Urine |
| Cannabinoids | Presump Pos | ng/mL | Urine |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 8050U | Postmortem Toxicology - Urine Screen Add-on (6-MAM Quantification only) |
| 8051B | Postmortem Toxicology - Basic, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Gray Top Tube | 10 mL | 07/04/2013 21:00 | Peripheral Blood | |
| 002 | Gray Top Tube | 7.5 mL | 07/04/2013 21:00 | Peripheral Blood | |
| 003 | Red Top Tube | 5 mL | 07/04/2013 21:00 | Vitreous Fluid | |
| 004 | Clear Plastic Container | 35 mL | 07/04/2013 21:00 | Urine | |

All sample volumes/weights are approximations.

Specimens received on 07/05/2013.

v.8

 **NMS** LABS

CONFIDENTIAL

| | |
|---|---|
| Workorder | 13166638 |
| Chain | 11440342 |
| Patient ID | BCC13-0267 |

Page 2 of 6

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Diazepam | 75 | ng/mL | 20 | 001 - Peripheral Blood | LC-MS/MS |
| Nordiazepam | 220 | ng/mL | 20 | 001 - Peripheral Blood | LC-MS/MS |
| Cocaine | 29 | ng/mL | 20 | 001 - Peripheral Blood | GC/MS |
| Benzoylecgonine | 3200 | ng/mL | 50 | 001 - Peripheral Blood | GC/MS |
| Oxycodone - Free | 780 | ng/mL | 10 | 001 - Peripheral Blood | GC/MS |
| Oxymorphone - Free | 13 | ng/mL | 10 | 001 - Peripheral Blood | GC/MS |
| Opiates | Presump Pos | ng/mL | 300 | 004 - Urine | EIA |

This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended.

| Cocaine / Metabolites | Presump Pos | ng/mL | 300 | 004 - Urine | EIA |
|---|---|---|---|---|---|

This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended.

| Benzodiazepines | Presump Pos | ng/mL | 50 | 004 - Urine | EIA |
|---|---|---|---|---|---|

This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended.

| Cannabinoids | Presump Pos | ng/mL | 20 | 004 - Urine | EIA |
|---|---|---|---|---|---|

This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended.

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

## Reference Comments:

1. **Benzodiazepines - Urine:**

   Benzodiazepines are a class of drugs that are prescribed for their anxiolytic, muscle relaxant, anticonvulsant and hypnotic effects. The degree of each effect is dependent upon the specific drug, its pharmacokinetics and any relevant metabolite.

   This result derives from a presumptive test, which may be subject to cross-reactivity with non-benzodiazepine related compounds. A second test is necessary to confirm the presence of benzodiazepine related compounds.

2. **Benzoylecgonine (Cocaine Degradation Product) - Peripheral Blood:**

   Benzoylecgonine is an inactive metabolite and chemical breakdown product of cocaine. Cocaine is a DEA Schedule II controlled central nervous stimulant drug. Effects following cocaine use can include euphoria, excitement, restlessness, risk taking, sleep disturbance, and aggression. A period of mental and physical fatigue and somnolence follow the use of cocaine after the excitant-stimulant effects wear off. Benzoylecgonine has a half-life of 6 to 10 hours. The average blood benzoylecgonine concentration in 906 impaired drivers was 1260 ng/mL (range 5 - 17600 ng/mL). Benzoylecgonine blood concentrations in patients admitted to an emergency room for cocaine related medical complaints were 1280 ng/mL (SD = 1280 ng/mL). Benzoylecgonine concentrations in plasma following oral administration of 2 g/day of cocaine over 6 days, averaged 4900 ng/mL. The average blood benzoylecgonine concentration in 37 cocaine related fatalities was 7900 ng/mL (range 700 - 31000 ng/mL).

3. **Cannabinoids - Urine:**

   Cannabinoids are chemical compounds derived from the plant Cannabis sativa (marijuana), including active components, chemical congeners and metabolites. Delta-9-Tetrahydrocannabinol (THC) is the principal active component. This result derives from a presumptive test, which may be subject to cross-reactivity with non-cannabinoid compounds; therefore, a confirmatory test is recommended.

v.8



| | |
|---|---|
| Workorder | 13166638 |
| Chain | 11440342 |
| Patient ID | BCC13-0267 |

Page 3 of 6

## Reference Comments:

4. **Cocaine - Peripheral Blood:**

   Cocaine is a DEA Schedule II controlled central nervous stimulant drug. Effects following cocaine use can include euphoria, excitement, restlessness, risk taking, sleep disturbance, and aggression. A period of mental and physical fatigue and somnolence follow the use of cocaine after the excitant-stimulant effects wear off. Cocaine is metabolized to the inactive compounds benzoylecgonine, ecgonine methyl ester, and ecgonine. Benzoylecgonine and ecgonine methyl ester can form from cocaine breakdown after death and even after sample collection. The average blood cocaine concentration in 906 impaired drivers was 87 ng/mL (range 5 - 2390 ng/mL). Blood cocaine concentrations in patients admitted to an emergency room for cocaine related medical complaints were 260 ng/mL (SD = 500 ng/mL). Cocaine concentrations in plasma following oral administration of 2 g/day over 6 days, averaged 1260 ng/mL. The average blood cocaine concentration in 37 cocaine related fatalities was 4600 ng/mL (range 40 - 31000 ng/mL).

5. **Cocaine / Metabolites – Urine:**

   Cocaine is a central nervous system stimulant and drug of abuse. This result derives from a presumptive test, which may be subject to cross-reactivity with non-cocaine related compounds. A second test is necessary to confirm the presence of cocaine related compounds.

6. **Diazepam (Valium®) - Peripheral Blood:**

   Diazepam is a benzodiazepine used primarily for its sedative anxiolytic or muscle relaxing effects. It is a U.S. DEA Schedule IV listed central nervous system depressant, and patients using this medication are warned accordingly, especially concerning motor functions. It is habituating, and frequently abused. It is metabolized to several pharmacologically active compounds: nordiazepam, oxazepam and temazepam. In order to evaluate the effects of this compound, concentrations of these metabolites must also be considered.

   The reported diazepam concentration in a chronic steady-state regimen of 5 mg twice daily ranges from 100 - 400 ng/mL with nordiazepam being in the range of 130 - 500 ng/mL. Oxazepam and temazepam may be present in low concentrations.

   Toxic effects may be produced by blood concentrations in excess of 1500 ng/mL; fatalities produced by diazepam alone are rare, but may occur at blood concentrations greater than 5000 ng/mL. Alcohol greatly enhances the activity of the benzodiazepines.

7. **Nordiazepam (Chlordiazepoxide Metabolite) - Peripheral Blood:**

   Nordiazepam is a pharmacologically active metabolite of several benzodiazepine anxiolytic/sedative/hypnotic agents, e.g., diazepam (Valium®). Nordiazepam is also the major active entity in clorazepate (Tranxene®), a benzodiazepine agent used for agitation, seizures and anxiety. The action of this compound is based on its CNS-depressant activity.

   Reported peak blood concentrations of nordiazepam following a single 15 mg oral dose of clorazepate were approximately 200 ng/mL at 2 hr. Chronic therapy with a daily oral dose of 22.5 mg clorazepate produced reported steady-state plasma concentrations of nordiazepam of 600 ng/mL whereas 50 mg produced average concentrations of 1600 ng/mL.

8. **Opiates - Urine:**

   Opiates are a class of drugs that have effects similar to morphine. These drugs are most commonly prescribed as analgesics for the relief of pain, but are also utilized for sedation, preanesthetic medication and anesthesia in the hospital setting, and as antitussives and as antidiarrheals in ambulatory medicine.

   This result derives from a presumptive test, which may be subject to cross-reactivity with non-opiate related compounds. A second test is necessary to confirm the presence of opiate related compounds.

9. **Oxycodone - Free (OxyContin®; Roxicodone®) - Peripheral Blood:**

   Oxycodone is a DEA Schedule II controlled semi-synthetic narcotic analgesic. It is used to control pain associated with such ailments as bursitis, injuries, simple fractures and neuralgia. The addiction liability of oxycodone is about the same as for morphine. This compound should be administered in the smallest effective dose and as infrequently as possible. The usual adult dose of the hydrochloride salt is 5 mg every 6 hr.

   Following the oral administration of oxycodone as both sustained-release (Oxycontin®) and regular formulations, peak plasma concentrations of the compound are generally less than 100 ng/mL; however, the sustained-release preparation may also result in peak concentrations of oxycodone less than 10 ng/mL serum.



CONFIDENTIAL

| | |
|---|---|
| Workorder | 13166638 |
| Chain | 11440342 |
| Patient ID | BCC13-0267 |

Page 4 of 6

## Reference Comments:

Oxymorphone is a pharmacologically active metabolite of oxycodone that may be seen in blood in very low concentrations.

In overdose, oxycodone can produce stupor, coma, muscle flaccidity, severe respiratory depression, hypotension and cardiac arrest. In two oxycodone-related suicides, blood concentrations of 4300 and 14000 ng/mL were reported. However, sustained-release preparations appear to produce adverse reactions, up to and including death, at concentrations of oxycodone well less than 1000 ng/mL, especially in combination with other central nervous system depressants, depending on use pattern and route of administration.

10. Oxymorphone - Free (Numorphan®; Opana®) - Peripheral Blood:

Oxymorphone is a semisynthetic opioid analgesic. It is indicated for use in the relief of moderate to severe pain and as a preanesthetic medication. The compound may be administered by injection or by mouth. Oral preparations are available as immediate-release tablets (5 or 10 mg) and as extended-release tablets (5 to 40 mg). Oxymorphone is also a pharmacologically active metabolite of oxycodone.

The mean oral bioavailability of oxymorphone is approximately 10%. The compound is extensively metabolized by reduction to 6-oxymorphol and conjugation to oxymorphone glucuronide and oxymorphone sulfate. Approximately 50% of an oral dose of oxymorphone is eliminated in the urine over 5 days primarily as conjugated oxymorphone and smaller amounts of free oxymorphone and free and conjugated 6-oxymorphol. The mean elimination half-life of oxymorphone is approximately 7.5 to 9.5 hours.

Thirty minutes following a single 5, 10, or 20 mg immediate-release tablet, mean peak plasma concentrations were 1.1, 1.9 and 4.4 ng/mL, respectively. Twenty mg extended-release tablets given every 12 hours for 3 days resulted in a mean peak plasma concentration of 2.5 ng/mL within 3.5 hours following the last dose. Doubling the dose to 40 mg increased the mean peak plasma concentration to 4.5 ng/mL.

Adverse effects of oxymorphone are typical of the opioid group of compounds.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded three (3) months from the date of this report, and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 13166638 was electronically
signed on 07/11/2013 07:57 by:

*Susan B. Crookham*

Susan Crookham,
Certifying Scientist

## Analysis Summary and Reporting Limits:

Acode 50012B - Benzodiazepines Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 7-Amino Clonazepam | 5.0 ng/mL | Flurazepam | 2.0 ng/mL |
| Alpha-Hydroxyalprazolam | 5.0 ng/mL | Hydroxyethylflurazepam | 5.0 ng/mL |
| Alprazolam | 5.0 ng/mL | Hydroxytriazolam | 5.0 ng/mL |
| Chlordiazepoxide | 20 ng/mL | Lorazepam | 5.0 ng/mL |
| Clobazam | 20 ng/mL | Midazolam | 5.0 ng/mL |
| Clonazepam | 2.0 ng/mL | Nordiazepam | 20 ng/mL |
| Desalkylflurazepam | 5.0 ng/mL | Oxazepam | 20 ng/mL |
| Diazepam | 20 ng/mL | Temazepam | 20 ng/mL |
| Estazolam | 5.0 ng/mL | Triazolam | 2.0 ng/mL |

v.8



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 13166638 |
| **Chain** | 11440342 |
| **Patient ID** | BCC13-0267 |

Page 5 of 6

## Analysis Summary and Reporting Limits:

Acode 50013B - Cannabinoids Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by Multi-dimensional Gas Chromatography/Mass Spectrometry (GC-GC-GC/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 11-Hydroxy Delta-9 THC | 5.0 ng/mL | Delta-9 THC | 1.0 ng/mL |
| Delta-9 Carboxy THC | 5.0 ng/mL | | |

Acode 50014B - Cocaine and Metabolites Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Benzoylecgonine | 50 ng/mL | Cocaine | 20 ng/mL |
| Cocaethylene | 20 ng/mL | | |

Acode 50016B - Opiates - Free (Unconjugated) Confirmation, Blood (Forensic) - Peripheral Blood

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 6-Monoacetylmorphine - Free | 10 ng/mL | Hydromorphone - Free | 10 ng/mL |
| Codeine - Free | 10 ng/mL | Morphine - Free | 10 ng/mL |
| Dihydrocodeine / Hydrocodol - Free | 10 ng/mL | Oxycodone - Free | 10 ng/mL |
| Hydrocodone - Free | 10 ng/mL | Oxymorphone - Free | 10 ng/mL |

Acode 8050U - Postmortem Toxicology - Urine Screen Add-on (6-MAM Quantification only)

-Analysis by Enzyme Immunoassay (EIA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 1000 ng/mL | Methadone | 300 ng/mL |
| Barbiturates | 0.30 mcg/mL | Opiates | 300 ng/mL |
| Benzodiazepines | 50 ng/mL | Phencyclidine | 25 ng/mL |
| Cannabinoids | 20 ng/mL | Propoxyphene | 300 ng/mL |
| Cocaine / Metabolites | 300 ng/mL | | |

Acode 8051B - Postmortem Toxicology - Basic, Blood (Forensic) - Peripheral Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 20 ng/mL | Methadone | 25 ng/mL |
| Barbiturates | 0.040 mcg/mL | Opiates | 20 ng/mL |
| Benzodiazepines | 100 ng/mL | Phencyclidine | 10 ng/mL |
| Cannabinoids | 10 ng/mL | Propoxyphene | 50 ng/mL |
| Cocaine / Metabolites | 20 ng/mL | | |

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Buprenorphine / Metabolite | 0.50 ng/mL | | |

-Analysis by Headspace Gas Chromatography (GC) for:

v.8



**CONFIDENTIAL**

Workorder    13166638
Chain    11440342
Patient ID    BCC13-0267

Page 6 of 6

## Analysis Summary and Reporting Limits:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|----------|-----------|----------|-----------|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

v.8

EXHIBIT 2

```
  P/N
Tx Number: 1301704085     DC# 1303003359
Entered          01/17/13 14:19:25 by C08    /196012
Dispatched       01/17/13 14:20:27 by P04    /241913
Enroute          01/17/13 14:20:27 by P04    /241913
Arrived          01/17/13 14:22:18 by P04    /241913
Closed           01/17/13 14:30:14 by P04    /241913

Type: PWEAP (PERSON WITH A WEAPON)  Priority: 1
Location: 600 FITZGERALD ST ,PHL
District/Sector: 033     Routed: 03

Remarks:

MLES ON LOC ARMED WITH BRASS KNUCKLES & A BAT NFI

14:19 ENTRY
14:20 DE 331 (RPC O/248547 MCCANN, JOSEPH J  O/248600 SCHILL, FRANCES )
14:20 PRIUNIT 331
14:20 DE 332 (RPC O/218493 SLADE, TERRI  O/254458 SMITH, BRIAN ) 326 (RPC O/
219660 HENDERSON JR, JOE B  O/233922 HILL, LYNNEICE N )
14:22 ONS 331
14:30 CLEAR 332 326 331  D/UNF  $P1303003359
14:30 CLOSE
```

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | | CASE NO: M13-10 | |
|---|---|---|---|---|---|
| | | | | INTERVIEWER: Grebloski/Hessser | |
| NAME Michael Rongione | | AGE 42 | RACE W | DOB ▓▓▓▓ | |
| ADDRESS Fitzgerald St. | | APARTMENT NO. | | PHONE NO. ▓▓▓▓ | |
| NAME OF EMPLOYMENT/SCHOOL Unemployed | | | | SOC. SEC. NO. ▓▓▓▓ | |
| ADDRESS OF EMPLOYMENT/SCHOOL | | DEPARTMENT | | PHONE NO. | |
| DATES OF PLANNED VACATIONS | | | | | |
| DATES OF PLANNED BUSINESS TRIPS | | | | | |
| NAME OF CLOSE RELATIVE Ann Marie Rongione | | | | | |
| ADDRESS ▓▓ Fitzgerald St. | | | | PHONE NO. | |
| PLACE OF INTERVIEW Homicide Unit | | | | DATE 1/19/13 | TIME 1:10PM |
| BROUGHT IN BY Police | | | | DATE 1/18/13 | TIME |
| WE ARE QUESTIONING YOU CONCERNING Shooting death of Anthony Rangione and Michael Spering insid 639 Fitzgerald st. | | | | | |
| WARNINGS GIVEN BY | | | | DATE | TIME |
| ANSWERS  (1)  (2)  (3)  (4)  (5)  (6)  (7) | | | | | |

Q. Michael, I am Det. Grebloski and this is Det. Hesser of the Homicide Unit. We are asking you questions about a shooting incident that occurred inside 639 Fitzgerald St. on 1/18/13, do you understand this?
A. Yes.

Q. Were you present when Anthony Rangione and Michael Spering were shot inside 639 Fitzgerald St. ?
A. No.

Q. How far did you go in school?
A. 12th Grade.

Q. Do you read, write and understand the English language?
A. Yes.

Q. Are you currently under the influence of alcohol or drugs at this time?
A. No

Q. Do you go by any other name or nickname?
A. Bubba.

Q. Are you related to Anthony Rangioni?
A. Yes , he's my brother.

Q. Did you go inside 639 Fitzgerald St. on 1/18/13.
A. No , the police wouldn't allow me.

*Michael Rongione  01/19/13*

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

PAGE 2

Q. When was the last time you spoke to or saw Anthony?
A. I seen Anthony on 1/17/12 , Anthony had his firearm on him, he has a permit to carry, it's legal.
   It was about 4PM or 5PM. We were looking for a guy named Joe Mehl and his last name might be
   Mitchell. Also looking for a guy that had Tattoo's and said he was with the Pagan's or Road Runners.

Q. Why were you looking for Mehl and the Tattoo guy?
A. Because they came to Anthony's house on Thursday and threatened Anthony and me. The tattoo guy
   and Mehl.

Q. Why did they threaten you and Anthony?
A. The tattoo guy said Anthony owed him money. It was somewhere between 2 and 8 thousand dollars.
   The tattoo guy said he ran with the Pagan's and the Road Runners.

Q. What was the money allegedly owed for?
A. It was from Dr. O'Brien who is in Levitown now. A male by the name of Mikey Thompson works for
   Dr. O'Brien and has records of who owes Dr. O'Brien money. Thompson has a guy named Joe Mehl who
   solicits people for Dr. Obrien to get prescription drugs. Anthony had gotten in an auto accident and
   That's how he met Dr. O'Brien for therapy. Then Dr. O'Brien told Anthony he owed him money.

Q. Where did Dr. O'Brien have his office?
A. It was right off of Porter near Shunk St., It says Dr. Ficchia now on the building.

Q. Do you know how many guns Anthony had?
A. He had quite a few in cases. He had bows, he was an avid hunter.

Q. Do you know Michael Spering?
A. Yes , he was staying in the back bedroom at Anthony's house.

Q. Did you ever see Michael with a handgun?
A. No , Michael never had handguns.

Q. When was the last time you saw Michael?
A. Maybe about 5 or 6 days ago.

Q. Do you know if Anthony was using any type of narcotics?
A. No, not that I know of.

Q. Do you know if Michael was using any type of narcotics?
A. Yes he was on a lot of medication. He had steel plates in his body from a prior auto accident, he was
   run over by a car.

Q. Did Anthony tell you if anyone besides Joe Mehl has threatened him recently?
A. No, I don't know anyone else.

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

PAGE 3

Q. Could you describe the tattoo guy that threatened you and Anthony on Thursday?
A. White male, tattoo's all over his head and neck. He was wearing a black baseball cap. About 6'5", 260 pounds , approximately 40 years old.

Q. Could you describe Joe Mehl to me?
A. White male, skinny, cocky. Wearing a dark blue hoody and Blue jeans.30-40 years old.

Q. Did they have a vehicle that Thursday?
A. Yea, a grey Dodge Durango with tinted windows. It's usually parked around Shunk and Mildred. Joe Mehl lives at 2422 Mildred St. His car is always parked near there.

Q. Did they have handguns when they were there on Thursday?
A. No , The tattoo guy had brass knuckles and Joe Mehl had a metal pipe.

Q. Were you or Anthony injured on Thursday after the confrontation with Joe Mehl?
A. No , we stood away from it , I called the police and they left before the police arrived.

Q. Have you seen Joe Mehl or the tattoo guy since Thursday?
A. No.

Q. Do you know if Anthony kept a large amount of money in his house?
A. No , my brother never kept a large amount of money in the house.

Q. Michael at this time would you read over your 3 page interview and if it is correct please sign and date each page. Please let me know if there is anything else you would like to add to the interview, okay?
A. It's okay.

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | | CASE NO: M13-10 |
|---|---|---|---|---|
| | | | | INTERVIEWER: N. Williams / Singleton |
| NAME Anna Marie Rongione | | AGE 67 | RACE W/F | DOB ▉▉▉ |
| ADDRESS ▉ Fitzgerald Street | | APARTMENT NO. house | | PHONE NO. ▉▉▉ |
| NAME OF EMPLOYMENT/SCHOOL Unemployed | | | | SOC. SEC. NO. ▉▉▉ |
| ADDRESS OF EMPLOYMENT/SCHOOL n/a | | DEPARTMENT n/a | | PHONE NO. n/a |
| DATES OF PLANNED VACATIONS n/a | | | | |
| DATES OF PLANNED BUSINESS TRIPS n/a | | | | |
| NAME OF CLOSE RELATIVE Michael Rongione (son) | | | | |
| ADDRESS ▉ Fitzgerald Street | | | | PHONE NO. same |
| PLACE OF INTERVIEW  Homicide Unit  750 RACE STREET | | | DATE 01-18-13 | TIME 8:19pm |
| BROUGHT IN BY Officers O'Neill # 3778 and Gorman # 5786 | | | DATE 01-18-13 | TIME 6:50pm |
| WE ARE QUESTIONING YOU CONCERNING | | | | |
| WARNINGS GIVEN BY N/A | | | DATE | TIME |
| ANSWERS          (1)          (2)          (3)          (4)          (5)          (6)          (7) | | | | |

Q:    Miss Rongione I'm Det. Singleton and you've met my partner Det. Williams. We will be asking you several questions concerning the shooting death of your son, Anthony Rongione and Michael Spearring inside of 639 Fitzgerald Street on January 18, 2013 at approximately 5:56pm, ok?

A:    Ok.



| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

████████████████████████████████████

████████████████████████████████████ t

████████████████████████████████████ It

A:   Yes. They always kept the doors locked.

████████████████████████████████████

████████ The ██████ "Where ██ the ███ in the bedroom shot?"
████████████ was shot too.

Q████
A████

Q████
A████

Q████

Q:   Did anything seem to be out of place?

A:   No, but the guy next door has a surveillance camera. His house is the second house
from the corner of Fitzgerald Street.

Q:   Is the house with the camera on the same side of the street as your son Anthony's
house?

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA. |
|---|---|
| ***CONTINUATION SHEET*** | POLICE DEPARTMENT |

A:   Yes.

Q:   Can you describe the house with the camera?
A:   It's completely gated.

Q:   Do you know the owner's name with camera at his house?
A;   His first name is ▉▉▉▉▉▉



Q:   Do you know if your son Anthony was having a problem with anyone?
A:   Yesterday he was approached by Joe Mehl and another guy. They were going to hit
Anthony with a pipe and the other guy was going to use brass knuckles on him. Joe
Mehl told my son that he owed him money. My son asked him, "Who are you. I don't
owe you no money." Joe Mehl said, "Well you live at 639 Fitzgerald and your name is
Anthony Rongione." Joe showed Anthony a business card from Dr. O'Brien and said,
"You owe him money." Then my other son Michael Rongione came walking up and he
said, "What's going on." Joe told my son Michael to keep walking and that it didn't
have anything to do with him. Michael told him that it is my business when it comes to
my brother. Then Joe said, "Oh yeah? You're going to get it too." That's when Joe
Mehl pulled out the pipe and the other guy pulled out the brass knuckles. The black
guy, More More, from across the street saw it and told Michael, "Watch his hands, he
got brass knuckles." Then Michael ran into the house to get something. I yelled out the
window and told Joe Mehl that he better get moving, because I will shove that pipe
right up his ass and I will call the cops. Joe said, "You a tough lady." Then More

*Anna Marie Rongione*

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

More told Joe that's his mom. Then Joe looked and said, "I'm a Mitchell too." I told him that he wasn't nobody. Then I said, you and your tattoo friend get lost. Then they got in the car and left.

Q;   What time yesterday did this incident take place?
A;   I'm going to say 2pm. I know that it was in the afternoon.

Q;   Did you call the police and report this incident?
A;   Yes.

Q:   Did the police respond?
A:   Yes. The police walked over and was talking to Anthony and Michael Spearring.

Q;   Can you give me a description of the guy that was with Joe Mehl?
A;   He was a white guy, he had tattoos on the back of his neck and head. He was bald. He was about the same age as Joe Mehl, in his forties. He had on a jean jacket and jeans. He was the guy with the brass knuckles.

Q:   What was Joe Mehl wearing at the time of this incident?
A:   He had on a black and dark gray hoodie. He had his hoodie up. He was looking right up at me and talking to me. I looked him right in his face. I didn't know who he was at that time. After he said, "I'm a Mitchell" I knew who he was.

Q:   How do you know Joe Mehl?
A;   I don't.

Q:   How do you know of Joe Mehl?
A:   I've heard of him.

Q:   From whom did you hear of Joe Mehl?
A;   I can't think of the names of the people who told me about him.

Q:   What were you told about Joe Mehl that let you know that you were talking to Joe Mehl at the time of the incident yesterday?
A;   When he mentioned the name Mitchell I knew who he was.

Q:   How is the name Mitchell associated with Joe Mehl?
A;   Because the Mitchell's are like second cousins to the Mehls?

Q:   How are you sure that it was Joe Mehl that you were talking to yesterday?

*Ann Marie Rangere*

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

A:     After the incident I went over to my girl friend's house, Katherine Mitchell. I spoke with her son Richard Mitchell. I said to him, "Where does your cousin Joe Mehl live. What does he look like and what does he drive?" He told me the description of him and then I asked him what type of car does he drive? He told me a gray Dodge Durango.

Q;     Did Richard say that his cousin's name was Joe Mehl?
A:     Yes.

Q:     Can you describe the car Joe Mehl and the guy with the tattoos left in?
A:     It was a gray Dodge Durango. It looked like an older model.

Q:     How many times have you seen Joe Mehl?
A:     Just yesterday.

Q;     Det. Williams is going to show you a single photo, can you tell me if you recognize this person?
A;     That's Joe Mehl. (photo shown of Joseph B. Mehl 3rd. Assigned OLN # 21684374).

Q:     Was there any physical altercation yesterday between Joe Mehl and Anthony?
A:     No, they didn't hit each other at all.

Q:     Do you know what the altercation yesterday was about?
A:     Joe Mehl wanted money from Anthony. Anthony didn't even know him.

Q:     Who produced the business card from Dr. O'Brien?
A:     Joe Mehl.

Q:     Do you know who Dr. O'Brien is?
A:     He was Anthony's therapy doctor from a car accident. He didn't want to even give Anthony his medical records until Anthony gave him money.

Q;     Where is Dr. O'Brien's office located?
A;     49 Rolling Lane in Levittown Pa.

Q:     Is this the office Anthony was going to for his therapy?
A:     No, he was going to his office of Broad Street. He did go one time to the office at 49 Rolling Lane.

Q:     What's Joe Mehl's relationship to Dr. O'Brien?
A:     Joe Mehl works for him.

*Anne Marie Rogers*

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA |
|---|---|
| *CONTINUATION SHEET* | POLICE DEPARTMENT |

Q;   How do you know Joe Mehl works for Dr. O'Brien?
A;   I was told Joe Mehl brought people in to the doctor. I don't know how they worked, but I know that they know each other very well.

Q:   What's Anthony's cell phone number?
A:   ███████████

Q;   What's your cell phone number?
A:   ███████████

Q:   Who owns the property at 639 Fitzgerald Street?
A:   That's Anthony's house.



| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT HOMICIDE DIVISION | CASE NUMBER: 13-10 |
|---|---|---|
| | | INTERVIEWER: Santamala |

| NAME: Anna Jackson | AGE: 50 | RACE: WF | SEX: FEMALE | DOB: ▓▓▓▓ |
|---|---|---|---|---|

| ADDRESS: ▓▓ Fitzgerald St | APARTMENT #: | HOME TELEPHONE# ▓▓▓▓▓ | OTHER CONTACT# |
|---|---|---|---|

| NAME OF EMPLOYMENT / SCHOOL: N/A | | SOCIAL SECURITY # ▓▓▓▓▓ |
|---|---|---|

| ADDRESS OF EMPLOYMENT / SCHOOL: | DEPARTMENT: | WORK TELEPHONE# |
|---|---|---|

| DATES OF PLANNED VACATIONS: |
|---|

| DATES OF PLANNED BUSINESS TRIPS: |
|---|

| NAME OF CLOSE RELATIVE OR ALTERNATE CONTACT PERSON: Robert Terlinto (friend) | RELATIONSHIP: Fiance |
|---|---|
| ADDRESS: Same | TELEPHONE# ▓▓▓▓ |

| PLACE OF INTERVIEW: Homicide Unit | DATE: 1/18/13 | TIME: 9:10PM |
|---|---|---|
| BROUGHT IN BY: Police | DATE: 1/18/13 | TIME: |

| WE ARE QUESTIONING YOU CONCERNING: The Homicide Investigation of two white males inside 639 Fitzgerald St on 1/18/13 |
|---|

| WARNINGS GIVEN BY: | DATE: | TIME: |
|---|---|---|

| ANSWERS: | | | | | | |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

Q  Do you read, write and understand English?
A  Yes

Q  Do you go by any other names?
A  No

Q  Are you on any medication that would affect your judgment at this time?
A  No

Q  What is your relationship to Michael Spering?
A  He is my brother

Q  I am showing you a PennDot driver's license photo. Do you know this person?
A  That is Michael (showing #21688716)

Q  When was the last time you spoke to Michael?
A  Yesterday on Fitzgerald St. We just spoke briefly.

Q  I am showing you a second photo, do you know this male?
A  That is Anthony Rongione (showing PennDot photo #21951372)

Q  What is your relationship to Anthony?
A  He is my fiancé's nephew

| INVESTIGATION INTERVIEW RECORD | CITY OF PHILADELPHIA | |
|---|---|---|
| **CONTINUATION SHEET** | **POLICE DEPARTMENT** | |
| NAME:<br>Anna Jackson | PAGE#<br>2 | CASE#<br>13-10 |

Q   Do you know of any problems Michael and Anthony were having?
A   I know yesterday, I'm going to guess, between 4:00 and 5:00 PM in the afternoon I heard hollering outside. I looked outside and saw two white males at Anthony's door. Anthony said something to them and they walked over to his mother's house across the street. She answered the door and said something to them but I don't know what and I went back in the house. I looked out again and saw the two guys getting back into a truck. I saw the one had brass knuckles. He was a tall thin white male wearing no jacket but a t-shirt with no sleeves. He had a lot of tattoos. I would say he was late 20's, early 30's. The other male was on the other side of the street and the truck and the door to the truck which was open was blocking my view of him.

Q   Did you ever see either of these two males before?
A   Never

Q   Describe the vehicle they were getting in to?
A   It was olive green if I'm not mistaken; it was bigger than an SUV.

Q   Did you ever find out who or what these two males were looking for?
A   No

EXHIBIT 3

File #: 209C-PH-110018 (WC2)
Date: 07/23/2015
(BAC)

| | |
|---|---|
| JM: | JOSEPH MEHL |
| DH: | SA DIANA HUFFMAN |
| JG: | TFO JOSH GILL |
| SH: | SSA STEVE HEANEY |
| MM: | MARY MONTANERO |
| UI: | UNINTELLIGIBLE |
| OV: | OVERLAPPING VOICES |



File #: 209C-PH-110018 (WC2)
7



JG:    Do you know who um, Anthony Rongione is? He owed the, Doctor O'Brien some money. 11,000 dollars. You went to his house with a business card of O'Brien's, with Pat.

JM:    (UI) Street.

JG:    You got into an argument with his mom. You had-you had a-a pipe. Pat had brass knuckles.

JM:    This is on, back, by, s-Second Street.

JG:    His brother was there with him.

JM:    Yeah.

JG:    Do you remember that?

JM:    Yeah.

JG:    What happened?

JM:    We got out of the car and knocked on the door. To be hon- I mean, a-a-again you want me to be honest with you. I'm gonna tell you straight. We had the wrong house. We went to the wrong person. Supposedly.

JG:    (UI) you talked to the right person.

JM:    I was-I was, there was supposed to be two brothers or something like that. We went there with-with, to go talk to the brothers about the money.

File #: 209C-PH-110018 (WC2)
8

DOOR OPENS AND CLOSES

JG:     Right. And what happened?

JM:     Yeah, the brother went in the house. Came runnin out of the house with a baseball bat. Or somethin like that. And we were ready to start fighting in the middle of the street.

JG:     Did you guys start fighting?

JM:     No, we left.

File #: 209C-PH-110018 (WC2)
10



JM:    No, I went there earlier. The only thing, I was there for the first thing, that big argument and then we, we left. And then he said he was goin back. Cause he told me afterwards he was goin back. I said, I'm not, I'm not going. The dude was ready to call the cops on us. No, what are you talking about? And so we left. Why would we go back? We'll do it another way.



DH:    Who told you to go talk to him?

JG:    O'Brien?

JM:    Oh, yeah, O'Brien, yeah.

JG:    What did he say? Did he offer you money?

JM:    No, it was just, no. All I, um, it's like one of the ways of getting me back in. You know I was booted out again and you know Patrick was like, I'll-I'll get you back in. I said, no, fuck that he's going to let me back in himself. Because when he moved from 18th Street to Broad Street, he had nobody. So I had to go get everybody all together again and went and went over there and put two people on the corner of 18th Street then pull all them people over to come, leave 18th Street to come over to him on Broad Street when he left. I had business cards made up and (UI).

File #: 209C-PH-110018 (WC2)
11

Stealing all-all their customers, you know, that I had originally brought there. So. And that got me back. I must've got kicked out like ten times.

JG:   But did he approach Pat about talking to Rongione?

JM:   Yeah.

JG:   Okay.

JM:   And-and the Chinese dude and his ex-wife.

JG:   Okay.

JM:   But we never got to his ex-wife.

JG:   Okay. Were you there, present for those conversations?

JM:   Yeah, for the wife definitely.

JG:   Okay. What about the Chinese- the Asian guy?

JM:   Yeah, definitely.

JG:   Okay. But not Rongione?

JM:   No.

JG:   But Pat came to you and said, hey, the doc wants me to do this guy too.

JM:   Uh huh.

JG:   Did he say collect the money, threaten em, or hurt em?

JM:   No, he said get the money any way possible. So that's-that's either way. Because there's only one way.

JG:   Okay.

11

EXHIBIT 4

<u>UNITED STATES V. WILLIAM J. O'BRIEN III</u>

Transcript:  December 18, 2012

<u>LEGEND</u>

AR:    ANTHONY RONGIONE
*WJO:*   *DR. WILLIAM O'BRIEN*
*ANR:*   *ANGELA RONGIONE*
*UM:*    *UNKNOWN MALE*
*UF2:*   *UNKNOWN FEMALE*
*UF3:*   *UNKNOWN FEMALE*
*UI:*    *UNINTELLIGIBLE*
*OV:*    *OVERLAPPING VOICES*

---

**SCRATCHING SOUNDS**

**BREATHING**

**SPEAKING IN BACKGROUND, PHONE RINGING**

WJO:   So, there should be [UI] and they're under a contract [UI]. They have to pick a pharmacy. Obviously [UI].

**SPEAKING IN BACKGROUND**

WJO:   Right.

**SPEAKING IN BACKGROUND**

WJO:   Okay. That's fine. Well, do you wanna not fill any of them? I'm okay with that. Alright [UI].

**SPEAKING IN BACKGROUND**

WJO:   Right. Patrick Treacy. He's got a [UI] he's got a pick a pharmacy.

**SPEAKING IN BACKGROUND, RATTLING SOUNDS, TRAFFIC IN BACKGROUND**

WJO:   [UI]

AR:    I've been horrible I-I've…

1

WJO120589

File #: 209C-PH-110018 (WC2)

2

WJO:   You sound like you're having a tough day.

AR:   You know what, I don't understand I was up in Lundy's office yesterday, okay?

WJO:   Mhmmm.

AR:   There was two things denied an MRI for my neck, for $275 dollars.

WJO:   You were denied?

AR:   Yeah because they wanted, you know, eh, I paid for it.

WJO:   Right.

AR:   With the insurance.

WJO:   Right.

AR:   Your name was not even on any of the forms, okay. None of it.

WJO:   I don't know why that is.

AR:   I don't know.

WJO:   [UI]

AR:   Now, Lundy's been asking for the bills.

WJO:   [UI]

AR:   And actually James Conway he told me, he's been asking for the bills.

WJO:   [OV] Anthony-Anthony. Anthony, trust me.

AR:   That's not what he told me…

WJO:   [OV] [UI] Stuff over. I've been in this for 17 years, kay? Some of the attorneys [UI] doctor someday.

AR:   Okay.

WJO:   Okay? I've worked with everybody, like over 900 attorneys.

AR:   Right.

File #: 209C-PH-110018 (WC2)

3

WJO:   They don't know I'm happy to cut my bills and stuff like that, kay? These guys know that they're supposed to call and say, oh he owes you how much? Hey, can ya cut a deal? And they're supposed to go to you...

AR:   Right.

WJO:   And say, look, you're medical bills are $50 grand. We [UI] pay for $9.

AR:   Right.

WJO:   And then you can say, oh wow. Right? Instead, they took their money. They tried to fuck me...

AR:   [OV] [UI]

WJO:   [OV] And that leaves... it puts you and I in a bad situation.

AR:   This-this is-this is-this is what [UI]...

WJO:   And we don't want to be in a bad situation.

AR:   No. This is what I-this is what I told her, I wanted to talk to you because... I settled for $11,000 dollars. I tell you what I settled for.

WJO:   Right.

AR:   What's this? Nothin. Okay?

WJO:   Right.

AR:   My truck transmission is gonna cost me $6,100 dollars.

WJO:   Right.

AR:   I owe my mother money because she's been helping me live off my mortgage.

WJO:   What did Lundy get?

AR:   Lundy got, um, $6,000 something. I don't, I...

WJO:   So out of the $11 you gave him $6?

AR:   Yeah. They got 33 of their percent. Whatever it came out to be.

**PHONE RINGING**

WJO120591

File #: 209C-PH-110018 (WC2)

4

WJO:  Well that means you just…

AR:  $15… Let's do it this way. It was $15,000, so whatever that percentage is.

WJO:  Well then you did $5.

AR:  Okay, $5,000. So…

WJO:  [OV] So that means you walk out with $10.

AR:  [UI] It was $11,000.

**PHONE RINGING**

WJO:  You had told me you'd settle for $30.

AR:  Well it's supposed to settle for $30.

WJO:  Okay.

AR:  Okay? They're holding, and I told you, my ex has arrears for [UI].

WJO:  Oh, for the child support?

AR:  For the child.

WJO:  But it's still your money.

AR:  But they're holdin it, that she shouldn't even be gettin that much.

WJO:  Doesn't matter. [UI]

AR:  I understand that.

WJO:  Right.

AR:  I have to go to court the 21st to fight…

WJO:  [UI]

AR:  It's only about $800 dollars…

WJO:  Okay.

AR:  The other thing is, like I said, I have to pay. I mean, it's not your problem, but a transmission, I bought my mom's car. I had to pay mom back.

WJO120592

File #: 209C-PH-110018 (WC2)
5

WJO:   I understand.

AR:   I have-I have $2,800 dollars left. [UI]

WJO:   I totally understand.

AR:   And that's all I have.

WJO:   Okay.

AR:   Now, I know this is what I owe you. I mean, even if I could pay you...

WJO:   I'll tell you what I'll do, man.

AR:   [OV] We... I mean, I'm-I'm hurtin so bad.

WJO:   [OV] Anthony, [UI]...

AR:   I don't know what to do. I'm ready to-I'm ready to bust [UI].

WJO:   Okay, here's the thing. You ready? I understand what you're saying. Okay? Lundy's the one who screwed you. Okay? I wasn't who screwed you, I'm the one who's done all the health care.

AR:   No, you did.

WJO:   I put the bills in, I did everything I can. I'm a keep doing everything I can to help you. Okay? Cause even when this is over, I'm still your doctor.

AR:   Right.

WJO:   I still going to be writing your meds...

AR:   Right.

WJO:   Still [UI] forms. Okay?

AR:   [OV] Yeah-yeah, that-that-that's what I need because I don't get paid.

WJO:   And Anthony, I'm happy to do that for you. Okay? Now, I wanted $3,000 dollars. Can't get it. Okay? [UI] $2,800 left, whatever. I totally understand. Can you give me $2,200?

AR:   Let me see what my 3 mortgage payments are, okay?

WJO:   But see, here's the problem. I understand what you're saying.

WJO120593

File #: 209C-PH-110018 (WC2)

6

AR:     Right.

WJO:    When did-I become the fucking last guy in the line?

AR:     No you're, you shouldn't be the last guy that I...

WJO:    Where should I be? I should be in the front of everybody [UI].

AR:     [OV][UI] You should a got your money, right.

WJO:    No. So, I should a got, now remember, the bills were $ 11,000. I guarantee ya, those guys would settle it for $5.

AR:     [EXHALES]

WJO:    I guaren-fuckin-tee ya.

AR:     I believe it.

WJO:    Okay.

AR:     I believe it.

WJO:    That means I got $5 off the top.

AR:     Right.

WJO:    Okay? They get their piece, I got my piece and then you're left with everything else.

AR:     Right.

WJO:    Not a problem with it. That didn't happen.

AR:     But why weren't the bills, I don't understand.

WJO:    They were.

AR:     But see, if I go on, if you go on Geico...

WJO:    Mhmmm.

AR:     There's nothing submitted. That's why...

WJO:    [UI] You'd already maxed.

AR:     [UI] I'm gonna get a print out.

File #: 209C-PH-110018 (WC2)
7

WJO:   You already maxed.

AR:    I understand that.

WJO:   Once you're maxed, they don't put em in. They just kick em back to me sayin they're maxed.

AR:    But, see when they come back to you, this is what I don't understand. It's confusing.

WJO:   [UI]

AR:    I went to Sedacca, I went to Sedacca twice, right.

WJO:   Right.

AR:    And then I went to the-the ambulance and then I went to you. So where did that money go at? That's what confuses me.

WJO:   When Geico did their $5,000 pay out...

AR:    Right.

WJO:   They pay people up to $5,000 dollars. You can get that pay out sheet from your attorney.

AR:    Right.

WJO    You have your attorney call Geico, and go, give me that pay out sheet.

AR:    I am going to get...

WJO:   So I can see where the money went, okay?

AR:    [OV] Yeah, I wanna, I want that.

WJO:   Then you see where the money went, okay? But Sedacca's paid up.

AR:    Right.

WJO:   He didn't ask for any money. Then my people ask for money, so you know they got paid before me.

AR:    Well, the [UI] I told them Lundy wasn't payin em.

WJO:   Right.

WJO120595

File #: 209C-PH-110018 (WC2)
8

AR:     But I-I told them right off the bat, they wanted $275 dollars...

**KNOCKING**

WJO:    Yeah.

ANR:    Hey. Here, I just wanted to give you, um, [UI].

WJO:    That's fine.

ANR:    [UI]

WJO:    That's great.

ANR:    [UI] Do you need anything?

**PHONE RINGING**

WJO:    No, I'm gonna go out and then I have a [UI] after I get done [UI].

ANR:    Uh oh [UI].

WJO:    Anthony and I are gonna have a wonderful discussion.

ANR:    [LAUGHS]

AR:     It's just-it's just-it's just aggravating because [UI].

WJO:    [UI] I-I need fuckin money. I don't have any.

AR:     Right.

WJO:    So, normally, okay, what I would say is this...

**PHONE RINGING, SPEAKING IN BACKGROUND**

WJO:    I'm not going to talk to you or see you until I get $5,000 dollars. I'll throw you under the
        bus and then I'm gonna sue you for the $11,000. You're gettin mad, go to your attorney,
        he's gonna fuckin flip the fuck out. Attorney's gonna call me and within 6 weeks to 8
        weeks, usually after we go to court, your flippin out, the attorney's flippin out, I would
        get a check for $3,500.

AR:     Right.

WJO:    That's normally what I would do. I don't wanna do that.

WJO120596

File #: 209C-PH-110018 (WC2)
9

AR:     Alright, I-I-I…

WJO:   But I'm happy to.

AR:     I'm-I-I like you…

WJO:   I like you, too.

AR:     I like [UI]…

WJO:   This is what I wanna do. I wanna get paid for the work I did.

AR:     Okay.

WJO:   I'm willing to take less, okay? You just said, well I got $2,800 left over.

AR:     Right.

WJO:   I thought I should be nice, say $2,200.

AR:     Okay.

WJO:   Then you say, well I got 3 mortgages. I'm like, well I ain't fuckin takin $1,000 [UI]…

AR:     [OV] [STUTTERS] I understand what you're sayin.

WJO:   So how bout we do this, can you give me $2,000 dollars? And we call it even.

AR:     I can-I can-I can do that.

WJO:   You can do that?

AR:     I can do that.

WJO:   When can you get me the $2,000 dollars?

AR:     Well, I have to wait for the checks to clear. The whole thing, okay?

WJO:   No. Busy tomorrow?

AR:     Oh, um….

WJO:   Get me the check tomorrow. I want-I want the money tomorrow.

AR:     Well see I can't get it, it's in the bank already.

WJO:   Which bank?

WJO120597

File #: 209C-PH-110018 (WC2)
10

**PHONE RINGING**

AR:     My TD Bank.

WJO:   Right, when does your checks go in? They didn't go in today.

AR:     Yesterday.

WJO:   Right. So they'll clear tomorrow. Bring a check tomorrow for $2,000 dollars. I'll write the check, I'll deposit it. You write me a check tomorrow, I'll put it in. It ain't gonna clear till Friday.

AR:     Okay.

WJO:   But if it bounces, I will fuckin hunt you down like a dog and hurt you.

AR:     Okay.

WJO    Is that clear?

AR:     It's clear.

WJO:   Are you sure?

AR:     Yes.

WJO:   If it doesn't bounce, I'll write the rest off, we start from scratch and I'll keep hookin you up.

AR:     Okay.

WJO:   How's that?

AR:     That's fair.

WJO:   So you got a great deal.

AR:     It's fair, it's fair.

WJO:   You got more than a great deal, alright?

**SCRATCHING SOUND**

WJO:   Now I'm gonna write this down for ya.

**PHONE RINGING**

File #: 209C-PH-110018 (WC2)
11

AR:     See if my wife, the ex, the witch wasn't holdin up my money, that's-that whole thing...

WJO:    You're gonna get that.

AR:     Right. And you were gonna get that-that's what I'm sayin [UI].

WJO:    But you know what? I'd rather have the money tomorrow. $2,000 tomorrow helps me more than the $3,000 in two weeks.

AR:     Okay.

WJO:    And you know what? It's better for you.

**PHONE RINGING**

WJO:    I just had someone else came to me, $20,000 dollars [UI]. Okay? They're getting their money middle of January. [UI] $20,000 to me, to my company, okay? $20 grand in the middle of January. He said doc, I you're your tight for Christmas. If I gave you $15,000 Wednesday, are we good? I'm like, I'm great. So he's supposed to come tomorrow with $15, now he just saved $5 grand.

AR:     Right.

WJO:    It's a pretty good deal, right?

AR:     Right.

WJO:    For everybody.

AR:     But see...

WJO:    But normally I'd have money. I'd be like, no, [UI] fuckin $20 grand.

AR:     Right. See, what-what's not fair though, is where the fuck did this money go at the $5,000 dollars.

WJO:    [OV] That's what you gotta talk to him about.

**PHONE RINGING**

AR:     And that's what I wanna know because they said they... you didn't send the bills in, this is what they said.

WJO:    Bullshit.

AR:     Now, I-I don't know who's lying about...

File #: 209C-PH-110018 (WC2)
12

WJO:   Anthony.

AR:   I-I-I-I believe you...

WJO:   [OV] Even if I did send the bills in, the $5,000's maxed. I sent the fuckin bills in, I've been treating you since September.

AR:   Yeah.

WJO:   I've been sendin bills every couple weeks.

AR:   Well, I didn't see one bill on there for you and that's what I'm sayin...

WJO:   [OV] [UI] They didn't process it.

AR:   [OV] And I didn't deny, and I-and I didn't deny you. They're saying I denied you a [UI].

WJO:   [UI] What Lundy did, was he had you sign a document that they don't have to pay any attorney, any doctors. He blanketed-he blanketed the doctors with a-with a form, a legal form that protects him. [UI] pay doctors, and he blamed you. You're allowed to do that.

AR:   So he fucked me, [UI].

WJO:   He fucked over your attorn-he fucked all the doctors and left you out to dry. But he got his piece.

AR:   But he fucked me.

WJO:   Of course he did.

AR:   Well, but see, the whole thing, even my transmission's bad right now. Right?

WJO:   Right. [UI]

AR:   He was supposed to get that fixed for me.

WJO:   Who?

AR:   Uh...

WJO:   Lundy?

AR:   James Conway, or whatever the fuck his name is that [UI]...

WJO:   You're still 44?

WJO120600

File #: 209C-PH-110018 (WC2)

13

AR:     And Lundy comes in to me...

WJO:   How old are you?

AR:     44. I'll be 45, uh, geez January 24th. It just pisses me off because that-that-that money should a been there for you and I don't know who got the money and I'm gonna find out who got the money.

WJO:   Well, the problem is you can't control who they pay. So they'll turn around and say ah well we paid...

AR:     Well, I gotta see it, they gotta show me.

WJO:   Right. But that's the thing too, the-the attorneys don't give a fuck. They just try and take money as fast as they can. You know what I'm sayin?

AR:     Right. And the other thing is, like I said, I gotta come to you. I don't get paid from them. You know?

WJO:   Who?

AR:     My company.

WJO:   I'll fill out the paperwork for you.

AR:     No-no-no. But like I said, it gets into a situation that I don't get paid from my company because fuckin Lundy, fucked whoever...

WJO:   Right.

AR:     And then-and then left me out to fuckin dry.

WJO:   Well, they-they don't care...

AR:     [OV] Now listen, I...

WJO:   If you blow up the relationship with me cause they're like, well go find another doctor...

AR:     No, it's not...

WJO:   [UI] Doctor's gonna fill the shit out for you?

AR:     Right and I-and I'm in pain that's the whole thing. I'm the one that's fucked up here.

WJO:   Right. Well you're the one who needs help.

WJO120601

File #: 209C-PH-110018 (WC2)
14

AR:    I'm really getting to hate this fuckin world anymore. That's why I wanna [UI] talk to you because not for nothin, uh, Angela is...

**PHONE DINGING**

AR:    I guess she's your secretary, but...

WJO:    Well her job...

**SCRATCHING SOUNDS**

AR:    Her job [UI].

WJO:    You know what the girls are here for.

AR:    Yeah.

WJO:    They work hard and they're tryna get paid [UI].

**SCRATCHING SOUND**

AR:    The point is...

WJO:    [UI] Something's wrong with you.

AR:    No-no-no, its fine. But alls it is-is like I said, I wanted to come last week after I came here.

WJO:    Right.

AR:    She wouldn't let me come back in to drop off the forms here.

WJO:    Why?

AR:    Because sh-you're too busy.

WJO:    Doesn't matter, can't see the form.

AR:    Know what I mean?

WJO:    I personally prefer to do it this way, so if I have a question, you're right in front of me.

AR:    Well that's what I wanted though...

WJO:    [OV] You see what I'm sayin?

AR:    I went out to talk to you, that's why I said [UI], here's my number [UI].

File #: 209C-PH-110018 (WC2)
15

WJO:   Yeah, it's right here in front of us, so there's no issues. You were out of work from August 22nd, right?

AR:   [UI]

WJO:   [UI] To the work.

AR:   [UI] February 1st, which I would say I-I wanted to be out until the end of February, but...

WJO:   So you want [UI] out till the February 28th?

AR:   Yeah. Cause, see, the other thing is I gotta start payin for my medical, too, so. Not... and in March 15th I gotta start payin for my medical, too. So that's where I'm gettin screwed now, too, if I can't go back to work. I gotta start payin for it. I'm in a really fuckin shit creek, you know what I mean, doc?

WJO:   You'll get through it.

AR:   [UI]

WJO:   You know what, the key is, the first thing is, look, I can fill out forms, I can help you any which way I can, but, and I will. Second thing is, you're gonna get through it.

AR:   It's just hard livin off a somethin I should a had fuckin... I-I up-upgraded my under insured motor's to $300,000 because this is-this would a been at least half a that, you know what I mean?

WJO:   Well, it's ridiculous that, you know, there was no insurance there when the guy hit ya. Like you said, he was [UI].

AR:   Oh, I mean, he-I mean he had no driver's license, I found out.

WJO:   Yeah, that's ridiculous.

AR:   I had to shoot my own insurance and now they're pissed at me cause they don't wanna pay for my fuckin truck, you know what I mean? $5,000.

**SPEAKING IN BACKGROUND**

AR:   They always said you're very busy. And I know you are, you're a doctor...

WJO:   [UI] says I'm a lazy doctor. And the thing about being busy is, um, you know, I know doctor's who suck that are busy cause they see more people, one person for close to an hour.

File #: 209C-PH-110018 (WC2)
16

AR:     Right.

WJO:    I fuckin bank the patients like crazy, man. But, and you know this just like I do, the
        money's not there like it used to be. [UI] paid like I used to be, look, I got $11,000 dollars
        in charges, I'm takin $2. It's not what I want, it's what we have to do right now.

AR:     Right.

WJO:    So we take [UI].

**SCRATCHING SOUND**

WJO:    And Anthony, I'm happy to help you.

AR:     Okay, thank you so much.

WJO :   I'll see you tomorrow with that check….

**SPEAKING IN BACKGROUND, PHONE RINGING**

AR:     Okay, I do. Yeah. [UI] find out where this fuckin money went. [UI] somethin wrong with
        that, you know?

WJO:    I'll see you tomorrow.

AR:     Okay.

WJO:    When you get here, I'll call Ang and just bring you right back. [UI]

AR:     [UI]

WJO:    [UI]

AR:     Alright.

WJO:    [UI]

**SPEAKING IN BACKGROUND**

**TRAFFIC IN BACKGROUND, WIND**

**DOOR OPENING**

AR:     [UI] There's an envelope on her desk I need.

UM:     [UI]

WJO120604

File #: 209C-PH-110018 (WC2)
17

AR:     [UI]

**CONVERSATION IN BACKGROUND**

AR:     It's right there [UI]. [UI] envelope [UI].

UF2:    Um, an empty envelope?

AR:     Yeah, [UI].

**CONVERSTATION IN BACKGROUND**

UF2:    Just an empty envelope?

AR:     Yeah, [UI].

**CONVERSTATION IN BACKGROUND**

AR:     [SIGHS]

**BEEPING SOUND, TRAFFIC IN BACKGROUND**

**DOOR OPENING**

**SPEAKING IN BACKGROUND**

**RUSTLING SOUND**

AR:     When's Angela come back?

UF3:    Scuse me?

**SPEAKING IN BACKGROUND**

AR:     [UI]

UF3:    Um, after 3 I believe.

AR:     Alright, I'll come back [UI].

UF3:    Okay.

**—END—**

WJO120605